**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

04 APR -9 PH 3: 27

U.S. ... ... URT
N.D. ... AMA

LYDIA HOVANSKI,                    )
    **Plaintiff,**                    )
                                      )

**vs.**                    )        **CIVIL ACTION NO.:**
                                        )        **CV-03-S-0838-S**

**AMERICAN INCOME LIFE INSURANCE**    )
**COMPANY; REA AGENCY CORPORATION,**  )
**ALLAN JENNINGS, in his official capacity as** )
**State General Agent for AMERICAN INCOME** )
**LIFE INSURANCE COMPANY and**        )
**individually, and OFFICE AND**       )
**EMPLOYEES INTERNATIONAL UNION,**    )
**LOCAL 277**                          )
                                      )
    **Defendants**                    )

### PLAINTIFF'S OPPOSITION TO DEFENDANTS ALLAN JENNINGS AND REA AGENCY CORPORATIONS MOTION FOR SUMMARY JUDGMENT

COMES NOW the plaintiff, Lydia Hovanski, (hereinafter "Hovanski") by and through her

Counsel of Record, and respectfully submits this Brief in Opposition of the Defendant's Motion for

Summary Judgment. There are numerous disputed material facts at issue before this Court rendering

Summary Judgment inappropriate.

### TABLE OF CONTENTS

I.     STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    Plaintiff's Response to Defendant's Facts . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    Plaintiff's Statement of Additional Undisputed Facts . . . . . . . . . . . . . . . . . . 3

        a.    Lydia Hovanski . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
        b.    Allan Jennings and The REA Agency . . . . . . . . . . . . . . . . . . . . . . . 14



|  | c. | Debbie Gamble and American Income Life . . . . . . . . . . . . . . . . . . . | 18 |
|  | d. | Sexual Harassment of Hovanski . . . . . . . . . . . . . . . . . . . . . . | 19 |
|  | e. | Hovanski's Complaints of Sexual Harassment . . . . . . . . . . . . . . . . | 21 |
|  | f. | Hovanski's Termination . . . . . . . . . . . . . . . . . . . . . . . . . . | 22 |

C.   Plaintiff's Statement of Disputed Facts . . . . . . . . . . . . . . . . . . . . . . . . 23

II   Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

A   Hovanski Has Created A Genuine Issue Of Material Facts Regarding Whether She Was An Employee of American Income Life . . . . . . . . . . . . . . . . . . . . . . . 27

   1.   Lyons and Ratigan Are Not Persuasive Authority Because Neither Plaintiff Had Any Contact With American Income Life . . . . . . . . . . . . . . . . . 34

   2.   The Court Should Be Guided By The Eleventh Circuit's Decision in Daughtrey v. Honeywell, Inc., . . . . . . . . . . . . . . . . . . . . . . . . . 35

B   Hovanski Has Created A Genuine Issue Of Material Fact Regarding Whether She Was An Employee Of The REA Agency . . . . . . . . . . . . . . . . . . . . . . . . 38

C.   Plaintiff Hovanski Has Created A Genuine Issue Of Fact On Her Claim Of Sexual Harassment Under Title VII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

D.   Plaintiff Hovanski Has Created A Genuine Issue Of Fact On Her Claim Of Retaliation Under Title VII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

E   Plaintiff Hovanski Has Created A Genuine Issue Of Fact On Her Claims Invasion Of Privacy, Assault And Battery And Negligent And/or Wanton Training, Supervision And Retention . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

   1.   Invasion Of Privacy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
   2.   Assault And Battery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
   3.   Negligent And/Or Wanton And Malicious Training, Supervision And Retention . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
   4.   Wanton And Malicious Training, Supervision And Retaliation . . . . . . 56

III   Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

# I.   STATEMENT OF FACTS

## A.   PLAINTIFF'S RESPONSE TO DEFENDANTS' FACTS

2

1.    Admitted.

2.    Admitted.

3.    Admitted

4.    Admitted.

5.    Admitted.

6.    Admitted.

7.    Admitted.

8.    Admitted.

9.    Admitted.

10.    Admitted.

11.    Admitted.

12.    Admitted.

13.    Admitted.

14.    Admitted.

15.    Admitted.

16.    Admitted.

17.    Admitted.

18.    Admitted.

19    Admitted.

20.    Admitted.

21.    Admitted.

22.    Admitted.

23.     Admitted.

24.     Admitted.

25.     Admitted.

26.     Admitted.

27.     Admitted.

28.     Admitted.

29.     Admitted.

30.     Admitted.

31.     Disputed. The references does not support this fact.

32.     Admitted.

33.     Admitted.

34.     Admitted.

35      Admitted.

36.     Admitted.

37.     Admitted but context clarified in brief.

38.     Disputed. (Hovanski Suppl. Decl. ¶ 11).

39.     Admitted but context clarified in brief

40.     Admitted but context clarified in brief.

41.     Admitted but context clarified in brief.

42.     Admitted.

43.     Admitted.

4

44.     Admitted.

45.     Admitted.

46.     Admitted but context clarified in brief.

47      Admitted but context clarified in brief.

48.     Admitted but context clarified in brief.

49.     Admitted.

50.     Disputed.   (Jennings Dep., 49:22:8).

51.     Admitted.

52      Admitted.

53.     Admitted.

54.     Admitted.

55.     Admitted.

56.     Admitted.

**B.     PLAINTIFF'S STATEMENT OF ADDITIONAL UNDISPUTED FACTS**

**a.)     LYDIA HOVANSKI**

1.      In April of 2001, Hovanski was hired to work as a Public Relations Representative at the agency that sold American Income products in Utah which was named Jennings & Associates as it was operated by the State General Agent for American Income Life, Bill Jennings. (Hovanski Suppl. Decl. ¶ 2-3).

2.      During an interview with the State General Agent of Utah, Bill Jennings told Hovanski that in order to be hired, American Income Life would have to approve her application after conducting an extensive background check. (Hovanski Suppl. Decl. ¶ 2).

3.      She did not begin actually working as a Public Relations Representative until May of 2001, after American Income Life approved her hiring and she received an insurance license. (Hovanski Dep. I, 221:17-225:19)

4.      In May of 2001, Hovanski signed a Public Relations Contract that Bill Jennings also signed as the State General Agent. (Hovanski Dep I. 224: 5-18; Ex. 11;  Hovanski Decl.Suppl. ¶ 3).

5.      The agency identified on the Public Relations Contract is Jennings & Associates. (Hovanski Dep I; Ex. 11; Hovanski Suppl. Decl. ¶ 3).

6.      Upon signing the Public Relations Contract, Hovanski asked Bill Jennings whether it was true that she could work for another insurance company pursuant to the contract  (Hovanski Suppl. Decl. ¶ 3).

7.      Bill Jennings responded that she worked for American Income Life and that she could not work for any other insurance company. (Hovanski Suppl. Decl. ¶ 3).

8.      Prior to becoming a Public Relations Representative in Utah, Hovanski had no experience working in the public relations field or any training in public relations. (Hovanski Suppl. Decl ¶ 3).

9.      As a Public Relations Representative working in Utah, Hovanski's job was to solicit leads for the sale of American Income Life insurance products. (Hovanski Dep. I, 30:2-20; Hovanski Suppl. Decl. ¶ 4).

10.     American Income Life sells insurance products almost primarily to unions, credit unions, and associations. (Hovanski Dep. I, 30:2-20, 251:3-253:10; Hovanski Suppl. Decl. ¶ 4).

11.     After a period of time working in Utah, she was trained how to properly perform her job duties by Denise Bowyer, the Vice President and National Director of Public Relations for

American Income Life. (Hovanski Suppl. Decl. ¶ 9; Gamble Dep.,10:1-24 ).

12.     All of the literature and other documents that were necessary for Hovanski to obtain leads were provided to her by American Income Life. (Hovanski Dep. I, 267:16-269:17; 270:16-276: 2; Hovanski Suppl. Decl. ¶ 4; Jennings Dep. 68:22-69:22).

13.     While she worked in Utah, Hovanski did not furnish any of the materials that were necessary to perform her job, except she did provide her own transportation. (Hovanski Dep.I, 270:9-15, Hovanski Suppl. Decl. ¶ 4).

14.     Further, while she worked in Utah, Hovanski spent approximately half of her time working in the office and the other half of her time meeting with  union, credit union and association representatives.  (Hovanski Suppl. Decl. ¶ 4).

15.     Before Hovanski could obtain the actual leads, American Income had to approve the contract with the particular union or association. (Hovanski Dep. I, 251:3-254:10; Hovanski Suppl. Decl. ¶ 6).

16.     If American Income Life did not approve of the particular entity, then Hovanski could not send the necessary documentation to obtain the leads. (Hovanski Suppl. Decl. ¶ 6).

17.     If American Income Life approved the contract with the particular union or association, Hovanski was then responsible for drafting the letters and signature cards that would be sent to each member of the specific organization. (Hovanski Dep. I, 77:22-79:3;  Hovanski Suppl. Decl. ¶ 7).

18.     Throughout her employment, every document, including letter and signature cards, that Hovanski sent to obtain leads had to be approved by American Income Life. (Hovanski Dep. I, 77:22-79:3, 262:5-264:6; Hovanski Suppl. Decl. ¶ 7).

19.     While Hovanski worked in Utah, in order to obtain approval from American Income, she was in contact with Susan Snowden at least once a day. (Hovanski Suppl. Decl. ¶ 7).

20.     Hovanski would send by facsimile the documents she had drafted to Ms. Snowden in Waco and the documents would be returned after they had been reviewed and often edited by employees of American Income Life. (Hovanski Dep. I, 262:5-264:6; Hovanski Suppl. Decl. ¶ 7).

21.     After Hovanski was notified that the documentation had been approved, she would mail them in order to obtain leads.  (Hovanski Suppl. Decl. ¶ 7).

22.     The State General Agent did not have a significant role in approving contracts or other documents mailed by Hovanski to obtain leads. (Hovanski Suppl. Decl. ¶ 7).

23.     In approximately December of 2001, Allan Jennings became the State General Agent for American Income Life in the State of Utah and began operating the office in Utah. (Hovanski Suppl. Decl. ¶ 8).

24.     When Allen Jennings replaced Bill Jennings as the State General Agent in Utah, Hovanski was not required to sign a new contract. (Hovanski Dep. I, 315:18-317:5; Hovanski Suppl. Decl. ¶ 8).

25.     When Hovanski asked whether she needed to sign a new contract, both Denise Bowyer and Allan Jennings told her that it was not necessary for her to sign another contract because Public Relations was operated as a completely different entity as the agency. (Hovanski Dep. I, 315:18-317:5; Hovanski Suppl. Decl ¶ 8).

26.     Further, Allan Jennings told Hovanski, "I don't know anything about PR, or have any control over PR, if you have any questions or need anything, contact Denise Bowyer." (Hovanski Dep. I, 315:18-317:5 Hovanski Suppl. Decl. ¶ 8).

8

27.     Therefore, whenever Hovanski had a question related to Public Relations she would call or e-mail Denise Bowyer or someone who worked for her at the Home Office of American Income Life in Waco. (Hovanski Suppl. Decl. ¶ 8).

28.     In January 2002, Allan Jennings notified Hovanski that she was being promoted to Director of Public relations because of her job performance as a Public Relations Representative. (Hovanski Dep. I, 301: 1-4; Hovanski Suppl. Decl. ¶ 10).

29.     Jennings told Hovanski that he had discussed several issues which pertained to her with Denise Bowyer and that she was being promoted. (Hovanski Suppl. Decl. ¶ 10).

30.     Denise Bowyer also told Hovanski that she was being promoted.  (Hovanski Dep. I, 301. 1-4).

31.     Hovanski had not applied for a promotion or even asked if she was interested prior to receiving the position. (Hovanski Suppl. Decl. ¶ 10).

32.     Hovanski was not required to sign a new contract when she received the promotion. (Hovanski Suppl. Decl. ¶ 11).

33.     Subsequently, Hovanski received the raise, but again, did not have to sign a new contract. (Hovanski Suppl. Decl. ¶ 8).

34.     In July of 2002, Allan Jennings became the State General Agent for the State of Alabama. (Hovanski Suppl. Decl. ¶ 11).

35.     Denise Bowyer informed Hovanski that if she did not move to Alabama it would be very detrimental to her career with American Income Life. (Hovanski Suppl. Decl. ¶ 11).

36.     Ms. Bowyer told her that if she did transfer to Alabama that she would eventually receive a promotion to a "corporate" position with American Income Life. (Hovanski Dep. I, 50:19-

54:9;  Hovanski Suppl. Decl. ¶11).

37.     As Hovanski hoped to advance her career with American Income Life, she agreed to transfer to Alabama. (Hovanski Dep. I, 50:19-54:9; Hovanski Suppl. Decl. ¶ 11).

38.     Hovanski did not have to sign a new contract when she transferred to Alabama as Director of Public Relations. (Hovanski Suppl. Decl. ¶ 11).

39.     When Hovanski began working in Alabama, Denise Bowyer and Allan Jennings instructed Hovanski to put the office in order. (Hovanski Suppl. Decl. ¶ 12).

40.     Hovanski was also made responsible for supervising the work of three other Public Relations Representatives who worked in the Birmingham agency.  (Hovanski Dep. II, 47:8-48:4; Hovanski Suppl. Decl. ¶ 12).

41.     American Income Life had to approve the hiring of these three Public Relation Representatives. (Hovanski Suppl. Decl. ¶ 12).

42.     Hovanski did not have the power to hire any of the Public Relations Representative that she supervised without the approval of American Income Life. (Hovanski Dep. I, 103:6-104-1; Hovanski Suppl. Decl. ¶ 12).

43.     Hovanski's duties as a supervisor required her to review the paperwork completed by these Public Relation Representatives, to submit this paperwork to American Income Life for approval and to handle problems with their paychecks. (Hovanski Suppl. Decl. ¶ 12).

44.     Hovanski was also made responsible for dealing with complaints regarding the conduct of sales agents and for handling accidental death and dismemberment claims. (Hovanski Dep. I, 77:4-21; 337:23-339-17; Hovanski Suppl. Decl. ¶ 12).

45.     Denise Bowyer and Allan Jennings instructed Hovanski that she would have to handle

customer complaints and accidental death and dismemberment claims. (Hovanski Dep. I, 77:4-21, 337:23-339-17).

46.     Bowyer told Hovanski that if she did not know how to handle an issue that she should contact her. (Hovanski Dep. I, 77:4-21).

47.     American Income Life provided Hovanski a specific document in order for Hovanski to handle the accidental death and dismemberment claims. (Hovanski Suppl. Decl. ¶ 12, Ex. D).

48.     While Hovanski was the Director of Public Relations in Birmingham, Denise Bowyer was intimately involved with Hovanski's supervision duties. (Hovanski Suppl. Decl. ¶ 14).

49.     For example, when Hovanski experienced performance problems with one of the Public Relations Representatives, she discussed these issues with Bowyer at her direction. (Hovanski Dep. I, 103:6-104-1; Hovanski Suppl. Decl. ¶ 14 ).

50.     Eventually, Bowyer instructed Hovanski to terminate the particular Public Relations Representative, and Bowyer told Hovanski exactly what to write in the termination letter. (Hovanski Dep. I, 103:6-104-1; Hovanski Suppl. Decl. ¶ 14).

51.     Moreover, as a supervisor working in Birmingham, Hovanski was still responsible for supervising Public Relations Representatives in Utah, which required her to obtain their paperwork and have it edited and approved by American Income Life (Hovanski Suppl. Decl. ¶ 13).

52.     In Birmingham, Hovanski worked in the agency office and she did not provide any of the equipment or materials that were necessary to perform her job, except a computer and her automobile. (Hovanski Suppl. Decl. ¶ 15).

53.     As in Utah, all of the documentation that she sent to obtain leads had to be approved by American Income Life. (Hovanski Dep. I, 77:22-79:3, 262:5-264:6; Hovanski Suppl. Decl. ¶ 15;

Exs. E and F).

54.      In order to obtain this approval, she was required to send by facsimile all of the documentation to Pat McFarland, an employee of American Income Life in Waco for editing and final approval. (Hovanski Dep. I, 77:22-79:3, 262:5-264:6; Hovanski Decl.Suppl. ¶ 15; Exs. E and F).

55.      Throughout much of her employment, Hovanski was required to enter her own lead information into American Income Life's computer system. (Hovanski Suppl. Decl. ¶ 16).

56.      Despite the language in the Public Relations Contract Hovanski signed which stated that she was not to "represent or imply that she was an employee or officer of the agency or American Income Life," Denise Bowyer instructed Hovanski to tell the union representatives that she met with that she was an employee of American Income Life and that every employee of American Income Life was a member of union OPEIU Local 277  (Hovanski Dep. I, 33:23·-35:13; Hovanski Suppl. Decl. ¶ 9).

57.      As the result of Ms. Bowyer's instructions, Hovanski held herself out as an employee of American Income Life. (Hovanski Dep. I, 33:23:-35:13).

58.      Moreover, Hovanski was provided with business cards from the Home Office of American Income Life that reflect that Hovanski is the Director of Public Relations for American Income Life. (Hovanski Decl. Suppl.¶ 9; Ex. B).

59.      American Income Life also provided Hovanski with documentation with the letterhead of American Income Life that stated that she was the Director of Public Relations or Regional Director of Public Relations for American Income Life. (Hovanski Suppl. Decl. ¶ 15, Ex. G),

60.      In addition, on one occasion Denise Bowyer told Hovanski that she was performing her job so well that she could retire after several years with American Income Life. (Hovanski Suppl.

12

Decl. ¶ 9).

61.     Ms. Bowyer's statement was totally consistent with the letter Hovanski received on her one year anniversary with American Income Life celebrating her decision to begin a new career at American Income. (Hovanski Suppl. Decl. ¶ 9; Ex. C).

62.     As a result of such comments and many of the factors discussed above, Hovanski believed that she was an employee of American Income Life despite the contract she had signed near the beginning of her employment in Utah. (Hovanski Dep. I, 33:23:-35:13; Hovanski Suppl. Decl. ¶ 9).

63.     In fact, during a conversation about independent contractors with Allan Jennings and some field agents in which the agents complained that as independent contractors they did not have to attend weekly meetings or work in the office, Jennings abruptly told them that they were only considered independent contractors so that American Income Life would not have to pay taxes and that other than signing a 1099 form, they were employees and would have to attend meetings and work specific hours. (Hovanski Suppl. Decl. ¶ 19).

64.     Moreover, despite American Income Life's contention that Allan Jennings worked as a State General Agent "without any direction or supervision from American Income," Hovanski personally observed Jennings receive a daily phone call from Bob Falvo, a management employee at American Income. (Hovanski Dep. I, 190:2-192:14; Hovanski Suppl. Decl. ¶ 17).

65.     Hovanski heard the contents of many of these conversations because Jennings routinely spoke on his speaker phone. (Hovanski Dep. I, 33:23:-35:13; Hovanski Suppl. Decl. ¶ 17).

66.     During these daily conversations, Hovanski heard both Jennings and Falvo discuss the sales numbers of the office and how to increase these sales numbers. (Hovanski Dep. I, 33:23:-

35 13, Hovanski Suppl. Decl. ¶ 17).

67.     Hovanski also heard Jennings discuss personnel issues with Falvo and receive direction as to how to handle these issues. (Hovanski Suppl. Decl. ¶ 17).

68.     In fact, on one occasion after Jennings had terminated two sales agents, Hovanski heard Falvo angrily tell Jennings that he had not followed the chain of command when terminating these employees and after this conversation, these sales agents continued to work in the Utah office despite Jennings decision to terminate them.  (Hovanski Dep. I, 99:12-100: 23;  210:3-10; Hovanski Suppl. Decl. ¶ 17).

69.     In Birmingham, Jennings also held weekly sales meetings that Hovanski was required to attend in which Jennings discussed the demands being made by American Income Life. (Hovanski Suppl. Decl. ¶ 18).

70.     Towards the end of her employment, Jennings instructed Hovanski to draft weekly reports, including every phone call she made and every client or potential client she visited. (Hovanski Suppl. Decl. ¶ 18).

71.     Also near the end of her employment, Allan Jennings made the decision to make Emily Jennings primarily responsible for public relations in Birmingham. (Hovanski Dep. I, 18:6-22:8; 320:18-321:1; Hovanski Dep. II., 120:19-121, 8;  Hovanski Suppl. Decl. ¶ 18).

72.     When Hovanski spoke to Denise Bowyer about her demotion, Bowyer stated that she had approved the change. (Hovanski Suppl. Decl. ¶ 18.)

73     Finally, despite defendant's contention that American Life merely "facilitated" the payment of commissions allegedly paid by the State General Agent, every paycheck Hovanski received during her employment came from American Income Life and was signed by the Chairman

of the Board of American Income Life. (Hovanski Suppl. Decl. ¶ 20).

74.     Also, the only bonuses she received during her employment were paid directly to Hovanski from American Income Life. (Hovanski Suppl. Decl. ¶ 20).

75.     Hovanski never received a bonus from Allen Jennings, the State General Agent. (Hovanski Decl. ¶ 20).

76.     Further, Hovanski received life insurance as an employee of American Income Life as benefits of her employment.  (Hovanski Decl. ¶20; Ex. H).

**b.)   ALLAN JENNINGS AND THE REA AGENCY**

77      Allan Jennings has worked for American Income Life continuously since 1996, with a small break in service. (Jennings Dep., 19:15-18).

78.     When Jennings transferred from New Orleans to Alabama in the 1990s' American Income Life had to approve the transfer because the company has a rule that a State General Agent cannot recruit agents from another agency. (Jennings Dep., 25:4-27:13).

79.     American Income Life has to approve all promotions recommended by State General Agents such as Allan Jennings. (Jennings Dep., 27:15-31:15; 35:1-36:16).

80.     Prior to becoming State General Agent of Utah, he discussed the promotion with Roger Smith, the CEO and President of Operations for American Income.  (Jennings Dep.,39:15-40,20)

81.     In June of 2002, Bob Falvo, Vice President of SGA Development for American Income Life asked Jennings if he wanted to return to Alabama as SGA of Alabama and Utah. (Jennings Dep., 41:2-42:1).

82.     In January of 2004, Jennings took on a partner, Pat Sheehan, who is currently co-state

15

general agent. (Jennings Dep., 43:21-44:17).

83.     Bob Falvo informed Jennings that Pat Sheehan was coming Alabama to work with him. (Jennings Dep., 44:11-46:5).

84.     Sheehan chose to work with Jennings in Alabama without any involvement by Jennings in that decision. (Jennings Dep., 45, 22-48,20).

85.     When Jennings was told that Sheehan was coming to work with him in Alabama, Jennings had never met, talked to or had even heard of Sheehan. (Jennings Dep., 45:22-48:20).

86.     Jennings has not received any sexual harassment training from American Income Life. (Jennings Dep., 49:5, 82:7-10).

87.     The REA Agency is a Sub S Corporation whose officers are Allan Jennings and his wife, Emily Jennings. (49:22-51:5).

88.     The name on Allan Jennings' office door in Alabama says American Income Life, rather than the REA Agency. (Jennings Dep., 51:18-52:3).

89.     Jennings has been provided training by American Income Life in all aspects of the insurance business, including recruiting, phone room, conversation, licensing, and underwriting. (Jennings Dep., 54:15-55:20).

90.     According to Jennings, Bob Falvo, who is in charge of SGA Development for American Income Life, introduces recruiting, operation, and training systems to ensure agency success for new SGAs. (Jennings Dep., 57:4-23).

91.     Jennings has always followed recommendations given to him by Falvo regarding production issues. (Jennings Dep., 58:12-59:15; 116:13-120:20).

92.     Jennings uses American Income Life's training manual, which includes information

on presentations, setting up appointments, underwriting, products and markets in the agency in Alabama. (Jennings Dep., 60:16-61:15).

93.     According to Jennings, he does not supervise or direct the day-to-day activities of Public Relations Representatives.(Jennings Dep., 62:4-20).

94.     Jennings does not know whether Denise Bowyer supervises the Public Relations Representatives. (Jennings Dep., 62:21-63:2).

95.     Jennings cannot recall whether he discussed promoting Hovanski to Director of Public Relations prior to the promotion. (Jennings Dep., 63:7-12).

96.     According to Jennings the Public Relations Representatives who currently work in the Alabama agency do not have a supervisor. (Jennings Dep., 64:7-66:18).

97.     According to Jennings, he does not supervise the Public Relations Representatives; he only monitors their results. (Jennings Dep., 64:7-66:18).

98.     According to Jennings, he did not supervise Hovanski. (Jennings Dep., 69:23-70:2).

99.     Jennings does not train public relations representatives. (Jennings Dep., 80:21-23).

100.    If someone made a complaint of sexual harassment to Jennings which he could not resolve, he would contact Debbie Gamble, Senior Vice President of Agency for American Income Life for instructions on how to handle the matter because she would be the person who could "direct you to where you needed to go." (Jennings Dep., 82:7-83:9; Gamble Dep., 7:15-17).

101.    American Income Life pays the Public Relations Representatives and handle all payroll issues. (Jennings Dep., 83:19-85:11).

102.    When he received Hovanski's EEOC charge, Jennings called Debbie Gamble and asked her what to do about it. (Jennings Dep., 86:6-87:3).

17

103.    Hovanski trained other Public Relations Representatives. (Jennings Dep., 92:17-21).

104.    One of Hovanski's job duties was to deliver accidental death claim checks. (Jennings Dep., 96:2-23).

105.    When Jennings first met Hovanski she complained that she was not receiving proper credit for leads so Jennings called Denise Bowyer who flew to Utah to conduct a manual lead count with Jennings to ensure that Hovanski received proper credit. (Jennings Dep., 99:7-19).

106     American Income Life has to approve the hiring of every person who works in an agency office. (Jennings Dep., 112:11-18).

107.    The employment applications and other forms that are signed by individuals who work in the agencies are provided by American Income Life. (Jennings Dep.,113:11-114:14).

108     American Income Life assigns a production and recruiting quota to each agency, including the REA Agency. (Jennings Dep., 115:13-116:17).

109.    If he was not meeting these quotas, Bob Falvo would give him directions regarding the manner in which to meet these quotas. (Jennings Dep., 116:16-117:13).

110.    American Income Life provides life insurance to everyone who works in the agency for a minimum of 90 days. (Jennings Dep., 121:10-14).

111.    As the Manager of Public Relations, Hovanski trained public relations representatives and was compensated for this training by receiving certain percentages of these individuals commissions, which are referred to as "manager overrides." (Jennings Dep., 129:22-136:15).

112.    As State General Agent of Utah, he terminated two individuals that worked in the agency in Utah, and someone in management at American Income Life reversed his decision to terminate these two individuals. (Jennings Dep., 136:18-140:14).

18

113. On October 31, 2002, before Jennings wrote a termination letter to Hovanski he contacted Debbie Gamble to discuss the problem he was having with Hovanski. (Jennings Dep., 266:12-267:11).

114. Jennings told Gamble about the problems he was having with Hovanski, and he called Gamble seeking advice regarding the correct way to accomplish solving the problem. (Jennings Dep., 266:12-267:11).

115. Gamble instructed Jennings to document and send a 30-day notice of termination. (Jennings Dep., 266:12-267:11).

116. The letterhead that Jennings uses says "American Income Life" rather than the REA Agency (Jennings Dep., 269:11-21).

117. American Income Life approves all scripts, presentations, and everything else that is used in the field by individuals who work in the agencies. (Jennings Dep., 270:19-271-1).

118. American Income Life pays for at least a portion of the health insurance premiums of the agents who work in the agency office in Alabama. (Jennings Dep., 272:7-273:12).

**c.)   DEBBIE GAMBLE AND AMERICAN INCOME LIFE**

119. According to Debbie Gamble, everyone who works for an agency that sells American Income Life insurance is an independent contractor, including the State General Agents. (Gamble Dep., 16:25-17:17).

120. According to Gamble, American Income Life's "field force" is made up of 2300 independent contractors (Gamble Dep., 16:25-17:17).

121. According to Gamble her job duties include dealing with the independent contractors, the State General Agents, and any issues about contracts that arise. (Gamble Dep., 17: 18-18:2).

122.    Gamble also interfaces with the agency administration department and other user departments with any type of questions that the State General Agents may have.  (Gamble Dep., 17:18-18:2).

123.    American Income Life provides extra commissions based on production criteria for the cost of health insurance and life insurance, along with the State General Agent.  (Gamble Dep., 45:11-46:8).

124.    American Income Life provides policies and procedures for public relations representatives to follow. (Gamble Dep., 45:11-46:8).

125.    American Income Life also pays, at least a portion, of bonuses to public relations representatives and agents as a production incentive.  (Gamble Dep., 150:14-151:3).

### d.)    SEXUAL HARASSMENT OF HOVANSKI

126.    These men often rubbed her shoulders, stroked her legs and hugged her. (Hovanski I, 67:12-68:1; 92:13-94:6).

127.    The first time that Hovanski met Marcellus Adams, he put his hand on her knee, began stroking her knee, and said "You'll fit in great here." (Hovanski I,41:8-42:13).

128.    The male insurance agents in Utah made comments to Hovanski that she need to be home making breakfast and having babies because she was a Mormon woman. (Hovanski I, 41:8-43-12).

129.    In both Utah and Alabama, Hovanski would walk into the office and be subjected to very crude and vulgar sexual jokes and stories about sex by the agents. (Hovanski I, 41:8-44-12)

130.    The lewd comments and joked increased when Hovanski moved to Alabama apparently because her husband was not living in Alabama at the time. (Hovanski Suppl. Decl. ¶ 19)

131.    Hovanski recalls parts of one joke relating to blowjobs and interviews, which involved something about why are women called back for more than one interview? Because they need to prove they could suck more than once and like it… (Hovanski Suppl. Decl. ¶ 21).

132.    These men all stated that it would make her enjoy being in Alabama so much more if I would have sex. (Hovanski Suppl. Decl. ¶ 22)

133.    When Hovanski came into the office, she was subjected to comments such as "nice ass." (Hovanski Suppl. Decl. ¶ 22)

134.    The men in the office in Alabama were constantly inviting Hovanski to attend mud or Jell-O wrestling fights, which were held, at one of the local bars. (Hovanski I, 61:16-63:16).

135.    They would tell Hovanski that they would love to see her get down in the mud and show off her body while playing with another woman. (Hovanski Suppl. Decl. ¶ 21)

136.    Bronson Zolik called Hovanski a "bitch" on numerous occasions. (Hovanski Suppl. Decl. ¶ 2)

137.    Allan Jennings also frequently referred to many of the female employees as bitches to Hovanski, when they would discuss other publikc relations representatives.

138.    On one occasion in September of 2002, Hovanski was in the break room and there were some men making rude and obscene comments about females. (Hovanski Suppl. Decl. ¶ 23)

139.    Hovanski replied to them that she did not appreciate their conversation and that it could be considered sexual harassment. (Hovanski Suppl. Decl. ¶ 23)

140.    At that moment, Bronson Zolik said he was tired of words being seen as sexual harassment and he grabbed Hovanski and kissed her on the lips stating "this is sexual harassment!" (Hovanski Suppl. Decl. ¶ 23)

141.  Subsequently, Hovanski began to blush, and he snickered to the other men and he said "See, she even liked it." (Hovanski Suppl. Decl. ¶ 23)

142.  While Hovanski worked in Utah, Adams called her a "bitch" and a "slut" on numerous occasions.  (Hovanski Suppl. Decl. ¶ 24)

143.  In both Utah and Alabama, Zolik referred to her as a "bitch", "ho" and a "slut." (Hovanski Suppl. Decl. ¶ 24)

144.  Hovanski told Jennings she was uncomfortable with the manner in which women were treated in the office and about the sexually offensive language that was being used by the agents. (Hovanski II, 24:3-15).

145.  As the result of the sexually inappropriate conduct she was subjected to during her employment, Hovanski often could not go into the office because she did not feel safe in the office. (Hovanski I, 45:13-46:21).

146.  Further, as the result of the sexually inappropriate touchings that she was subjected to she felt hesitant towards Jennings, Adams and Zolik. (Hovanski Dep., I, 93:4-94:14).

147.  At one point, she believed that Adams was going to hit her.  (Hovanski Dep., I, 93:4-94:14).

148.  As a result of the sexual harassment she was subjected to during her employment, Hovanski often dreaded to go to work and had difficulty performing her job. (Hovanski Dep., II, 137:1-139:23).

149.  The day that Bronson Zolik kissed her, she had to go home because she was unable to continue working. (Hovanski Dep., II, 137:1-140:6).

**e.)    HOVANSKI'S COMPLAINTS OF SEXUAL HARASSMENT**

150.    Hovanski made complaints of sexual harassment to both Allan Jennings and Denise Bowyer, but they failed to stop the harassment. (Hovanski I, 46:22-47:22; 62:10-65:13; 66:17-67:17; 70:1-71:7).

151.    The first time she made a complaint of sexual harassment to Denise Bowyer she stated that it would be taken care of and also that she would be in Alabama soon and things would be different there. ( Hovanski I, 47:7-22).

152.    While she worked in Alabama, Hovanski complained to Bowyer regarding the offensive language used in the office, the way women were being treated in the office, and her complaints about these issues to Jennings. (Hovanski Dep., I, 184:9-185:2).

153    In Alabama, Hovanski complained to Jennings that Zolik kissed her, and he stated that he must have done something to provoke it and made her apologize.  ((Hovanski I, 65:22-66:16).

154.    Hovanski told Jennings she was uncomfortable with the manner in which women were treated in the office and about the sexually offensive language that was being used by the agents. (Hovanski II, 24:3-15).

155.    After she was kissed by Bronson Zolik, Hovanski filed an EEOC charge. (Hovanski Dep., I, 79:4-80:6).

### f.)    HOVANSKI'S TERMINATION

156.    On the day that she was told that she was terminated, she told Allan Jennings that because of the sexual harassment that she had been subjected to in the office and his failure to do anything about her complaints that she had filed a formal complaint. (Hovanski Dep.I, 80:7-81:14; Hovanski Dep. II, 76:17-89:7).

157.    Emily Jennings, who is an officer and director of the REA Agency informed Hovanski

that she was terminated. (Hovanski II., 76:17-89:7; Jennings Dep., 49:22-50:6).

157.    Allan Jennings informed Hovanski that her contract with the REA Agency and American Income Life was terminated in a letter dated Nov. 1, 2002, which he wrote after consulting with Debbie Gamble. (Jennings Dep., 266:12-127:11; Ex. 7; ).

159.    On October 31, 2002, before Jennings wrote a termination letter to Hovanski he contacted Debbie Gamble to discuss the problem he was having with Hovanski. (Jennings Dep., 266:12-267:11).

160.    Jennings told Gamble about the problems he was having with Hovanski, and he called Gamble seeking advice regarding the correct way to accomplish solving the problem. (Jennings Dep., 266:12-267:11).

161.    Gamble instructed Jennings to document and send a 30-day notice of termination. (Jennings Dep., 266:12-267:11).

162.    Jennings testified that there was not a single document in existence that reflects the alleged performance issues that Hovanski supposedly had. (Jennings Dep., 180; 13-182:1).

163.    Approximately four days before Hovanski complained of sexual harassment for the last time, Jennings wrote a note to Hovanski that said "Keep the faith and you will double your income." (Jennings Dep., 209:21-212:19; Ex. 30).

164.    The defendant does not provide a sexual harassment policy to its approximately 2300 alleged independent contractors who work in agencies across the country that only sell American Income Life products nor does it provide any of these individuals with sexual harassment training. (Gamble Dep., 95:1-97:8)

165.    American Income Life does not provide any meaningful sexual harassment training

24

to the State General Agents that operate these agencies.(Gamble Dep., 95:1-97:8)

## C.    PLAINTIFF'S STATEMENT OF DISPUTED FACTS

1.    Each month while Hovanski worked at American Income Life, she received a memo from Denise Bowyer or from someone in her office directing Hovanski to meet with the representatives of particular labor unions, credit unions, and/or associations as soon as possible. (Hovanski Dep. I, 268: 22-269: 17; Hovanski Suppl. Decl. ¶ 5).

2.    In these memos from American Income Life, Hovanski was instructed that she "must" or needed to meet with representatives of these entities. (Hovanski Dep. I, 268: 22-269:23; Hovanski Suppl. Decl. ¶ 5).

3.    She was not given the option of whether or not to contact the particular union or association. (Hovanski Dep. I, 268: 22-269; Hovanski Decl.Suppl. ¶ 5).

4.    On many other occasions, throughout her employment, Hovanski was directed by employees of American Income Life to contact specific union or association representatives. (Hovanski Suppl. Decl. ¶ 5, Ex. A).

5.    While Hovanski worked in Utah, after she met with the particular representatives of the labor unions, credit unions, and/or associations as she was directed to do by Denise Bowyer or other employees of American Income Life, she would contact Susan Snowden, who is an employee of American Income Life in Waco. (Hovanski Suppl. Decl. ¶ 6).

6.    As in Utah, she was required by American Income Life to meet with representatives of particular labor unions, credit unions, and associations in order to contract with these entities to obtain leads. (Hovanski Suppl. Decl. ¶ 15).

7.    During her employment, Hovanski was touched on many occasions in a sexually

offensive manner by Allan Jennings, Marcellus Adams, and Bronson Zolik, insurance agents of AIL. (Hovanski I, 67:12-68:1; 92:13-94:6).

8.      Allan Jennings often gave Hovanski long, lingering hugs which made her uncomfortable. (Hovanski I, 68:15-69:23).

9.      Marcellus Adams, Allan Jennings, Bronson Zolik and several other agents told lewd jokes and stories about sex in Hovanski's presence, including jokes about "blowjobs and sexual positions." (Hovanski II, 31:19-32:18).

10.     While Hovanski worked in Alabama, Jennings, Zolik and several of the agents who worked in the office made comments to Hovanski about her being away from her husband and how they could give her some. (Hovanski Suppl. Decl. ¶ 22)

11.     Hovanski's personal computer was constantly used to look at pornographic material by the agents in the office. (Hovanski Suppl. Decl. ¶ 23)

12      When she complained to Allan Jennings about my computer being used for public purposes he told me there was nothing he could do. (Hovanski Suppl. Decl. ¶ 23)

13.     She was then told by Allan and Bronson that they had gone onto her hard drive and went into her personal files and accused her of looking at the pornography because as long as she was away from her husband she needed something to sustain her. (Hovanski Suppl. Decl. ¶ 23)

14.     Further, on many occasions throughout her employment Hovanski heard agents such as Jennings, Adams, and Zolik refer to the women who worked in the office as "ho's" and "sluts".(Hovanski Suppl. Decl. ¶ 24)

15.     Allan Jennings called Hovanski a "slut" on one occasion and called her a "bitch" on other occasion. (Hovanski Suppl. Decl. ¶ 24)

16.  Jennings told Hovanski that Marjorie Wade was a slut and a whore and that she would "promote" herself to sign groups. (Hovanski II, 28:4-19).

## II    ARGUMENT

### A.    HOVANSKI HAS CREATED A GENUINE ISSUE OF MATERIAL FACT REGARDING WHETHER SHE WAS AN EMPLOYEE OF AMERICAN INCOME LIFE.

As the Court is aware, Title VII only applies to employees, and thus, does not apply to independent contractors.  Cobb v. Sun Papers, Inc., 673 F. 2d 337-340 (11th Cir. 1982).  The Supreme Court's recent decision in Clackamas Gastroenterology Assoc. v. Wells, 123 S.Ct. 1673 (2003) is a proper case to begin the analysis of whether Hovanski was an employee of the defendant and American Income Life.  In Clackamas, the Supreme Court reaffirmed that courts should examine the factors set forth in Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 323-324 (1992) to determine whether an individual is an employee.  Further, as is the clearly established law in the Eleventh Circuit, the United States Supreme Court held that "the common-law element of control is the principal guidepost that should be followed...".  Clackamas Gastroenterology Assoc. v. Wells, 123 S.Ct. 1673, 1679 (2003).  The Court in determining the issue of whether an individual was a shareholder-director or an employee gave great deference to factors promulgated by the EEOC. Id. & n.8 (citing EEOC Compliance Manual §605.008).  The Court also noted that the determination of whether an individual is an employee depends on all the incidents of the relationship and that one particular factor should not be decisive. Id at 1681.  Further the Court recognized that the "mere existence" of a document allegedly defining the relationship is not determinative. Id.

Several of the factors that have been established as indicating whether a worker is in an employment relationship with an employer, including whether the employer has the right to control

27

them, where, and how the worker performs the job; whether the employer furnishes the tools, materials, and equipment necessary to perform the job; whether the work is performed on the employer's premises; whether the employer has the right to assign additional projects to the worker; whether the employer sets the hours of work and the duration of the job; whether worker is paid by the hour, week, or month rather than the agreed cost of performing a particular job; whether the worker is engaged in his/her own distinct occupation or business; whether the employer provides the worker with benefits such as insurance, leave, or workers' compensation; whether the worker is considered an employee of the employer for tax purposes (i.e., the employer withholds federal, state, and Social Security taxes); whether the employer can discharge the worker; and whether the worker and the employer believe that they are creating an employer-employee relationship. Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 323-324 (1992).   Other factors include the worker's role in hiring and paying assistants, the skill involved in performing the work, and whether the work is part of the regular business of the employer. See, Daughtrey v. Honeywell, Inc., 3 F. 3d 1488, 1492.

The plaintiff has presented substantial evidence that she was an "employee" of American Income Life, thus making summary judgment inappropriate.  American Income Life contends that it did not even hire the plaintiff.  However, Hovanski has presented substantial evidence that  she could not even begin working in Utah until AIL approved her hiring.  Further, it is undisputed that Hovanski could not have been hired without AIL's approval.  American Income Life contends that it had no control regarding when, where or how Hovanski performed her work.  To the contrary, plaintiff has presented evidence that she received substantial direction from American Income Life. American Income Life, through Denise Bowyer, the Vice President and National Director of Public Relations or an employee who works in her office in Waco, directed Hovanski to meet with

representatives of particular labor unions, credit unions, and/or associations in a prompt manner. Hovanski was directed that she "must" meet with the representatives of the particular organizations. Hovanski was not given the option of deciding whether or not to contact these entities. In addition to these monthly instructions, on many other occasions, Hovanski was directed by American Income Life to contact specific union or association representatives.

Moreover, not only did American Income Life tell Hovanski who to meet with but every document that Hovanski sent to members of the credit unions, labor unions, and/or associations had to be approved by American Income Life. This process made it a requirement that Hovanski have nearly daily communication with employees of American Income Life. Often, the documents that Hovanski used to solicit leads were edited by American Income Life before receiving approval. American Income Life had almost complete control over the process and manner in which Hovanski used to solicit leads.

Further, Hovanski was trained how to perform her job duties according to company standards by Denise Bowyer, a Vice President at American Income Life. Bowyer gave Hovanski specific instructions about how to resolve personnel problems with one of the employees Hovanski was responsible for supervising and eventually directed Hovanski to terminate the employee and told her exactly what to write in the termination letter. Bowyer also told Hovanski that if she did not transfer to Alabama from Utah that it would be very detrimental to her career with American Income Life. Bowyer further informed Hovanski that she did not have to sign another contract when Allan Jennings became the State General Agent in Utah because Public Relations was operated as a completely different entity than the agency. In fact, Jennings, the very person that the defendant says that Hovanski may have taken some direction from, told Hovanski, "I don't know anything about PR, or

29

have any control over PR, if you have any questions or need anything, contacted Denise Bowyer."

Thus, any time she had a public relations question, Hovanski contacted Bowyer or someone in her

office. Moreover, Bowyer instructed Hovanski to tell union representatives that she was an employee

of American Income Life and that all of the employees of American Income Life were union

members.

American Income Life contends that it did not primarily furnish the materials, tools, or

equipment necessary for Hovanski to perform her job and that she has never worked on their

premises.    Plaintiff has submitted substantial evidence to the contrary.  As plaintiff's job was

essentially to solicit leads through the mail, the documents that she mailed were absolutely necessary

to perform her job . All of these documents were furnished by American Income Life.  Not only did

American Income Life provide her with form letters, contracts, signature cards, envelopes, and

'memographs" but American Income Life provided her with letterhead that reflected that she was the

Director of Public Relations or Regional Director of Public Relations for American Income Life.  Not

only did American Income Life provide her with its letterhead, but American Income Life also

provided Hovanski with business cards which also reflected that she was the Director of Public

Relations for American Income Life. In fact, the only equipment or materials that Hovanski ever

furnished to perform her job was the computer that she used after she transferred to Alabama and her

automobile.

American Income Life also contends that it did not assign any projects, "much less additional

projects" to Hovanski and did not set the hours she worked or the duration of her job.  Hovanski,

however, has submitted substantial evidence that American Income Life did assign and/or  approve

the assignment of additional duties to her.  In addition to receiving directions regarding meeting with

particular union or association representatives by American Income Life, as discussed above, Bowyer, along with Jennings, instructed Hovanski to put the office in order when she arrived in Alabama. This work involved drafting, completing and filing paperwork that had not been completed by the former Director of Public Relations.  Moreover, since Hovanski had been promoted, at least with the approval of Denise Bowyer, she was made responsible for supervising Public Relations Representatives in both Alabama and Utah, even when  she worked in Alabama.   Her role as a supervisor required her to assist other Public Relations Representatives draft their paperwork, obtain approval from American Income Life, and handle issues with her subordinates' paychecks.  Hovanski was also given a specific "memogram" by American Income Life so that she could handle accidental death and dismemberment claims, which was a clearly not a duty designed to solicit leads or one that she had when she had when she first began working for American Income Life.

While American Income Life did not set her specific hours, plaintiff has submitted substantial evidence that American Income Life did have substantial input into the duration of the job.  Plaintiff makes this contention, because her job as controlled by American Income Life, essentially had no set duration.  Plaintiff's employment was not typical of an independent contractor where an individual is hired to perform a specific job within a certain length of time.  Denise Bowyer told the plaintiff that she could retire from American Income Life after several years with the company.  Roger Smith, the President and CEO of the company, congratulated her on her decision to begin a career with American Income Life and offered his hope that he could celebrate many more of her anniversaries with American Income Life.  Bowyer also referred to her career with American Income, when she and Hovanski discussed the transfer to Alabama.  Further, the Public Relations Contract signed by Hovanski does not set forth any time frame for Hovanski to complete her job.  In sum,  American

Income Life admittedly provided a career opportunity for Hovanski with the potential of an unlimited duration standard in at-will employee relationships.

The plaintiff does not dispute that she was paid commissions and that she was not treated by American Income Life as an employee for tax purposes; however, she has presented substantial evidence that the money she received for her work was paid by American Income Life and that she did receive some benefits from American Income Life. Hovanski has presented evidence that every paycheck and bonus that she received was paid to her from American Income Life and was signed by the Chairman of the Board of American Income Life. American Income Life actually provided Hovanski with a weekly draw. Further, Hovanski has presented evidence that she received bonuses paid, at least in part, by American Income Life. Furthermore, in contrast to American Income Life's contention that Hovanski received no benefits from the company, Hovanski has presented evidence that she received life insurance from American Income Life during her employment. Hovanski has also presented evidence the Denise Bowyer approved the method of her payment and approved a raise in her commission rate.

American Income Life also contends that it had no input whatsoever in plaintiff's discharge. Hovanski, however, has presented evidence that creates a question of material fact on this issue. First, the State General Agent for American Income Life, sent Hovanski a letter on letterhead that includes the name of American Income Life Insurance stating that Hovanski was terminated from her PR contract with the REA Agency and American Income Life Insurance Company. Most importantly, Jennings testified that he did not write this letter until after he discussed alleged problems he was having with Hovanski with Debbie Gamble, the Senior Vice President of Agency for American Income Life. Gamble directed Jennings to write the termination letter. Further, Hovanski has

32

presented evidence that Jennings did not have the power to terminate agency employees without the direction of American Income Life. Specifically, Jennings admitted that he had terminated two individuals in Utah and that management at American Income Life over-turned his termination decision. From this evidence a reasonable factfinder could infer that since Jennings did not have the power to terminate Hovanski without input, or at least approval, of American Income Life. Moreover, it would be reasonable to infer that since Jennings had been previously warned about terminating an agency employee without input from American Income Life that he would be less likely to do it on a subsequent occasion. In addition, the fact that Denise Bowyer had approved her demotion from a supervisory position shortly before her termination also leads to the inference that Bowyer or another management employee at American Income Life was involved in the decision to terminate Hovanski.

American Income Life further contends that plaintiff had "no basis whatsoever" to believe that she was entering into an employer-employee relationship. This contention is simply without merit. Hovanski had a substantial basis for believing she had an employer-employee relationship with American Income Life. For example, Bowyer told her to tell the organizations that she met with that she was an employee of American Income Life. Bowyer also told her that she did not have to sign another contract after the State General Agent changed. Bowyer trained her and she had almost daily contact with employees of American Income Life in Waco. American Income Life had to approve all of the documentation that she sent to obtain leads. Further, Bowyer told her that she would eventually advance in the company if she transferred to Alabama and that she could retire with American Income Life after several years. The President of the company even congratulated Hovanski for deciding to begin a career with American Income Life. Moreover, American Income Life provided Hovanski with business cards and letterhead stating that she was the Director of Public

Relations for American Income Life. She did not have to sign another contract when Allan Jennings became State General Agent of Utah or Alabama or when she was promoted and subsequently transferred. For these reasons and many more, Hovanski had more than a sufficient basis to believe that she had an employer-employee relationship with American Income Life.

American Income Life argues that because of Hovanski's contract with Jennings & Associates, which states that plaintiff is in control of her own work that this Court is precluded from finding that American Income Life was Hovanski's employer. Again, this contention is simply without merit. The fact that Hovanski did not have to sign a new contract when she moved from Utah to Alabama and began working at the REA agency weighs in favor of an employment relationship between Hovanski and American Income Life because it implicitly diminishes the significance of the contract in defining Hovanski's work status. Moreover, the defendant makes this argument in the face of the clear direction of the Supreme Court and the Eleventh Circuit that a contract is not dispositive and that all of the incidents of the employment relationship must be considered. See, Clackamas Gastroenterology Assoc. v. Wells, 123 S.Ct. 1673, 1679 (2003).

Notably, American Income Life does not address in its motion some factors that weigh in the favor of finding an employer-employee relationship. For example, Hovanski, as a manager, did not have the power to hire or fire without the approval of American Income Life. Also, Hovanski had no experience in the public relations field prior to her employment with American Income Life. Hovanski did not have any specific talent or skill in the public relations field and the position of Public Relations Representative must not have required a deal of great of skill as Hovanski's was hired with approval of American Income Life without any previous experience. Moreover, Hovanski was obviously not engaged in her own distinct occupation or business. Also, American Income Life

is in the business of selling insurance, and Hovanski was told that she could not solicit leads for any other insurance company by the State General Agent of Utah.

**1.     LYONS AND RATIGAN ARE NOT PERSUASIVE AUTHORITY BECAUSE NEITHER PLAINTIFF HAD ANY CONTACT WITH AMERICAN INCOME LIFE.**

In support of its position American Income Life relies primarily on Judge Johnson's Memorandum Opinion and Order in Lyons v. American Income Life Insurance Company, CV-02-J-494-S, and Ratigan v. American Income Life Inc. Co., 1999 WL 446079 (D.Or. 1999).  In asserting that Lyons compels the same decision in the instant case, the defendant contends that Lyons involved "virtually identical circumstances."  This contention is  not accurate.  In Lyons, Judge Johnson was faced with substantially different evidence than submitted by Hovanski.  For example, Lyons held a sales position rather than a public relations position, had never held a supervisory position, had not been trained by a person who was clearly an employee of American Income Life, had to pay her own expenses, and was provided with absolutely no benefits. (Lyons, p. 1-2, 6-7).  Moreover, Lyons never had any contact with American Income Life, but rather only had contact with the agency.   The evidence in Lyons, also reflected that American Income Life did not control the manner in which she did her job. (Lyons, p.7).  For example, Lyons had discretion regarding which leads to call on and American Income Life did not monitor or oversee her activities in any manner. (Lyons, p.7).

Without totally rehashing the evidence in the instant case, as discussed above, clearly Hovanski's employment was not "virtually identical" to Lyons'.   Hovanski, in contrast to Lyons, had nearly daily contact with American Income Life and, not only, did the defendant monitor or oversee Hovanski's work but required her to meet with particular representatives, reviewed, edited and had to approve her work product .  Moreover, in contrast to Lyons, Hovanski was trained by the National

35

Vice President of Public Relations for American Income Life, was given specific directions on several issues from this Vice President, had daily contact with the defendant, and was required to contact American Income Life every time she had a question about public relations. The evidence presented by Hovanski as presented above is obviously quite different than the evidence presented by Lyons, especially regarding the element of control that is the "principal guidepost" that should be followed by the Court.

Also, the evidence presented by the plaintiff in Ratigan v. American Income Life Inc. Co., 1999 WL 446079 (D.Or. 1999) is also substantially different than evidence presented by Hovanski. While it is true that both Ratigan and Hovanski did not work at the defendant's Home Office in Waco, had a contract with an agency, and were not treated by the defendant as an employee for tax purposes, the differences in their relationships with the defendant was obviously very different. Ratigan was simply an appointment setter and general office assistant for the State General Agent. Ratigan apparently had absolutely no contact with American Income Life, despite the fact that her job included some public relations duties, along with janitorial duties, general secretarial duties, and receptionist duties. Id. at *1-2. Also, in contrast to Hovanski, Ratigan was paid with checks that were signed by the State General Agent and the State General Agent filed a 1099 form for Ratigan. Id. The district court in explaining its decision found that Ratigan was not an employee of American Income Life stated that because the plaintiff had presented no evidence that American Income Life controlled her employment in any manner or had presented any evidence that American Income Life even was aware of her existence during her employment. Id. at *3-4.

> **2.    THE COURT SHOULD BE GUIDED BY THE ELEVENTH CIRCUIT'S DECISION IN DAUGHTREY V. HONEYWELL, INC.**

In <u>Daughtry v. Honeywell, Inc.</u>, 3 F.3d 1488 (11th Cir. 1993), the Eleventh Circuit held that summary judgment was inappropriate on the employer issue under a fact situation less clear than the one in the instant case. In <u>Daughtry</u>, the plaintiff entered into a consulting contract with the defendant that specifically designated that she was not an employee of the defendant and that he was not entitled to any benefits or privileges of an employee. <u>Id</u>. at 1490. The defendant contracted with a third party to pay the plaintiff and the other consultants. <u>Id</u>. The plaintiff was hired only to work on a specific project, and he had several years experience as a computer programmer. <u>Id</u>. The consulting contract specifically stated that the consultant "is an independent contractor and shall be free to exercise discretion and independent judgment as the method and means of performance of the services in connection with the assignments made hereunder by HONEYWELL." <u>Id</u>. The district court held that because the plaintiff was not an employee, she had no cause of action under the ADEA. <u>Id</u>. at 1491.

However, the Eleventh Circuit, looked beyond the independent contractor agreement and reversed the district court's decision on the employer issue. The Eleventh Circuit considered factors such as that the plaintiff did not supply any of the materials necessary to perform her job and that the defendant supplied such materials, that the plaintiff was required to work on the defendant's premises, that the plaintiff did not hold herself as providing computer programming services to others, that the employment contract could be terminated at will, and that the plaintiff provided services personally. <u>Id</u>. at 1492-1493.

In the instant case, Hovanski did not supply any of the tools and materials that were necessary to perform her job, except the computer she used in Alabama and her automobile. Rather, virtually all of the materials she used were supplied by American Income Life. Further, Hovanski was required to work in the agency offices, an office with the name "American Income Life" on the door. Also,

not only did Hovanski not hold herself out as public relations services to others, she held herself out as the Director of Public Relations for American Income Life.  In fact, a Vice President of the American Income Life instructed her to tell union and association representatives that she was an employee of American Income Life.  In addition, the contract that Hovanski signed with Jennings & Associates stated that it could be terminated by either party at any time, and, in fact, she was terminated without notice.

In addition to the factors discussed above, the Eleventh Circuit considered the control over the manner and means that Honeywell had over the plaintiff's performed services to be most pivotal. Id. at 1493.  The plaintiff presented affidavit testimony that she was required to specifically perform her job as instructed by the defendant, was provided training by the defendant, had to work according to a process established by the defendant and  took direction on a daily basis from employees of the defendant. Id.  The Eleventh Circuit held that the district court erred by resolving the facts on the most pivotal issue of control against the plaintiff and reversed. Id.

Similarly, Hovanski has presented sufficient evidence of control of the means and manner of her job duties sufficient to withstand summary judgment.  Hovanski has presented evidence that she was required to meet with specific union and association representatives at the direction of  the defendant.  Hovanski has also presented evidence that she was trained by American Income Life, that every document she mailed to solicit leads had to be approved by American Income Life, that she was required to work within the public relations system established by the defendant, and that she was in almost daily contact  with the defendant.  Hovanski has even presented testimony that the State General Agent, Allan Jennings, even told her that he was not in control of PR and that if she had any questions to ask a Vice President of American Income Life.  Hovanski could not have performed her

job duties as a Public Relations Representative or Director of Public Relations as demanded by the defendant without the required constant contact she had with the defendant. American Income Life was involved in every aspect of her work and had the ultimate discretion regarding nearly all of the terms and conditions of her employment. Thus, as in Daughtrey, summary judgment is due to be denied.[1]

## B. HOVANSKI HAS CREATED A GENUINE ISSUE OF MATERIAL FACT REGARDING WHETHER SHE WAS AN EMPLOYEE OF THE REA AGENCY.

Plaintiff has asserted claims under Title VII against American Income Life and the REA Agency Defendant REA Agency has moved for summary judgment asserting on the issue of whether it should be considered an "employer" under Title VII. . For reasons as will be set out herein, genuine issues of material fact exist as whether the REA Agecny is to be considered an "employer"under Title VII and summary judgment is due to be denied.

Contrary to the defendant's initial argument, plaintiff does not contend that the she was a direct employee of the REA agency. Plaintiff does contend as set forth in her complaint that the REA Agency acted as an agent of her direct employer, American Income Life, as set forth above, within

---

[1] Plaintiff recognizes that insurance sales agents are often considered by courts to be independent contractors. See, Schweiger v. Farm Bureau Insurance Co. New England, 207 F.3d 480 (8th Cir. 2000); Oestman v. National Farmers Union Insurance Co., 958 F.2d 203 (10th Cir. 1992). However, Hovanski was not a sales agent and American Income Life had substantially more control over the means and manner of her employment than an insurance company general has over a sales agent. The control that American Income Life had over Hovanski's employment is much more similar to that found to establish a genuine issue of fact on the employee issue in Jenkins v. Southern Farm Bureau Casualty, 307 F.3d 741, 743-745 (8th Cir. 2002).
Further, the defendant's reliance on the Right-to-Sue Notices by the EEOC is misplaced, as these documents have little if any evidentiary value especially without any evidence submitted by the defendant that the EEOC did any reasonable investigation before issuing the notices. See, Walker v. NationsBank of Florida N.A., 53 F.3d 1548 (11th Cir. 1995).

the meaning of Title VII.  In <u>Zaklama v. Mt. Sinai Medical Center</u>, 842 F.2d 291, (11th Circuit 1988),

the Eleventh Circuit Court of Appeals made plain that "[i]t is clear from the language of the statute

that Congress intended that the rights and obligations it created under Title VII would extend **beyond**

**the immediate employer-employee relationship**."  <u>Zaklama</u>, 842 F.2d at 294.  <u>See also</u>, <u>Baker v.</u>

<u>McNeil Island Corrections Center</u>, 859 F.2d 124, 127 (9th Cir. 1988)(holding that while Title VII

protections apply only where these is some connection with an employment relationship that such a

connection need not necessarily be direct).

The Eleventh Circuit has emphasized that consistent with the purpose of the statue, "[a] liberal

construction must be accorded to the term: employer." <u>McKenzie v. Davenport-Harris Funeral Home</u>,

834 F.2d 930, 933 (11th Cir. 1987).  In determining who is an employer for Title VII purposes, the

Eleventh Circuit considers not just statutory provisions and codified authority, but looks to "the

economic realities of the relationship viewed in light of the common law principles of agency and the

right of the employer to control the employee." <u>Cobb v. Sun Papers, Inc.</u>, 673 F.2d 337, 341 (11th

Cir. 1982). <u>see also</u> <u>Bristol v. Board of County Commissioners of County of Clear Creek</u>, 2002 WL

265824 (10th Cir.)(whether an employer/employee relationship exists is a matter of fact for the jury).

The Eleventh Circuit has recognized three methods of consolidating employers for purposes of Title

VII: the single employer, the joint employer, and the agency tests. See <u>Lyes v. City of Riviera Beach</u>,

166 F.3d 1332, 1341 (11th Cir.1999).  In making this determination, District Courts in the Eleventh

Circuit apply the following three doctrines:

> We accord a liberal construction to the term "employer" under Title VII. In keeping
> with this liberal construction, we sometimes look beyond the nominal independence
> of an entity and ask whether two or more ostensibly separate entities should be
> treated as a single, integrated enterprise when determining whether a plaintiff's
> "employer" comes within the coverage of Title VII. We have identified three

circumstances in which it is appropriate to aggregate multiple entities for the purposes of counting employees. First, where two ostensibly separate entities are " 'highly integrated with respect to ownership and operations,' " we may count them together under Title VII. This is the "single employer" or "integrated enterprise" test. Second, where two entities contract with each other for the performance of some task, and one company retains sufficient control over the terms and conditions of employment of the other company's employees, we may treat the entities as "joint employers" and aggregate them. This is the "joint employer" test. Third, where an employer delegates sufficient control of some traditional rights over employees to a third party, we may treat the third party as an agent of the employer and aggregate the two when counting employees. This is the "agency" test. Lyes v. City of Riviera Beach, Florida, 166 F.3d 1332, 1341 (11th Cir.1999).

Walker v. Boys and Girls Club of America, 38 F.Supp.2d 1326, 1330 (M.D. Ala. 1999). Plaintiff presents sufficient evidence herein to create a genuine issue of material fact as to whether the REA agency acted as an agent of American Income Life under Title VII.

A third party may be treated as an "agent" of an employer where the employer "delegates sufficient control of some traditional rights over employees" to the third party. Walker, 38 F.Supp.2d at 1330. In Williams v. City of Montgomery, 742 F.2d 586 (11th Cir. 1984), the Eleventh Circuit found the defendant was the "agent" of the direct employer for Title VII purposes because the direct employer had delegated to it traditional employer rights. In reaching its determination of the defendant's employer status as an "agent" under Title VII, the court stated,

> Title VII defines employer as a "person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding year and any agent of such person." 42 U.S.C.A. §2000e(b). This definition is to be accorded a liberal construction. Quijano v. University Federal Credit Union, 617 F.2d 129, 131 (5th Cir. 1980) ... "Where the employer has delegated control of some of the employer's traditional rights, such as hiring or firing, to a third party, the third party has been found to be an 'employer' by virtue of the agency relationship."

Id. at 588-589 (footnotes and internal citations omitted). In Williams the court easily found the

41

defendant to be an agent of the employer as the defendant had been delegated matters including formulating pay and classification plans, evaluating employees, and promoting, demoting, transferring and reinstating employees. Id.

In the case at bar, the plaintiff has presented sufficient evidence to withstand summary judgment that the REA Agency was delegated by American Income Life some of an employer's traditional rights, thus making it an "employer" under Title VII. Plaintiff has presented evidence that American Income Life delegated matters such as formulating commission rates, hiring, evaluating employees, promotions, demotions, and terminations. While American Income Life delegated such control to the REA Agency, plaintiff has presented evidence that American Income Life had to approve the majority of these decisions made by the REA Agency.   In the case at bar, American Income delegated the power to the REA Agency to promote, demote, evaluate, transfer, increase her pay and terminate Hovanski, however, generally with the approval of American Income Life. American Income delegated these traditional rights to the REA Agency while still maintaining a direct employment relationship with Hovanski. Thus, the REA Agency should be considered an "employer" of Hovanski under Title VII,  as a genuine issue of fact exists whether the REA Agency is an agent of Hovanski's direct employer, American Income Life.

### C.    PLAINTIFF HOVANSKI HAS CREATED A GENUINE ISSUE OF FACT ON HER CLAIM OF SEXUAL HARASSMENT UNDER TITLE VII.

In order to establish a hostile environment sexual-harassment claim under Title VII, Hovanski must show that  (1) she belongs to a protected group; (2) that she has been subjected to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on her sex; (4) that the harassment was

42

sufficiently severe or pervasive to alter the terms and conditions of her employment; and (5) there is a basis for holding the employer liable. See, Mendoza v. Borden, Inc., 195 F.3d 1238, 1244 (11th Cir. 1999). In the instant case, the plaintiff is able to establish all of these factors, and thus, summary judgment should be denied on her hostile environment claim. In Harris v. Forklift Systems, Inc., 114 S. Ct. 367, 371 (1993), the Supreme Court discussed the relevant considerations for determining whether a hostile environment exists:

> [W]e can say that whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect of an employee's well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

Harris, 114 S. Ct. at 371.

The Supreme Court affirmed the validity of the "totality of the circumstances" analysis for determining the hostility of the environment in Oncale v. Sundowner Offshore Services, Inc., 118 S.Ct. 998 (1998):

> [T]hat inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target. . . . The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitively to social context [are required].

Oncale, 118 S. Ct. at 1003. See also, Mendoza, 195 F.3d at 1246. At least one federal court of appeals has followed this language and held that it is improper for courts to analyze a discrete incident of harassment "without reference to the circumstances in which it occurred." Draper v. Coeur

Rochester, Inc., 147 F.3d 1104, 1109 (9th Cir. 1998)(rejecting defendant's argument that the one incident of harassment that occurred within 180 days of the plaintiff's filing her charge was not hostile where, when viewed in the context of the preceding harassment, a jury could find the incident was hostile). Another federal court of appeals has cited the above language to support the proposition that, in light of the fact-intensive nature of the hostility determination, the issue is more appropriately left for the jury. Gallagher v. Delaney, 139 F.3d, 338 347(2d Cir. 1998) (noting, "The Supreme Court has recognized the difficulty in precisely defining what will or will not, in the virtually infinite number of varying circumstances, constitute a violation of the statute.").

In Vance v. Southern Bell Telephone and Telegraph Company, 863 F.2d 1503, 1510, the Eleventh Circuit held that pervasiveness involves inquiry into the effect of incidents of harassment, and is not merely a matter of counting the number of incidents. Similarly, the Second Circuit Court of Appeals has asserted, "It is not how long the sexual innuendos, slurs, verbal assaults, or obnoxious course of conduct lasts. The offensiveness of the individual actions complained of is also a factor to be considered in determining whether such actions are pervasive." Carrero v. New York City Housing Authority, 890 F.2d 569, 578 (2d Cir. 1989).

Further, sexual harassment does not have to take the form of sexual overtures or lewd conduct; sexual harassment can take the form of "gender-based animosity," which "resembles harassment based on race or national origin." Barbara Lindemann & David D. Kadue, Sexual Harassment in Employment Law 75 (1992). There is no legal basis for contending that the predicate acts underlying a sexual harassment claim must be clearly sexual in nature. See, Bell v. Crackin Good Bakers, Inc., 777 F.2d 1497, 1503 (11th Cir. 1985); Hall v. Gus Construction Co., 842 F.2d 1010, 1014 (8th Cir. 1988)(citing Hicks v. Gates Rubber Co., 833 F.2d 1406, 1415 (10th Cir. 1987); McKinney v. Dole,

765 F.2d 1129, 1139 (D.C. Cir. 1985)); See also, <u>Robinson v. Jacksonville Shipyards</u>, 760 F. Supp.

1486, 1522-23 (M.D. Fla. 1991).

In <u>McKinney</u>, the court held explicitly that non-sexual gender based harassment is

actionable:

> We have never held that sexual harassment or other unequal treatment of an employee or group of employees that occurs because of the sex of an employee must, to be illegal under Title VII, take the form of sexual advances or of other incidents with clearly sexual overtones. And we decline to do so now. Rather, we hold that any harassment or other unequal treatment of an employee or group of employees that would not occur but for the sex of the employee or employees may, if sufficiently patterned and pervasive, comprise an illegal condition of employment under Title VII.

<u>McKinney</u>, 765 F.2d at 1138. "Conduct of a non-sexual nature which, for example, ridicules women

or treats them as inferior, can constitute prohibited sexual harassment." <u>Sims v. Montgomery County</u>

<u>Commission</u>, 766 F. Supp. 1052, 1073 (M.D. Ala. 1990). <u>See, Bell v. Crackin Good Bakers, Inc.</u>, 777

F.2d at 1503 (The plaintiff was under no obligation to adduce proof of "sexual advances, requests for

sexual favors [or] other verbal or physical conduct of a sexual nature.... Such harassment can be of

at least two kinds: (1) a threatening, bellicose, demeaning, hostile or offensive conduct by a

supervisor in the workplace because of the sex of the victim of such conduct; . . .").

The defendant contends that the sexually hostile environment that the plaintiff was subjected

to was not severe and pervasive.  In <u>Mendoza</u>, the Eleventh Circuit stated follows:

> Establishing that harassing conduct was sufficiently severe or pervasive to alter an employee's terms or conditions of employment includes a subjective and an objective component. <u>Harris</u>, 510 U.S. at 21-22, 114 S.Ct. 367.  The employee must "subjectively perceive" the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable. Id. . . . .Furthermore, "the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.' " <u>Oncale</u>, 118 S.Ct. at 1003 (quoting Harris, 510 U.S. at 23, 114 S.Ct. 367).

The objective component of this analysis is somewhat fact intensive. Nevertheless, the Supreme Court and this Court have identified the following four factors that should be considered in determining whether harassment objectively altered an employee's terms or conditions of employment: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. Allen v. Tyson Foods, 121 F.3d 642, 647 (11th Cir.1997) (citing Harris, 510 U.S. at 23, 114 S.Ct. 367). The courts should examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment. Id.; see Harris, 510 U.S. at 23, 114 S.Ct. 367; Henson, 682 F.2d at 904; Faragher, 118 S.Ct. at 2283 (citing Harris, 510 U.S. at 23, 114 S.Ct. 367, and explaining that '[w]e directed courts to determine whether an environment is sufficiently hostile or abusive by 'looking at all the circumstances' ").

Mendoza, 195 F.3d at 1246-1247.

Hovanski has presented evidence throughout her employment she was constantly subjected to sexually offensive touchings, lewd comments, sexual jokes, and other conduct of a sexual nature by the agents she worked with. Without reciting all the facts set forth above, Hovanski has presented evidence that she was kissed in the office by Bronson Zolik, that Jennings often hugged her inappropriately, and that Adams stroked her leg in a sexual manner. Hovanski was constantly subjected to lewd comments and sexual jokes, including jokes about "blowjobs" and sexual positions. The agents Hovanski worked with made sexual propositions to her and told her that she would like Alabama much more if she had sex. Also, Hovanski was subjected to comments such as "nice ass" and requests that she attend the Jell-O wrestling fights held at a local bar so they could see her body in the mud with another woman. Hovanski was called a "bitch" and a "slut" by Zolik and Adams on many occasions. Jennings also called Hovanski a "bitch" and a "slut." Further, Hovanski often heard Jennings, Zolik and Adams refer to the other women in the office as "bitches," "ho's" and "sluts." Hovanski's computer was also used to look at pornography and when she complained about this, she

was accused of viewing the pornography to satisfy herself.  As the result of such conduct, Hovanski has presented evidence that she was scared to go into the office at times, she often dreaded going into the office, she was hesitant around the men she worked with and she often had difficulty performing her job.  In light of all of the evidence, Hovanski has alleged conduct that meets the frequency, severity, humiliating and interference components of the four part test to survive summary judgment on her sexual harassment claim. See, Mendoza v. Borden, Inc., 195 F.3d 1238, 1245-1246 (11th Cir. 1999)

The defendant argues that Hovanski cannot prevail on her sexual harassment claim, in part because she acted in a sexually inappropriate manner while working at the REA Agency.  Whether conduct is "welcome" is a question of fact and "turns largely on credibility determinations committed to the trier of fact." Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 68 (1986).  In Henson v. City of Dundee, 682 F.2d 897 (11th Cir. 1982), the Eleventh Circuit held that conduct was "unwelcome" when "the employee did not solicit or incite [the conduct] and . . . the employee regarded the conduct as undesirable or offensive." Henson v. City of Dundee, 682 F.2d 897, 903 (11th Cir. 1982). The defendant's argument regarding this issue is simply without merit in light of the deposition testimony of Allan Jennings.  Jennings admitted that Hovanski did not tell sexual jokes in the office, hug anyone in the office in a sexual manner, or do anything in the office that was sexually inappropriate. (Jennings Dep., 246:7-248:13).  In light of this testimony, defendant's argument that she was a participant in the sexual misconduct must fail.

Further, defendant's argument regarding the prompt remedial action taken by the defendant must fail.      As stated by this Court in Portera v. Winn-Dixie of Montgomery, Inc., 996 F.Supp. 1418 (M.D.Ala. 1998),

> ... the Eleventh Circuit has held that the standard for determining
> whether or not remedial actions are appropriate is whether the remedy
> is "reasonably likely to prevent the misconduct from recurring."
> Reynolds v. CSX Transportation, 115 F.3d 860, 868 (11th Cir. 1997).

996 F. Supp at 1427-28. It is not enough that the employer simply take some form of responsive

action; in order for the employer's response to qualify as a prompt remedial action it, "must be

*effective* action in order to exempt an employer from liability." Saville v. Houston County Healthcare

Auth., 852 F.Supp. 1512, 1528 (M.D.Ala. 1994). More specifically, courts in this Circuit have held

that the remedial action,

> ... must be 'reasonably calculated to end the harassment,' and the
> promptness and adequacy of the employer's response must be
> evaluated on a case-by-case basis. Of special importance is whether
> the sexual harassment ended after the remedial action was taken.

Munn v. Mayor and Aldermen of City of Savannah, Georgia, 906 F.Supp 1577, 1583 (S.D.Ga.

1995)(internal citations omitted), quoting Sanchez v. City of Miami Beach, 720 F.Supp. 974, 981

(S.D.Fla. 1989), and Katz v. Dole, 709 F.2d 251, 256 (4th Cir. 1983). The employer acts unreasonably

either if it delays unduly or if the action it does take, however promptly, is not reasonably likely to

prevent the misconduct from recurring. See Guess v. Bethlehem Steel Corp., 913 F.2d 463, 465 (7th

Cir. 1990); Degitz v. Southern Management Services, Inc., 996 F. Supp. 1451, 1459 (M.D. Fla.

1998)(question of fact precluded summary judgment on the issue of the promptness of the remedial

action where the employer delayed two weeks before acting on the plaintiff's complaint of

harassment). Saville v. Houston County Healthcare Authority, 852 F. Supp. 1512, 1528 (M.D. Ala.

1994)("'Prompt and appropriate remedial action' must be effective action in order to exempt an

employer from liability.")(emphasis added); see e.g. Brooms v. Regal Tube Co., 881 F.2d 412, 421

48

(7th Cir. 1989)(remedial measures not effective where investigation consisted only of interviews with the victim and the harasser and corrective action of postponement of merit increase and verbal reprimand did not prevent further harassment).

The determination of whether a particular remedial action was appropriate so as to absolve the employer of liability is a factual one. See Reynolds, 115 F.3d at 867 (holding what is appropriate remedial action will necessarily depend on the particular facts of the case). In Munn, the Court set out this Circuit's standard for questioning the appropriateness of a remedial action at the summary judgment stage:

> 'An employer is absolved from liability if it takes prompt and *appropriate* remedial action in response to the harassment.' Sparks v. Regional Medical Ctr. Bd., 792 F.Supp 735, 744 (N.D.Ala. 1992)(citing Steele v. Offshore Shipbuilding, Inc., 867 F.2d 1311, 1316 (11th Cir. 1989)(emphasis added). Because the jury must find that the action was 'reasonably calculated to end the harassment,' it necessarily must determine the appropriateness of the actions taken (or not taken) by Defendant. Katz, 709 F.2d at 256. 'What is appropriate remedial action will necessarily depend on the particular facts of the case–the severity and persistence of the harassment, and the effectiveness of any remedial steps.' Waltman v. International Paper Co., 875 F.2d 468, 479 (5th Cir. 1989). Genuine questions of fact which arise in this regard will preclude summary judgment. Id.

906 F.Supp.at 1583.(emphasis in original). In Fowler v. Sunrise Carpet Industries, Inc., 911 F. Supp. 1560 (N.D. Ga. 1996), the Court set out the following factors relevant to determining whether a defendant employer's "remedial action" is to be deemed effective:

> An employer can demonstrate prompt remedial action was taken by showing: (1) the employer investigated claims of harassment through employee interviews; (2) the employer gave a strong, serious reprimand to the harassing employee; (3) the employee assured employees the harassment would stop; (4) the employer informed the harassing employee that future acts of harassment would result in

> suspension or termination; (5) the employer demoted or suspended
> the harassing employee; (6) the employer voluntarily monitored the
> harassing employee's future behavior; and, most importantly; (7) the
> harassing employee actually stopped harassing other employees.

911 F. Supp. at 1581. Under these factors it is obvious that the defendant's alleged remedial actions

fall quite short of being considered "effective." Jennings did conduct a meeting with the agents

regarding sexual harassment but during that meeting he spoke about a "bogus claim" of sexual

harassment and also sarcastically made it clear that Hovanski was the person who had made a

complaint of sexual harassment. (Hovanski Dep. II, 92:10-94:12). This meeting was clearly not

reasonably calculated to end the sexual harassment suffered by Hovanski, as such harassment did not

stop. Rather, Jennings terminated Hovanski immediately after receiving her last complaint about

sexual harassment, which obviously cannot be considered prompt, remedial action.

### D.   PLAINTIFF HOVANSKI HAS CREATED A GENUINE ISSUE OF FACT ON HER CLAIM OF RETALIATION UNDER TITLE VII.

Title VII contains two clauses regarding retaliation. Section 704(a) of Title VII, 42 U.S.C.

Section 2000e-3(a) provides that: "(i)t shall be an unlawful employment practice for an employer to

discriminate against any of his employees or applicants for employment... because he has opposed

any practice and made an unlawful employment practice by this title, or because he has made a

charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing

under this Title." Taylor v. Renfro Corp., 84 F. Supp.2d 1248, 1254 (N.D. Ala. 2000). These two

clauses are commonly referred to as the "opposition clause" and the "participation clause"

respectively. Id.

Under the facts in this case at hand, only the opposition clause is applicable. Hovanski

triggered the opposition clause by complaining to Allan Jennings about sexual harassment on the last

day of her employment and informing him that as the result of his failure to act she had filed a formal

complaint.    Meeks v. Computer Assocs. Int'l., 15 F.3d 1013, 1021 (11th Cir. 1994); Goldsmith v.

City of Atmore, 996 F.2d 1155, 1163 (11th Cir. 1993);  Hairston v. Gainesville Sun Publishing Co.,

9 F.3d 913, 918-919 (11th Cir. 1993); Donnellon v. Fruehauf Corp., 794 F.2d 598, 600-601 (11th Cir.

1986). A plaintiff engages in "statutorily protected activity" when he or she protests an employer's

conduct which is actually lawful, so long as he or she demonstrates "a good faith, reasonable belief

that the employer was engaged in unlawful employment practices." Taylor at 1255.  To recover for

retaliation, the plaintiff "need not prove the underlying claim of discrimination which led to her

protest, so long as she had a reasonable good faith belief that the discrimination existed." Meeks v.

Computer Assoc. Intern., 15 F.3d 1013, 1021 (11th Cir. 1994).

In order to preclude a finding of summary judgment for retaliation, a plaintiff must prove the

following three elements: "**first**, the plaintiff engaged in statutorily protected conduct; **second**, the

plaintiff suffered an adverse employment action; and finally, **(third)** the adverse action was causally

related to the protected expression." Farley v. Nationwide Mutual Ins. Co. 197 F.3d 1322, 1336 (11th

Cir. 1999) (emphasis added).

The Eleventh Circuit has repeatedly interpreted the "causal link requirement" broadly.  See

Meeks, 15 F.3d at 1021; EEOC v. Reichhold Chem., Inc., 988 F.2d 1564, 1571-72 (11th Cir. 1993).

In Meeks and Reichhold, the Court stated that "a plaintiff merely has to prove that the protected

activity and the negative employment action are **not completely unrelated**." Meeks, 15 F.3d at 1021

(emphasis added); Reichhold, 988 F.2d at 1571-72. The Eleventh Circuit has held that "[e]vidence

that the adverse treatment followed closely upon the protected activity . . . may be sufficient to

establish a causal connection." Eastland v. Tennessee Valley Authority,  704 F.2d 613, 627 (11th Cir.

1983)(holding that a causal link may be established upon a showing that only a short period of time passes between the protected activity and the adverse personnel action complained of); see also Goldsmith v. City of Atmore, 996 F.2d 1155, 1163-64 (11th Cir. 1993); Donnellon v. Fruehaup Corp., 794 F.2d 598, 601 (11th Cir. 1986); Jordan v. Wilson, 649 F. Supp. 1038, 1061 (M.D. Ala. 1986).

The awareness by the decision-maker of protected conduct, in conjunction with temporal proximity of a adverse employment action to protected conduct, is sufficient to create a factual issue about the causal link requirement. See Goldsmith v. City of Atmore, 996 F.2d 1155, 1163-1164 (11th Cir. 1993). The defendant's awareness of the protected statement, however, may be established by circumstantial evidence." Id. at 1163 (internal citations omitted) Whether or not causation exists is frequently decided on timing alone. Conversely, where an adverse action closely follows protected activity, it is usually reasonable to infer that the activity was the cause of the adverse employment decision. Mize v. Jefferson Bd. of Educ., 93 F.3d 739 (11th Cir. 1996). See, e.g. Bechtel Construction Co. v. Secretary of Labor, 50 F.3d 926, 934 (11th Cir. 1995). In the instant case, Hovanski was terminated by Allan Jennings with the approval of Debbie Gamble approximately four days after Hovanski's complaint.

The defendant contends that Hovanski cannot establish an adverse employment action because she voluntarily terminated her employment by not returning to work on the Monday after she complained of sexual harassment to Jennings. However, this argument must fail primarily because the defendant admits that Allan Jennings terminated Hovanski's contract. The defendant cannot have it both ways, and not coming to work on one day does not lead to the reasonable conclusion that Hovanski quit her job. Further, a jury could certainly find it reasonable that Hovanski did not abandon her job when she did not return to the office on Monday because an officer of the company,

Emily Jennings, told her that she was terminated and Allan Jennings watched her pack her office. Hovanski has presented substantial evidence that the defendant did terminate her, which clearly amounts to an adverse employment action.

The defendant contends that if Hovanski actually did not quit her job but she was terminated, that she was not terminated based on retaliation but because of performance problems and her failure to return to work. These reasons are simply pretext for retaliation. First, the timing alone in this case is sufficient to prove pretext. Hovanski was terminated approximately four days after her last report of sexual harassment. Further, it was certainly reasonable not to come back to work when an officer of the defendant told her that she was fired. Further, Jennings testified that there was not a single document in existence that reflects the alleged performance issues that Hovanski supposedly had. Finally, approximately four days before Hovanski complained of sexual harassment for the last time, Jennings wrote a note to Hovanski that said "Keep the faith and you will double your income." (Jennings Dep., 209:21-212:19; Ex. 30). A reasonable jury could conclude that a person who wrote that note had no intention of terminating Hovanski approximately one week later. Hovanski has presented substantial evidence of pretext, thus, summary judgment should be denied on her retaliation claim.

E.    **PLAINTIFF HOVANSKI HAS CREATED A GENUINE ISSUE OF FACT ON HER CLAIMS INVASION OF PRIVACY, ASSAULT AND BATTERY AND NEGLIGENT AND/OR WANTON TRAINING, SUPERVISION AND RETENTION.**

The Alabama Supreme Court has held that an employer may be held liable for the intentional torts of its agent if that plaintiff offers evidence that "1) the agents' wrongful acts were in the line and scope of his employment; **or** 2) that the acts were in furtherance of the business of the employer; **or**

3) that the employer participated in, authorized, or ratified the wrongful acts." Potts v. BE&K Construction Co., 604 So.2d 398, 400 (Ala. 1992) (internal quotations omitted; emphasis added). Under Alabama law, a plaintiff can also establish liability by proving her employer ratified the supervisor's acts by showing the employer "(1) had actual knowledge of the tortuous conduct of the offending employee and that the tortuous conduct was directed at and visited upon the complaining employee; (2) that based upon his knowledge, the employer knew, or should have known, that such conduct constituted sexual harassment and/or a continuing tort; and (3) that the employer failed to take "adequate" steps to remedy the situation." Potts, 604 So.2d at 400.

Based on the above facts a jury could find that the defendant had actual knowledge of the sexual harassment of the plaintiff, and that the defendant failed to take "adequate" steps to remedy the situation.

### 1. Invasion of Privacy

In Phillips v. Smalley Maintenance Services, 435 So.2d 705 (Ala. 1983), the court held that Alabama recognizes several types of invasion of privacy and specifically adopted Restatement (Second) of Torts, § 625B, as the law of Alabama. Id. at 708. The Alabama Supreme Court specifically held that activities associated with sexual harassment fall under that type known as "intrusion upon the plaintiff's physical solitude or seclusion." Id. The facts of the sexual harassment in Smalley, including solicitations to have sex, physical contact, and inquiries about the plaintiff's sex life, were found to meet the requisite elements of a § 625B action. Id. at 711; see also Quillen, 874 F. Supp. at 1298 (citing Busby v. Truswall Systems Corp., 551 So. 2d 322, 323 (Ala. 1989); Cates v. Taylor, 428 So. 2d 637, 639 (Ala. 1983)).

To determine whether Hovanski's wrongful invasion of privacy claim survives Summary

54

Judgment, this Court must determine "whether there was an offensive or objectionable prying or intrusion into the plaintiff's private affairs or concerns." Busby, 551 So.2d at 323. Hovanski has presented evidence from which a jury could reasonably find that touchings of her in an intrusive manner, especially the kiss by Zolik, and the sexual comments, especially about her sex life and her alleged promiscuity, made to Hovanski and the use of her computer to view pornography present a jury question of whether the defendant violated the "wrongful intrusion" arena of the invasion of privacy tort. Busby, 551 So.2d at 323. See also the recent case of, Horne v. Russell County Commission 2003 WL 22989304 (M.D. Ala.) (Plaintiff sufficiently alleged an invasion of privacy claim against defendants.)

### 2.      Assault and Battery

Alabama law has long defined assault and battery as any touching of the person of another in rudeness or anger. See Quillen v. American Tobacco Co., 874 F. Supp. 1285, 1298 (M.D. Ala. 1995). The issue of whether the touching would be harmful or offensive to a reasonable person is a question of fact. Quillen, 874 F. Supp. at 1299. An actual injury to the body is not a necessary element of a civil assault and battery. Surrency v. Harbison, 489 So.2d 1097, 1104 (Ala. 1986). The touchings at issue in the case, lingering hugs, inappropriate shoulder rubs by Jennings and Zolik and Zolik's kiss amount to assault and battery. Further, despite Hovanski's several complaints nothing was done to stop the conduct until eventually Hovanski was terminated.

### 3.      Negligent and/or Wanton and Malicious Training, Supervision and Retention

In Machen, the Alabama Supreme Court held a plaintiff had presented substantial evidence to support her claims that the bank defendants negligently or wantonly failed to investigate, train, supervise, and discipline her harassing supervisor. Machen, 781 So. 2d at 986 (Ala. 1999). The Court

in Machen denied summary judgment and held as follows:

> After reviewing the evidence in a light most favorable to Machen, we conclude that the evidence creates a genuine issue of material fact as to whether the bank defendants took adequate steps to investigate Machen's complaint of sexual harassment and to train bank employees, including Robert, regarding the bank's policies prohibiting sexual harassment, and whether they took appropriate disciplinary measures to remedy the situation; and, if they did not, whether their failure was the result of negligence or wantonness.

*Id.* at 987. The Court further noted "(a) jury could further conclude that had the bank defendants monitored and/or supervised the situation more carefully, Robert would not have repeated the acts of misconduct."

In Big B, Inc. v. Cottingham, 634 So.2d 999 (Ala. 1993), a customer sued the Assistant Store Manager of Big B, Inc. for false imprisonment and assault and battery. The plaintiff also alleged that Big B, Inc. had "negligently or wantonly trained and supervised (the assistant manager) and that negligence or wantonness was the proximate cause of her injuries." Id. at 1001.

The facts before this court provide sufficient evidence to send Hovanski's negligent training, supervision and retention claims to the jury because the defendant failed to take any meaningful action to protect Hovanski from being sexually harassed despite her complaints.

### 4.    Wanton and Malicious Training, Supervision and Retention

The Alabama Supreme Court in Machen also denied summary judgment on the plaintiff's wantonness claim and found as follows:

> (T)he plaintiff had presented substantial evidence to sustain a claim challenging wanton investigation, training, supervision and discipline. To prove wantonness, it is not essential to prove that the defendant entertained a specific design or intent to injure the plaintiff. Wantonness is defined by statute as conduct which is carried on with a reckless or conscious disregard of the rights or safety of others. . . (T)his court described wantonness as the conscious doing of some act or the omission of some duty, while knowing of the existing conditions and being conscious that, from doing

56

or omitting to do an act, injury will likely or probably result.

Machen, supra at 987 (internal quotations and citation omitted). In Big B, the court also found

sufficient evidence to sustain the plaintiff's claim of wanton training and supervision. The court once

again considered the fact that management did not train the Assistant Manager on how to detain and

handle an accused shoplifter. Also, the defendant's failure to properly investigate beyond the Assistant

Manager's denial of harassment supported a finding of wantonness. In particular, the Court noted that

management's failure to interview the female who had allegedly been harassed or failure to file an

official report with corporate headquarters could lead a reasonable jury to conclude Big B's

management "consciously chose to downplay the incident in order to retain [the assistant manager],

knowing that to do so would likely give [him] another opportunity to demean or otherwise mistreat

a female customer or employee." Id. at 1004.

Similarly, Hovanski has presented evidence that she received no training on the subject of

sexual harassment, the defendant failed to inform its employees and managers on the subject of sexual

harassment, the defendant failed to provide its employees with an effective method of reporting

harassment, and the defendant failed to adequately investigate Hovanski's complaints that she was

being sexually harassed her at work. which resulted in her suffering further physical abuse at work.

The defendant's refusal to take action against any of the agents who harassed Hovanski, allowed the

sexual harassment to continue establishes a plaintiff's claim.

## III.    CONCLUSION

For the foregoing reasons, summary judgment is due to be denied on plaintiff's claims of

sexual harassment and retaliation under Title VII. Further, summary judgment is due to be denied on

plaintiff's state law claims of assault and battery, invasion of privacy, and negligent and/or wanton

training, supervision and retention.   Plaintiff does not oppose summary judgment on any other substantive claim.

Respectfully Submitted,

Jon C. Goldfarb
Maury S. Weiner
Counsel For Plaintiff

**OF COUNSEL**:

WIGGINS, CHILDS, QUINN & PANTAZIS, P.C.
The Kress Building
301 19th Street North
Birmingham, AL 35203
Telephone No.: (205) 328-0640
Facsimile No.: (205) 254-1500

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document was served U.S. mail, postage prepaid and properly addressed to:

Sally Broatch Waudby, Esq.
Lehr, Middlebrooks, Price & Proctor, P.C.
2021 3rd Avenue North
Post Office Box 370463
Birmingham, Alabama 35203

Stephen E. Whitehead, Esq.,
Jennifer A. McCammon, Esq.,
Lloyd, Gray & Whitehead, P.C.
2501 Twentieth Place South
Suite 300
Birmingham, AL 35223

on this the ___9th___ day of __April__, 2004.

OF COUNSEL

58