# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION



| | |
|---|---|
| **LYDIA HOVANSKI,** | ] |
| | ] |
| **PLAINTIFF,** | ] |
| | ] |
| **v.** | ]**Civil Case No.** |
| | ]**2:03-CV-0838-VEH** |
| | ] |
| **AMERICAN INCOME** | ] |
| **LIFE INSURANCE CO.; et. al.,** | ] |
| | ] |
| **DEFENDANTS.** | ] |

## Opinion

This Court has before it the March 9, 2004, motion of Defendants REA Agency and Allan Jennings ("Defendants") for summary judgment as to Plaintiff Lydia Hovanski's claims.  (Doc. 55.)  For the reasons set forth below, the Defendants' motion is due to be granted as to Plaintiff's federal discrimination claims and granted in part and denied in part as to her state law claims.

## I.  Procedural History

Plaintiff Lydia Hovanski commenced this action on April 10, 2003, by

1

filing a complaint[1] in this Court alleging violations of Title VII of the Civil

Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., as amended by the

Civil Rights Act of 1991; 42 U.S.C. § 1981a; and the National Labor Relations

Act, 29 U.S.C. § 159.[2]   Plaintiff Hovanski alleges that she was subjected to

disparate treatment based on gender in demotion, discharge, compensation,

discipline, and the terms and conditions of employment.   Plaintiff Hovanski

contends that she was subjected to unwelcome acts of sexual harassment by

agents[3] of the Defendant,   in a manner sufficiently severe to create an

objectively hostile work environment.   Plaintiff Hovanski contends that when

she complained about the alleged sexual harassment, she was retaliated against

by the Defendant and constructively discharged.   Further, Plaintiff Hovanski

contends that Defendant AIL wantonly and/or negligently hired and failed to

---

[1] Plaintiff Hovanski amended her complaint on August 25, 2003, to include claims against Defendants REA Agency Corporation and Allan Jennings.

[2] The Plaintiff originally filed a complaint against Office and Professional Employees International Union Local 277,an entity subject to suit under the National Labor Relations Act. On September 23, 2005, Plaintiff Hovanski and Office and Professional Employees International Union Local No. 277 stipulated to the dismissal with prejudice of all claims and causes of actions filed by Plaintiff Hovanski against Office and Professional Employees International Union Local No. 277.   Plaintiff's claims against the remaining Defendant (American Income Life Insurance Company) are the subject of a separate pending summary judgment motions.

[3] Bronson Zolik, Allan Jennings, and Marcellus Adams.

2

train, supervise, and/or terminate Jennings, Adams, and Zolik which resulted in the alleged harassers subjecting Plaintiff Hovanski to sexual harassment, retaliation, and eventually a constructive discharge.

On March 9, 2004, the Defendant filed a motion for summary judgment asserting: (1) that Plaintiff Hovanski cannot establish a Title VII claim because she was not an employee of the Defendants; (2) that even if the Court determines that Plaintiff Hovanski was an employee of Defendants, Plaintiff Hovanski has failed to establish prima facie cases of gender discrimination, hostile environment sexual harassment, and retaliation; (3) Plaintiff Hovanski cannot establish her state law claims of negligent and wanton hiring, retention, training, and supervision, invasion of privacy, assault and battery, outrage, breach of contract, breach of implied contract, conversion, conspiracy, and defamation as a matter of law.

The Defendant has submitted evidence[4] in support of its motion for summary judgment and filed a supporting brief on March 9, 2004.  On April

_____

[4] The Defendant submitted the following evidence: excerpts of the deposition of Lydia Hovanksi, Volume I and certain exhibits; excerpts of the deposition of Lydia Hovanski, Volume II; deposition of Debbie Gamble and certain exhibits; deposition of Allan Jennings; supplemental affidavit of Debbie Gamble.  References to the deposition transcripts are denoted by the last name of the deponent, followed by the abbreviation "Dep.," followed by the page number of the deposition transcripts being referenced.

3

9, 2004, the Plaintiff filed a brief and evidence[5] in opposition to the Defendant's motion for summary judgment.  The Defendant filed a brief on April 30, 2004, in  reply to Plaintiff's response in opposition.

## II.  Standard of Review

### A.  Summary Judgment

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions

---

[5] The Plaintiff submitted the following evidence: deposition of Lydia Hovanski dated 1/6/04 with exhibits ; deposition of Lydia Hovanski dated 1/29/04; deposition of Allen Jennings; deposition of Debbie Gamble with certain exhibits; deposition of Lee Ann Jackson with exhibits; and supplemental declaration of Lydia Hovanski with exhibits.

of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp., 477 U.S. at 323.  Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  Id. at 324.

The substantive law will identify which facts are material and which are irrelevant.  Chapman, 229 F.3d at 1023; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  Chapman, 229 F.3d at 1023; Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248; Chapman, 229 F.3d at 1023.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United

States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. Fitzpatrick, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.  The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.

This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case. Fitzpatrick, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

### III.  Relevant Facts[6]

AIL is an insurance company headquartered in Waco, Texas. AIL primarily sells life and accident insurance policies, and caters to a clientele

---

[6] Facts are undisputed unless otherwise expressly noted. If the facts are in dispute, pursuant to Rule 56 of the Federal Rules of Civil Procedure, the facts are presented in the light most favorable to the Plaintiff. See Fitzpatrick, 20 F.3d at 1115.

within the niche market of union and other organization members.  (Gamble Dep. 8-9, 12.)   AIL contracts with insurance agents to sell its products. (Gamble Dep. 11-12, 14, 15, 17, 23.)  AIL's "highest" contract is with State General Agents ("SGA").  (Gamble Dep. 11-12.)  These SGAs essentially run their own businesses.  (Gamble Dep. 11-15, 21-22; Jennings Dep. 31-32.)  AIL does not share in any of the costs or expenses associated with the SGAs' offices.  (Gamble Dep.125-126, 150.)

Public Relations Representatives ("PR Reps") assist SGAs in developing relationships with unions, credit unions, and other organizations to sell insurance.  (Gamble Dep. 13-14.)   The SGAs contract with PR Reps to generate leads for their agents and the agents develop those leads to sell policies. (Gamble Dep. 13-14; Jennings Dep. 123, 169.)  The PR Reps contract directly with the SGAs.  (Gamble Dep. 14-15, 26-27, 29.)  Generally, it is the PR Rep's responsibility to contact a union, credit union, or organization to see if it is interested in offering no cost accidental death and dismemberment ("AD&D") policies to its members.  (Gamble Dep. 13-14).  If so, the PR Rep completes an application for group insurance coverage for the members of the organization.  (Gamble Dep. 13-14.)  AIL must approve the applications for

8

group insurance.  The SGA pays the cost of the group coverage for the organization. (Gamble Dep. 14.)  The organization, or the SGA on its behalf, then notifies members informing them by mail of this coverage. (Gamble Dep. 13-14.)  The members are asked to return a response card ("lead card") if they are interested in having an agent contact them to discuss other insurance products. (Gamble Dep. 13-14.)  If the lead card is returned, an agent will deliver a certificate of group coverage to the member and discuss other available insurance products with that person. (Gamble Dep. 13-14.)   PR Reps, including Plaintiff, are paid for each lead card returned. (Gamble at 15, 24, 34-35.)  PR Reps can either be paid on an "as earned" basis, meaning they are paid for each lead card which has been returned, or they can be paid an advance against anticipated lead credits. (Gamble Dep. 25, 39.)  Although AIL facilitates the payments to the PR Reps (i.e., AIL prepares the payments), AIL charges the amount paid to a PR Rep back to the appropriate SGA. (Gamble Dep. 24-25, 59, 76, 151-152; Hovanski Dep. 138-140.)  SGAs may have a PR Rep who manages other PR Reps. (Gamble Dep. 29.)  Some SGAs  may decide to compensate PR managers for their management duties by giving them manager overrides (a percentage of the amount the originating PR Rep

9

receives, per card) on lead cards generated by the PR Reps working under their supervision. (Gamble Dep. 78-79:24.)

AIL has a Collective Bargaining Agreement ("CBA") with Office and Professional Employees International Union ("OPEIU"), which represents certain agents and PR Reps. (Gamble Dep. 24, 35, 45.) Among other things, the CBA defines the relationship between AIL and the agents and PR Reps as an independent contractor relationship and sets minimum compensation levels for agents and PR Reps. (Gamble Supplemental Aff. at ¶¶5-8, Exhibit D thereto.) Pursuant to the CBA, AIL and the SGAs also provide a bonus to qualifying agents and PR Reps who meet certain production criteria, to reimburse them for some of the cost of their health insurance, which the agent or PR Rep must obtain for themselves. (Gamble Dep. 45-46, 149-150.) This reimbursement is a production incentive for which agents and PR Reps must qualify. (Gamble Dep. 149-150.) AIL does not provide health insurance to anyone working in the SGA offices. (Gamble Dep. 149.) The agents and PR Reps may also qualify, based upon production, for group term life insurance coverage, the cost of which is also divided between AIL and the SGA[7].

_____

[7] Plaintiff received AIL life insurance.

(Gamble Dep. 45.)

In the Spring of 2001, Plaintiff Hovanski was hired to work as a PR Rep at Jennings & Associates, an agency that sold American Income Life products in Utah. (Hovanski Suppl. Decl. ¶¶2-3.)  Jennings & Associates was operated by Bill Jennings, the State General Agent for American Income Life.  Id. Plaintiff was hired after posting her resume on the internet.  (Hovanski Dep., 41-42, 221-222.)   She was initially interviewed by Marcellus Adams in the Utah SGA office.  Id.  However, when it became apparent that Plaintiff was interested in a PR position, she was also interviewed by Becky Cutler, the PR Director for Bill Jennings' SGA offices in Colorado and Utah, and Bill Jennings.  (Hovanski Dep. 177-178, 223.)   Plaintiff received her public relations contract from Becky Cutler. (Hovanski Dep. 224.) Plaintiff read her public relations contract before she signed it and understood it.  (Hovanski Dep. 35-36.) After Plaintiff signed the public relations contract, Bill Jennings signed it.  (Hovanski Dep. 224; Gamble Dep. 35-36, Exhibit 1 thereto; Jennings Dep. 89, 261.)   The PR Contract signed by Plaintiff provides:

> The PR Rep shall not represent or imply that the PR Rep is an
> employee or officer of the agency or of American Income Life
> Insurance Company, or a person having the authority to transact

11

business for the agency or American Income Life Insurance Company. The PR Rep will not be treated as an employee with respect to services performed under this contract for federal and state tax purposes.[8]

(Hovanski 305-306, 314-316, Exhibits 11 and 17 thereto.) The PR contract

further provides that:

The PR Rep may devote such effort and hours to the work as the PR Rep chooses and shall not be required to work in any particular manner. [...] The PR Rep may pursue other business or work for other entities.[9]

(Hovanski Dep. 305-306, Exhibit 11thereto.) In addition to signing her PR

contract, Plaintiff completed certain documents which provided AIL with the

information necessary to evaluate her background for licensing purposes, and

to allow AIL to facilitate payments on behalf of the SGA. (Gamble Dep. 41-

44; Jennings Dep. 111-115.) When Plaintiff first started as a PR Rep, she

became a union member by joining OPEIU Local 277. (Hovanski Dep. 308-

---

[8] Plaintiff alleges that, despite the contract, Bowyer instructed her to tell the union representatives that she met with that she was an employee of AIL and that every employee of AIL was a member of union OPEIU Local 277. (Hovanski Dep. 33-35; Hovanski Suppl. Decl. ¶ 9.) Therefore, Plaintiff Hovanski held herself out as an employee of AIL. Id.

[9] Plaintiff alleges that upon signing the PR contract she asked Bill Jennings whether it was true that she could work for another insurance company pursuant to the contract. (Hovanski Suppl. Decl. ¶13.) Bill Jennings allegedly responded that Plaintiff Hovanski worked for AIL and that she could not work for any other insurance company. Id.

309, Exhibit 13 thereto; Gamble at 47-48.)  By joining the OPEIU, Plaintiff authorized the Union to be her exclusive collective bargaining agent. (Hovanski Dep. 309, Exhibit 13 thereto.)  Plaintiff received and read a copy of a CBA[10] between AIL and OPEIU which defines the relationship between AIL and the agents and PR Reps as an independent contractor relationship. (Hovanski Dep. 36, 72-73, 314, Exhibit 17 thereto.)  Everyone who works for an agency that sells American Income Life insurance is an independent contractor, including the SGAs.  (Gamble Dep. 16-17.)

Plaintiff began her duties as a PR Rep in approximately July 2001, after she received her insurance license.[11]  (Hovanski Dep. 175-176; 225.)  Plaintiff paid for her own insurance license.  (Hovanski Dep. 226-227.)  Plaintiff was trained by Cutler for three days and then she was sent to Colorado to watch Cutler work for a few days.  (Hovanski Dep. 177-178.)  Bill Jennings was the SGA in Utah when Plaintiff commenced her duties as a PR Rep.  (Gamble Dep. 36-37.)  At the end of December 2001, Allan Jennings ("Jennings") took over

---

[10] Collective Bargaining Agreement

[11] PR Reps are required to get an insurance license because they solicit applications for insurance.

as the Utah SGA.[12]  (Hovanski 175-176; Gamble Dep. 37; Jennings Dep. 40.)

In approximately January 2002, after Allan Jennings became the Utah SGA,

Denise Bowyer, National Director of Public Relations for AIL, came to Utah

to assist Plaintiff with some training.[13]  (Hovanski Dep. 238, 301.)   Ms.

Bowyer also provided Plaintiff with a password which enabled her to obtain

access to certain parts of AIL's website which were relevant to PR work.

(Hovanski Dep. 237- 238).  Access to AIL's website enabled Plaintiff to print

off additional copies of certain documents she needed to arrange AD&D

coverage for the groups with whom she worked.   (Hovanski Dep. 238-239.)

When Plaintiff first started work as a PR Rep,  she was paid a "draw" (or

advance) against anticipated lead card compensation.  (Hovanski Dep. 118.)

In Utah, after lead cards started coming in, Plaintiff transitioned to an "as

earned" compensation scheme and, at the same time, worked toward paying off

_____

[12] Allan Jennings was originally the Managing General Agent contracted under Bill
Jennings in Utah.  (Gamble Dep. 37; Jennings Dep. 259-260, Exhibit 40 thereto.)  Plaintiff was
not required to sign a new contract.  (Hovanski Dep. 315-317; Hovanski Supp. Decl. ¶8.)

[13] Since Allan Jennings informed Plaintiff Hovanski that he did not control or know
anything about PR, Plaintiff Hovanski would call or email Denise Bowyer whenever she had a
question related to public relations.  (Hovanski Dep. 315-317; Hovanski Suppl. Decl. ¶8.)  In
addition, AIL provides policies and procedures for public relations representatives to follow.
(Gamble Dep. 45-46.)

her debit balance, which had accrued as a result of her draw.  (Hovanski Dep. 118-119.)

In the late Spring or Summer of 2002, Allan Jennings became the SGA in Alabama while simultaneously serving as the SGA in Utah.  (Hovanski Dep. 16; Jennings Dep. 41-42.)   Around this time, Allan Jennings decided to promote Plaintiff to PR Manager.[14]  (Jennings Dep. 130-132; 185.)  Plaintiff Hovanski supervised the work of three other PR Reps who worked in the Birmingham agency.[15]  (Hovanski Dep. 47-48; Hovanski Suppl. Decl. ¶12.) In addition to being paid on a per card basis for groups she signed, Allan Jennings agreed to pay Plaintiff a manager override on groups signed by PR Reps under her supervision.  (Jennings at 132- 133, 134-136.)

Jennings created the REA Agency as a Subchapter S Corporation in Utah and moved it to Alabama from Utah.  (Jennings Dep. 49-51.)  The officers of

---

[14] Plaintiff Hovanski had not applied for a promotion or even asked if she was interested prior to receiving the position.  (Hovanski Suppl. Decl. ¶10.)  Plaintiff Hovanski was not required to sign a new contract when she received the promotion.  (Hovanski Suppl. Decl. ¶11.)

[15] AIL approved the hiring of these three PR Reps.  (Hovanski Suppl. Decl. ¶12.) Plaintiff Hovanski did not have the authority to hire any of the PR Reps she supervised without the approval of AIL.  (Hovansi Dep. 103-104; Hovanski Suppl. Decl. ¶12.)  When Plaintiff Hovanski experienced performance problems with one of the PR Reps, she discussed these issues with Bowyer at her direction.  (Hovansi Dep. 103-104; Hovanski Suppl. Decl. ¶14.)  Eventually, Bowyer instructed Plaintiff Hovanski to terminate the particular PR Rep and instructed Plaintiff on what to write in the termination letter.  Id.

REA Agency are Allan Jennings and his wife, Emily Jennings.  In addition to
PR Reps and agents, the REA Agency employs an office manager and four
"phone room" people who are paid by Jennings.  (Jennings Dep. 52-53, 54.)
As a PR Rep and Manager, Plaintiff was responsible for generating leads for
the insurance agents in her office to sell insurance.  (Hovanski Dep. 336.)  To
do this, she met with unions, credit unions, and other organizations and offered
them a no cost AD&D policy for the group's members.[16]  (Hovanski Dep. 338.)
In addition, Plaintiff was to obtain the group's membership list so that
information regarding AIL and a lead card could be mailed to the members.
(Gamble Dep. 13-14.)  Plaintiff was paid on a per-card basis for the number of
lead cards returned from these mailings.  (Hovanski Dep. 333-334.)    To
provide a group with the no cost AD&D coverage, Plaintiff was required to
have them sign an insurance application. (Gamble Dep. 13-14.).  As the PR
Rep, Plaintiff and the union president or manager were required to sign the
applications for group insurance (TG-13s, IG, and AGs).  (Hovanski Dep. 31-

---

[16] Before Hovanski could obtain the actual leads, AIL had to approve the applications for
group insurance with the particular union or association.  (Hovanski Dep. 251-254; Hovanski
Suppl. Decl. ¶6.)  If AIL did not approve of the particular union or association, then Hovanski
could not send the necessary documentation to obtain the leads.  (Hovanski Suppl. Decl. ¶6.)

33.)  After groups were signed, Plaintiff drafted lead letters to the members of the group.  (Hovanski Dep. 262-264.)  AIL approved these lead letters for legal compliance because they are considered advertisements and hence are regulated by law.  (Gamble Dep. 61-63.)  Once the lead letters were approved by AIL, the SGA office was responsible for the mailings and the costs associated with the mailings.  (Hovanski Dep. 230-231.)  When Jennings did not want to pay a mailing service to send out the mailings, Plaintiff and others in the office were required to get the mailings out themselves.  (Hovanski Dep. 231.)  Plaintiff was authorized by Jennings to sign releases at the mailing houses when she went to pick up mailings or to obtain quotes.  (Hovanski Dep. 33.)  In addition to her regular PR duties, Plaintiff was instructed by Becky Cutler and Jennings that she would also handle customer issues.  (Hovanski Dep. 77.)

Jennings held weekly mandatory office meetings.  (Hovanski Dep. 185, 188-190.)  As PR Manager, Plaintiff also held required weekly meetings of the PR Reps under her supervision to discuss what needed to be done in PR that week.  (Hovanski Dep. 185, 188- 190; Jennings Dep. 65-66.)  As PR Manager, Plaintiff also took on the administrative duties of dealing with AIL's home

17

office on paperwork for the PR Reps working under her supervision. (Hovanski Dep. 77-79.)

At either the end of September or the beginning of October 2002, Plaintiff had a conversation with Allan Jennings, after he returned from an SGA Conference in Texas, which she tape-recorded. (Hovanski Dep. 13-14.) In this conversation, Jennings told Plaintiff that he was taking away some of her managerial responsibilities and giving them to Emily Jennings. (Hovanski Dep. 20-21; 301.) Once Emily Jennings took over as PR Manager, she began having the PR meetings in her office. (Hovanski Dep. II at 98.) Plaintiff's pay did not change after her demotion. (Hovanski Dep.301.) While working as a PR Rep, Plaintiff received no formal performance evaluations. (Hovanski Dep.277.) However, she received informal feedback on her production. (Hovanski Dep. 277-278.) The only reprimand she received came from Jennings and related to her production. (Hovanski Dep. 278.). Jennings was her supervisor in the office. (Hovanski Dep. 85-86.) Plaintiff believes that she was successful throughout her time as a PR Rep. (Hovanski Dep. 366-367; Hovanski Dep. II 142-143.)

The tools and equipment Plaintiff used to complete her job were provided

by SGA, AIL, or Plaintiff.  Plaintiff received group insurance application forms from AIL.  (Hovanski Dep. 267-268, 333, Exhibit 27 thereto; Jennings Dep. 67-68.)  Plaintiff received form lead letters from AIL and received AIL's approval on the final versions of her letters.  (Hovanski Dep. 267-268, 330, Exhibit 26 thereto; Jennings Dep. 67-68.) Plaintiff was provided with business cards and letterhead for faxes from the home office of AIL that reflect that Plaintiff was the Director of Public Relations for AIL.[17]  (Hovanski Decl. Suppl. ¶¶9, 15; Ex. B; Ex. G.)  AIL also pointed Plaintiff to resources to find organizations to contact about obtaining group insurance, and provided all PR Reps copies of "blue papers" which contain information of interest to credit unions.  (Hovanski Dep. 268-269, 270-274, 322, Exhibit 22 thereto.)  These "blue papers" may also be mailed to different organizations at the SGA's expense.  (Gamble Dep. 94.)  Plaintiff obtained leads via internet research. (Hovanski Dep. 276.).  She also consulted a monthly recap list, which was generated by AIL and sent to the SGAs regarding groups which had previously had AIL insurance, for assistance in generating leads. (Hovanski Dep. 275-276;

_____

[17] AIL disputes that the business cards and letterhead were provided by its company.  AIL contends that the business cards and letterhead were provided by or generated by Allan Jennings without AIL's approval.  (Jennings Dep. 268-270.)

Jennings Dep. 67-68; Gamble Dep. 33.)   In Utah, Plaintiff used the computer, telephone and fax machine in the SGA office, which were paid for by the SGA. (Hovanski Dep. 269-270; Jennings Dep. 68-69, 271.)     When PR mailings went out, the SGA paid for the copying service  and postage on those mailings. (Jennings Dep. 271.)   Jennings also paid the rent on the SGA office and provided the furniture contained in the office.  (Jennings Dep. 271-272.)    In Alabama, Plaintiff provided her own computer.  (Hovanski Dep. 299; Jennings Dep. 271.)  Plaintiff was responsible for providing her own transportation and she was not reimbursed for her mileage.  (Hovanski Dep. 270.)  However, she was told by Jennings that she would be reimbursed for some of her trips between Alabama and Utah because they were business trips.  (Hovanski Dep. 368.)

Plaintiff was treated as a non-employee for benefits and tax purposes. Plaintiff received an IRS Form 1099 from AIL reporting her income for 2001 and 2002.  (Hovanski Dep. 301-303, Exhibits 8 and 9 thereto.)  Plaintiff never disputed the fact that she was classified as a non-employee for tax purposes. (Hovanski  Dep.  302-303.)     On  her  own  tax  returns,  Plaintiff  listed  the compensation she received via AIL as non-employee compensation and further

testified that everything on the tax return was true and correct.  (Hovanski Dep. 303-305, Exhibit 10 thereto.)   Plaintiff is not aware of anyone making unemployment compensation insurance payments for her while she was working as a PR Rep.  (Hovanski Dep. 299.)  Jennings did not pay worker's compensation insurance for either PR Reps or agents.  (Jennings Dep. 273)  An agent or PR Rep whose production met certain guidelines may qualify to be reimbursed for a portion of the cost of their health insurance.  (Jennings Dep. 273.)  However, the agent or PR Rep must obtain their own insurance, and half of the cost of the reimbursement amount is charged to the SGA.  (Jennings Dep. 273.)  As SGA, Jennings did not keep track of vacation and individuals in his agency did not need approval to take vacation.  (Jennings Dep. 273-274.)  After her termination, Plaintiff applied for unemployment benefits, which she did not receive because of her 1099 status.  (Hovanski Dep. 298.)

**Claims of Sexual Harassment**

Plaintiff claims that she was subjected to "constant touching" while working in the Alabama and Utah SGA offices.  (Hovanski Dep. 41.)  By "constant," Plaintiff means many times a week.  (Hovanski Dep. 44, 74.)  Plaintiff accuses Allan Jennings, Marcellus Adams, Bronson Zolik, and Gary

Clark of unlawful or harassing conduct.  (Hovanski Dep. 43-50, 64, 67-69.)
The alleged sexual harassment began in Plaintiff's initial interview when
Adams stroked her knee and told her that she would "fit in great."  (Hovanski
Dep. 41-42.)  Thereafter, Plaintiff claims that there was a constant demeaning
of women.  (Hovanski Dep. 43-44, Hovanski Dep. II 33-37.)  Plaintiff claims
that women were referred to as "sluts, hoes, [and] bitches."  (Hovanski Dep.
42, 75, Hovanski Dep. II 26-28.)  She alleges that "awful jokes" were told.
(Hovanski Dep. 44.)   While she worked in Utah, the male insurance agents
made comments that Mormon women need to be in the house making rubbed
her shoulders and hugged her.  (Hovanski Dep. 42.)  However, Plaintiff admits
Allan Jennings hugged both men and women. (Hovanski Dep. 18, 20-21.)  The
alleged harassment involving Zolik and Jennings began in Utah and continued
when Plaintiff moved to Alabama to continue working with them.  (Hovanski
Dep. 50, 59.)

Plaintiff testified that she was sure that she had rubbed people's
shoulders at work, but the only person whose shoulders she could recall
rubbing was Nathan Hammond.  (Hovanski Dep. 195-196.)  Plaintiff asked
Zolik to rub her feet on one occasion.  (Hovanski Dep. II at 57-58.)  She also

discussed a part of a woman's sexual anatomy at work.  (Hovanski Dep. 56-57.)  Plaintiff contends that when she was in Alabama, there were comments made about her husband being back in Utah, implying that she needed to "get someone" while in Alabama.  When she returned to Alabama from trips home to Utah, suggestive comments were made about her coming back in a good mood.  (Hovanski Dep. 62-63.)  On one occassion, Zolik expressed that he was tired of his comments to Plaintiff Hovanski being seen as sexual harassment.  (Hovanski Suppl. Decl. ¶23.)  He then grabbed Plaintiff Hovanski and kissed her on the lips.  (Id.)  Thereafter, he stated, "this is sexual harassment!"  As Plaintiff Hovanski began to flush, Zolik snickered and said to the the other men, "see, she even liked it."  (Id.)

In Alabama, at a time when Plaintiff provided her own computer in the office, she claims that Jennings and Zolik used it to view pornographic web sites.  (Hovanski Dep. 86-87.)  Plaintiff did not actually see them viewing the web sites, but they are the ones she saw using her computer.  (Hovanski Dep. 89.)  In response to discovering that her computer had been used to view pornography, Plaintiff locked her keyboard in a cupboard when she left the office.  (Hovanski Dep. 164.)  Upon finding the keyboard locked up, Plaintiff

testified that Emily Jennings called her repeatedly and instructed her to come to the office immediately or she would be fired.  (Hovanski Dep. 164.)  Plaintiff alleges that she complained to Jennings, Denise Bowyer and, on one occasion, Lee Ann Jackson, about this alleged harassment.  (Hovanski Dep. 63.)  As to her complaints to Jennings, Plaintiff reported being kissed by Zolik, the offensive language used with regard to women, and the hugging and shoulder rubbing.  (Hovanski Dep. 65-67.)  Plaintiff claims she complained to Bowyer numerous times about Jennings and the offensiveness in the office.  (Hovanski Dep. 70-71.)  Plaintiff also claims that she told Bowyer that she had told Jennings about these issues and he had done nothing about them.  (Hovanski Dep. 70-71.)  On the one occasion Plaintiff claims she complained to Lee Ann Jackson, she says she told Jackson about the "problems," the language, and about being kissed by Zolik.  (Hovanski Dep. 71-72.)  Plaintiff did not complain to Becky Turner of OPEIU until after her termination.  (Hovanski Dep. 72.)  Although the alleged harassment made it more difficult for Plaintiff to go into the office, she did not generate fewer leads and considered herself successful through her tenure as a PR Rep.  (Hovanski Dep. II 139-144.)

24

**Other Discrimination Claims**

In addition to a harassment claim, Plaintiff has also made a claim of gender discrimination. (Hovanski Dep. 36-40.) She bases this claim on the fact that, when she was PR Manager in Utah, before coming to Alabama, she was told to hire new PR Reps and was told that the maximum draw was $600 per month. (Hovanski Dep. 37.) Plaintiff later discovered that a male PR Rep she hired received a $750 per month draw. (Hovanski Dep. 37-38, Hovanski Dep. II at 117-118.) However, when Plaintiff moved to Alabama, she, too, received a $750 draw. (Hovanski Dep. 37-38, Hovanski Dep. II 117-118.) Schouten is the only PR Rep who Plaintiff claims received a larger draw than she did. (Hovanski Dep. 38- 39.) Plaintiff also claims it was gender discrimination that, when she moved to Alabama, she was not compensated for her move. (Hovanski Dep. 38.) She claims that this was discriminatory because Zolik and Hammond were compensated for their moves. (Hovanski Dep. 38.) However, Hammond and Zolik were both agents and had contracts directly with AIL. (Hovanski Dep. 39-40; Gamble Dep. 14-15.) Moreover, both received advances against future commissions and were required to pay the advances back. Gamble Supplemental Aff. at ¶9.

**Retaliation**

_____Plaintiff's retaliation claim is based upon her termination, which she claims occurred shortly after she informed Jennings that she had filed a "formal complaint" based upon the conduct in the office. (Hovanski Dep. 79-81.) She also claims that she was retaliated against by being given bad job references after her termination. (Hovanski Dep. 81-83, 85.) Potential employers Blue Cross Blue Shield, MedQuest, and the Country Loft told Plaintiff that she had been given bad references, but not by whom. (Hovanski Dep. 83-84; Hovanski Dep. 91– 92.) No one ever told Plaintiff that the bad reference came from AIL, REA Agency, or the Jenningses. (Hovanski Dep. 91-92.)

**Plaintiff's Contract Claims**

Plaintiff testified that she is suing AIL because of an alleged breach of contract. (Hovanski Dep. 24.) The only written contract of which Plaintiff is aware is her Public Relations Contract. (Hovanski Dep. 25.) Plaintiff identified her only written contract as the one page PR Contract signed by her and by Bill Jennings. (Hovanski Dep. 224, 305-306, Exhibit 11 thereto.) Plaintiff also claims that she had an implied contract that she would be paid as a manager. (Hovanski Dep. 25-27.) Plaintiff admits that she was being paid

as a manager while she was working, but stated the problems occurred after her termination.  (Hovanski Dep. 27-28).

**Plaintiff's Other State Law Claims**

Plaintiff's invasion of privacy claim is based upon the conduct of Jennings, Zolik, and Adams.  (Hovanski Dep. 91-92.)   In addition to the conduct which also comprises her harassment claim, Plaintiff also claims that Adams invaded her privacy by obtaining unauthorized access to her financial information.  (Hovanski Dep. 91-92.)  Plaintiff's assault and battery claim is based upon the conduct of Jennings, Adams, and Zolik.  (Hovanski Dep. 92-93.)  Adams allegedly stroked her knee, rubbed her shoulders, and hugged her. (Hovanski Dep. 93.)  Zolik allegedly kissed her, hugged her, and rubbed her shoulders.   (Hovanski Dep. 93, 94.)   Jennings allegedly hugged her and grabbed her shoulders when she was sitting in a chair.  (Hovanski Dep. 93-94.) Plaintiff was not bruised or injured as a result of this touching.  (Hovanski Dep. II 21.)  Plaintiff described herself as feeling hesitant, rather than scared of these men.  (Hovanski Dep. 94.).  However, on one occasion Plaintiff believed that Adams was going to hit her.  (Hovanski Dep. 94-95.)

Plaintiff's conversion claim is based upon her allegation that she was

entitled to certain manager overrides on groups signed by PR Reps who worked under her supervision and that she was no longer receiving these overrides after her termination. (Hovanski Dep. 107-108, 114-115, 120-123.) She also claims that credit was given to other PR Reps for lead cards returned on groups that she signed. (Hovanski Dep. 123-126.) The conversion claim against AIL is based upon money she claims is owed to her. (Hovanski Dep. 122, 130.) However, Plaintiff is unable to identify with particularity the money which is due her. (Hovanski Dep. 130, Hovanski Dep. II 61- 62.) These payment problems occurred after Plaintiff's termination. (Hovanski Dep. 132, 348-349.) Additionally, Plaintiff bases her conversion claim on a check made out to her that was deposited by Adams into his account, for which she received a replacement check, and another check she believes was sent to Jennings, in Alabama, which she claims she has not received. (Hovanski Dep. 137-138, 140-141.) Plaintiff's conspiracy to convert money claim is based upon these same events. (Hovanski Dep. 142.) Finally, Plaintiff's defamation claim is based upon the alleged bad job reference she received from Alabama. (Hovanski Dep. 142-143.) Plaintiff cannot specifically articulate the nature of the "bad references," nor can she even attribute them to any of the Defendants.

(Hovanski Dep. 91-92.)

## Sexual Harassment Policy

AIL has a policy prohibiting sexual harassment which it distributes to its employees.  (Gamble Dep. 95.)  The policy is posted on AIL's website and on its bulletin board.  Id.  Pursuant to AIL's policy, AIL employees may contact AIL's Director of Human Resources to make a complaint of sexual harassment. (Gamble Dep. 105.)  Further, AIL provides training to its employees on the policy, which includes requiring them to watch videos regarding harassment and sign acknowledgements periodically regarding their training on the policy. (Gamble Dep. 95.)   Since the people working in SGA offices are not considered employees of AIL, AIL does not provide this same sexual harassment policy or training to those offices.   (Gamble Dep. 95-97.) Therefore, AIL neither provides a sexual harassment policy nor sexual harassment training to its approximately 2300 alleged independent contractors who work in agencies across the country that only sell American Income Life products.  (Gamble Dep. 95.)  In addition, AIL does not provide any sexual harassment training to the SGAs that operate these agencies, including Jennings.  (Gamble Dep. 9; Jennings Dep. 49; 82.)

**Plaintiff's Termination**

On October 29, 2002, Plaintiff was getting ready for a trip back to Utah to visit her husband. (Hovanski Dep. 166-167, 168.) Allan Jennings came into her office and began discussing the possibility of her staying in Utah and told her that he would arrange for her to work with Marcellus Adams. (Hovanski Dep. 168.) Jennings further told her that her production had been falling, her attitude had been bad, and she could stay in Utah. (Hovanski Dep. 168.) Plaintiff and Jennings continued to talk and Plaintiff raised the issue that she had complained to him about a number of things about which he had done nothing. (Hovanski Dep. 169.) Plaintiff then told Jennings that she had filed a formal complaint, and they were interrupted. Id. The "formal complaint" filed by Plaintiff was her EEOC charge filed on October 31, 2002. (Hovanski Dep. 318-319, Exhibit 19 thereto.) After her conversation with Jennings, Plaintiff went to speak with Emily Jennings. (Hovanski Dep. 169-170.) Emily Jennings asked Plaintiff if she had been tape recording conversations. (Hovanski Dep. 170.) Plaintiff did not respond directly, nor did she deny having done so. (Hovanski Dep. 170.) In response, Plaintiff claims Emily Jennings fired her and told her she would see no money from the company.

(Hovanski Dep. 170-171, 320, Hovanski Dep. II 88-89.)  On November 1, 2002, Allan Jennings sent Plaintiff a letter giving her thirty days notice of the termination of her PR Contract.  (Jennings Dep. 94; 175-176.)  AIL did not receive a copy of the letter terminating Plaintiff's contract until after it was sent.  (Gamble Dep. 53, Exhibit 9 thereto.)  Jennings also determined that, as of Plaintiff's termination, she would no longer receive manager overrides on groups signed after her termination.   (Jennings Dep. 146-147, 161-167.) Plaintiff made a written complaint alleging sexual harassment, but not until approximately November 25, 2002.  (Hovanski Dep. 10-11, 241-243, Exhibit 3 thereto.)  This complaint was sent to Becky Turner of OPEIU.  (Hovanski Dep. 10-11, 241-243.)  Plaintiff also filed an amended charge of discrimination with the EEOC after her termination.  (Hovanski Dep. 319-320, Exhibit 20 thereto.)  Both charges were dismissed by the EEOC, on January 13, 2003, for lack of jurisdiction, "failure to establish employee/employer relationship under Title VII."  (Hovanski Dep. 321-322, Exhibit 21 thereto.)  Plaintiff filed her original complaint with this Court on April 10, 2003.  See Complaint.

## IV.  Applicable Substantive Law and Analysis

Plaintiff Hovanski alleges Title VII and state law claims against the

Defendants.  Specifically, Plaintiff Hovanski alleges that REA Agency acted as an agent of American Income Life, her direct employer, within the meaning of Title VII.[18]  The Defendants assert that Plaintiff Hovanski's Title VII claims are meritless because she was an independent contractor and not an employee of the Defendants.

The protection against discrimination that is afforded by Title VII is extended only to the employment relationship and is not afforded to independent contractors.  Cobb v. Sun Papers, Inc., 673 F.2d 337-340 (11th Cir. 1982).  See also Lockett v. Allstate Insurance Co., 364 F.Supp.2d 1368 (M.D. Ga. 2005) (citing Spirides v. Reinhardt, 613 F.2d 826, 829 (D.C.Cir. 1979) (independent contractors are not covered by Title VII).  A person's employment status "is a question of federal law to be ascertained through consideration of the statutory language of the Act, its legislative history,

_____

[18] Plaintiff Hovanski contends that pursuant to the "agency test," REA Agency was an "agent" of American Income Life, her alleged direct employer.  Under the agency test, a  third party may be treated as an "agent" of an employer where the employer "delegates sufficient control of some traditional rights over employees" to the third party.  Walker v. Boys and Girls Club of America, 38 F.Supp.2d 1326, 1330 (M.D. Ala. 1999); see also Williams v. City of Montgomery, 742 F.2d 586 (11th Cir. 1984).  However, the agency theory advanced by Plaintiff Hovanski applies only when aggregating employees for the purpose of counting employees toward  Title VII's fifteen employee jurisdictional minimum.  See 42 U.S.C. § 2000e(b).  Further, the Court determined in an opinion filed contemporaneously herewith that Plaintiff Hovanski was not an employee of Defendant AIL.  The proper test determining whether an individual is an independent contractor or an employee is the hybrid economic realities test.

existing federal case law, and the particular circumstances of the case at hand. Cobb, 673 F.2d at 339; Cuddleback v. Florida Bd. of Educ.., 381 F.3d 1230 (11th Cir. 2004) (affirming district court's summary judgment finding that plaintiff was an employee under Title VII).  Before the Court can address Plaintiff Hovanski's Title VII claims, the Court must determine whether Plaintiff Hovanski was an employee or an independent contractor of the Defendants.

Title VII defines "employee" as "an individual employed by an employer."  42 U.S.C. §2000e(f).  An "employer" is defined as a "person ... who has fifteen or more employees" during a specified period of time.  42 U.S.C. §2000e(b).  This circular definition leaves the term "employee" essentially undefined insofar as an employee is to be distinguished from an independent contractor.  However, to decide whether Plaintiff was an employee or independent contractor, the Eleventh Circuit has adopted a hybrid economic realities test.  Cobb, 673 F.2d 337-340-1 (11th Cir. 1982); see also Lockett v. Allstate Insurance Co., 364 F.Supp.2d 1368 (M.D. Ga 2005) (stating the Eleventh Circuit has adopted a hybrid economic realities test);  Cuddleback v. Fla. Bd. of Educ., 381 F.3d 230, 1234 (11th Cir. 2004) (stating "this circuit has adopted the 'economic realities' test to determine whether a Title VII plaintiff

33

is an employee"). This test looks "at the economic realities of the situation," but "the focus of the inquiry is the employer's right to control the 'means and manner' of the worker's performance." Oestman v. Nat'l Farmers Union Ins. Co., 958 F.2d 303, 305 (10th Cir. 1992) (quoting Spirides, 613 F.2d at 831). In addition, the hybrid test considers common-law agency principles: (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the employer or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated, i.e., by one or both parties; with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the employer; (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays Social Security taxes; and (11) the intention of the parties. Cobb, 673 F.2d at 340. The Court will first consider the common law principles, then Defendant's control over Plaintiff, and finally view the economic realities of the situation in light of the first two inquiries.

1.    *Common Law Principles*

Upon applying the common law principles to the case at hand, the Court finds that Plaintiff is likely an independent contractor.  Plaintiff contracted directly with the SGA as a PR Rep in order to generate leads for the SGA's agents to sell insurance policies.  Although Plaintiff provides public relations services, Plaintiff is licensed to sell insurance.  It is disputed whether Plaintiff was supervised by Allan Jennings.  However, at the summary judgment stage all facts and inferences must be viewed in the light most favorable to the Plaintiff.   Based on the first factor and all inferences in favor of Plaintiff Hovanski, Plaintiff is an employee.   As a public relations professional, Plaintiff's position did not require any great industry-specific skill.  Plaintiff did not have any experience as a PR Rep before working with the Defendants. Therefore, the second factor points towards Plaintiff's  status as an employee and not an independent contractor.  See Stewart v. Midani, 525 F.Supp. 843, 849 (N.D. Ga 1981) ("The  more skilled the employee, the more likely he is an independent contractor.") As for the third factor,  the tools and equipment used by Plaintiff primarily came from the Defendants and Plaintiff.  Plaintiff worked in an office paid for by the Defendants.  The furniture in the office, including the fax, copier, and telephone, was also provided by the Defendants.  When

public relations mailings went out, the SGA paid for the copying service and postage on those mailings. Plaintiff provided her own computer and transportation. She was not reimbursed for her mileage for conducting business. The AIL provided group insurance application forms, form lead letters, and other literature related to its products. Even though the Defendants provided the office space, equipment, and products to maintain the agency, Plaintiff Hovanski provided her own transportation and computer which are vital tools that allowed Plaintiff to perform her duties. Therefore, the third factor indicates that Plaintiff was not an employee of the Defendants.

The duration of the work relationship with Plaintiff and AIL was short-term. Plaintiff signed her PR contract with Bill Jennings in May 2001 and was given notice of her termination by Allan Jennings on November 1, 2002. However, unlike typical independent contractor relationships, the public relations contract signed by Plaintiff Hovanski does not set forth a length of time for Plaintiff Hovanski to complete her job. This factor is not valuable in the analysis of Plaintiff's employment status because she was terminated and the contract does not provide much insight as to the duration of her position. As to the fifth factor, Plaintiff was paid by commission. Plaintiff Hovanski was paid for each lead card which was returned by the groups she signed. As a

manager, Plaintiff also received a manager override on groups signed by PR Reps under her supervision. Overall, Plaintiff's compensation was determined by her productivity, which indicates, by the fifth factor, that she is likely an independent contractor. See Sica v. Equitable Life Assurance Soc'y of the U.S., 756 F.Supp. 539, 542 (S.D. Fla. 1990) ("Sica's method of compensation was by commission, as opposed to on a salary basis–a further indication of his status as an independent contractor."); John Cooper Produce, Inc. v. Paxton Nat'l Ins. Co., 774 F.2d 433 (11th Cir. 1985) (per curiam) (inferring independent contractor status from payment by commission). Further, Plaintiff Hovanski was treated as a non-employee for tax purposes. The payments made to Plaintiff were reported to the IRS on a Form 1099 rather than on a W-2 for 2001 and 2002. As for termination, the sixth factor, the public relations contract between Plaintiff and the Defendant gives either Plaintiff or the Defendants authority to terminate the agreement. Therefore, the agreement gives the Defendants  no greater authority to fire Plaintiff than Plaintiff has ability to resign. The sixth factor indicates that Plaintiff was an independent contractor. See Sica, 756 F.Supp. at 542 (noting that equal ability to fire and resign indicated independent contractor status).   Factor seven indicates an independent contractor relationship because Plaintiff does not receive paid sick

leave, paid vacation time, or any sort of annual leave from her relationship with the Defendants.  In fact, Allan Jennings did not keep track of vacation and Plaintiff Hovanski did not need approval to take vacation.  Similarly, factor nine evidences an independent contractor relationship as the Defendants did not provide retirement benefits and health insurance to Plaintiff.  Factor ten also indicates an independent contractor relationship.  Plaintiff was treated as a non-employee for benefits and tax purposes.  The Defendants did not withhold taxes from Plaintiff Hovanski's pay.  She received an IRS Form 1099 from AIL reporting her income for 2001 and 2002.  There is also no evidence of Defendant AIL paying social security taxes or unemployment insurance for Plaintiff.[19]  Compare McKenzie v. Davenport-Harris Funeral Home, 834 F.2d 930, 934 (11th Cir. 1987) (stating that deduction of social security, federal and state taxes from McKenzie's commission checks indicated that "she was regarded as a saleswoman, and not merely as an independent contractor").  The eighth factor is instructive as to the employment relationship between the parties.  Plaintiff Hovanski's duties as a PR Rep to contact unions, credit

---

[19] Although PR Reps were required to obtain their own health insurance, an agent or PR Rep who met certain production criteria was reimbursed for a portion of the cost of his or her health insurance.  The agents and PR Reps may also qualify, based upon production, for group term life insurance coverage.  Plaintiff received AIL life insurance.

unions, or similar organizations in order to generate insurance leads for the insurance agents is central to the Defendants' business. Therefore, the eighth factor weighs in favor of Plaintiff being an employee. See Weary, 377 F.3d at 528 (noting that individual is likely employee when work is regular part of hiring party's business).

The eleventh factor requires the Court to consider the intention of the parties. The public relations contract entered into by and between the Defendants and Plaintiff Hovanski indicates that the PR Rep should not represent or imply that she is an employee or officer of the agency or of AIL. The contract further states that the PR Rep will not be treated as an employee with respect to services performed under the contract for federal and tax purposes. Further, the collective bargaining agreement[20] between AIL and OPEIU defines the relationship between AIL and the agents and PR Reps as an independent contractor relationship. It is clear from the public relations contract and the collective bargaining agreement that at the time the agreements were entered into Plaintiff was designated as an independent contractor. As the terms of the agreement establish the parties' intentions, it is apparent that the

_____

[20] Plaintiff joined OPEIU and authorized the union to be her exclusive collective bargaining agent.

Defendants  intended for Plaintiff to operate as an independent contractor. Lockett v. Allstate Insurance Co., 364 F.Supp.2d 1368 (M.D. Ga 2005); see also Bates v. Variable Annuity Life Ins. Co., 200 F.Supp.2d 1375, 1379 (N.D. Ga. 2002) (looking to terms of contract to find insurance agent independent contractor for purposes of ADEA); Gordon v. Birmingham News, No. CV89-PT-0436-S, 1989 WL 222730 (N.D. Ala. June 27, 1989) (looking at applicable paragraph of contract for clear intention of parties).

In sum, the totality of the common law agency principles indicate that Plaintiff is an independent contractor.

2.      *Right to Control*

An alleged employer's control over an individual is a vital factor in determining whether a person is an employer or an independent contractor. When "an employer has the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details by which that result is achieved, an employer/employee relationship is likely to exist." Cobb, 673 F.2d at 340. The public relations contract entered between Plaintiff Hovanski and the Defendants indicate that Plaintiff Hovanski was allowed to devote such effort and hours to the work as she chose. Further, under the contract Plaintiff Hovanski was not required to work in any particular

manner. Therefore, Plaintiff Hovanski was free to set her own work hours and schedule. The only restriction on when Plaintiff was required to work involved weekly meetings called by the Defendants. The Defendants provided the office space, equipment, and products to maintain the agency. AIL provided Plaintiff Hovanski with group insurance application forms, form lead letters, and other literature related to its products. AIL also provided Plaintiff Hovanski with resources to find organization to contact in order to obtain group insurance. Even though the Defendants provided Plaintss with office space and furniture and Plaintiff was required to use the product forms and promotional materials provided by AIL, these requirements did not intrude onto Plaintiff's ability to control her business day. See Lockett, 364 F.Supp.2d at 1377. It is apparent from the record that the Defendants do not have the right to control the time, manner, and method of executing the work of Plaintiff Hovanski. Therefore, the Court finds that the Defendants do not have sufficient control over Plaintiff to find her the Defendants' employee.

3.    *Economic Realities*

The Eleventh Circuit has adopted a hybrid approach, which adheres to the common-law test with a consideration of the economic realities of the hired party's relationship with the hiring party. Daughtrey v. Honeywell, Inc., 3 F.3d

1488, 1488 (11th Cir. 1993).  Financial interdependence is a factor that is considered when determining whether an individual is an employee or independent contractor.  See N.L.R.B. v. O'Hare-Midway Limousine Serv., 924 F.2d 692, 695 (7th Cir. 1991).  Under the traditional economic realities test, "an individual is an employee if economically dependent on the business to which he or she renders service."  Daughtrey, 3 F.3d at 1495.  Under the hybrid test, the Court looks at the economic reality of the situation, but "the focus of the inquiry is the employer's right to control the 'means and manner' of the worker's performance."  Oestman, 958 F.2d at 305 (quoting Spirides, 613 F.2d at 831).

Since the Court has determined that the Defendants does not control the means and manner by which Plaintiff Hovanski conducts her business, the Court reviews the economic realities of the situation.  Plaintiff was paid by commission for her public relations services.  Plaintiff Hovanski was paid for each lead card which was returned by the groups she signed.  As a manager, Plaintiff also received a manger override on groups signed by PR Reps under her supervision.  Overall, Plaintiff's compensation was determined by her productivity, which indicate, that she is likely an independent contractor.  See Sica, 756 F.Supp. at 542 (S.D. Fla. 1990); see also John Cooper Produce, Inc.

42

V. Paxton Nat'l Ins. Co., 774 F.2d 433 (11th Cir. 1985) (per curiam) (inferring independent contractor status from payment by commission).  Further, Plaintiff Hovanski was treated as a non-employee for tax purposes.  The payments made to Plaintiff were reported to the IRS on a Form 1099 rather than on a W-2 for 2001 and 2002.  Additionally, there is no evidence of the Defendants paying social security taxes or unemployment insurance for Plaintiff.  While Plaintiff Hovanski does rely on the Defendants to pay her commission, Plaintiff is not economically dependent on the Defendants as she must rely on her own abilities in obtaining leads  to generate her income and is responsible for her own financial well-being.

Upon review of the hybrid test set forth by the Eleventh Circuit which adheres to the common-law test with a consideration of the economic realities of the hired party's relationship with the hiring party, the Court finds that Plaintiff Hovanski is an independent contractor.

## A.  Discrimination Claims

Since Plaintiff is an independent contractor, she is not protected by Title VII and her federal discrimination claims fail as a matter of law.  Title VII only applies to employees and does not apply to independent contractors.  Cobb, 673 F.2d at 337-340.  Accordingly, the Defendants' motion for summary judgment

as to Plaintiff Hovanski's federal discrimination claims is due to be granted.

## B.  State Law Claims

In addition to the federal discrimination claims, Plaintiff has alleged several state law claims in her complaint.  Plaintiff's state law claims are invasion of privacy (Count IV), assault and battery (Count V), outrage (Count VI), negligent and/or wanton hiring, retention, training, and supervision (Count VII), breach of duty of fair representation[21] (Count VIII), breach of contract (Count IX), breach of implied contract (Count X), conversion (Count XI), civil conspiracy (Count XII), and defamation (Count XIII).  Defendant moved for summary judgment on all of Plaintiff's state law claims against it.  In her brief in opposition to Defendant AIL's motion for summary judgment, Plaintiff Hovanski did not oppose  the Defendant's motion for summary judgment as to her outrage, breach of contract, breach of implied contract, conversion, civil conspiracy, and defamation state law claims.

In opposing a motion for summary judgment, "a party may not rely on

---

[21] Plaintiff's claim of breach of duty of fair representation was against Office and Professional Employees International Union Local 277.  Therefore, Plaintiff's claim of breach of duty of fair representation was dismissed on September 23, 2005 when Plaintiff and Office and Professional Employees International Union Local 277 stipulated to the dismissal with prejudice of all claims and causes of actions filed by Plaintiff Hovanski against Office and Professional Employees International Union Local 277.

[her] pleadings to avoid judgment against [her]." Ryan v. Int'l Union of Operating Eng'rs, Local 675, 794 F.2d 641, 643 (11th Cir. 1986). There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Blue Cross & Blue Shield v. Weitz, 913 F.2d 1544, 1550 (11th Cir. 1990). Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint, but not relied upon in summary judgment are deemed abandoned. Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp., 10 F.3d 1563, 1568 (11th Cir. 1994) (citing Lazzara v. Howard A. Esser, Inc., 802 F.2d 260, 269 (7th Cir. 1986)), cert denied, ---U.S.---, 115 S.Ct. 189, 130 L.Ed.2d 122 (1994). Accordingly, the Court finds that the Plaintiff has abandoned those state law claims against Defendant AIL. Therefore, Defendant's motion for summary judgment as to Plaintiff Hovanski's outrage, breach of contract, breach of implied contract, conversion, civil conspiracy, and defamation state law claims is due to be granted. Plaintiff's invasion of privacy, assault and battery, and negligent and/or wanton hiring, retention, training, and supervision claims will be addressed below.

**Invasion of Privacy**

      The Alabama Supreme Court recognizes that the invasion of privacy tort

consists of four distinct wrongs" "1) intrusion upon the plaintiff's physical solitude or seclusion; 2) publicity which violates the ordinary decencies; 3) putting the plaintiff in a false, but not necessarily defamatory, position in the public eye; and 4) the appropriation of some element of the plaintiff's personality for a commercial use. See Phillips v. Smalley Maintenance Servs., 435 So.2d 705, 708 (Ala. 1983). Plaintiff Hovanski's action for invasion of privacy is premised upon that species of invasion known as a wrongful intrusion into one's private activities. The Alabama Supreme Court has defined the tort as the wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities. Phillips, 435 So.2d at 705; Restatement (Second) of Torts § 652B (1977). To succeed on a claim alleging invasion of privacy relating to sexual harassment, a plaintiff must show: (1) that the matters intruded into are of a private nature; and (2) that the intrusion would be so offensive or objectionable that a reasonable person subjected to it would experience outrage, mental suffering, shame, or humiliation. See Ex parte Atmore Community Hospital, 719 So.2d 1190, 1194 (Ala. 1998).

Plaintiff Hovanski alleges that Jennings, Adams, and Zolik, agents of the Defendant, invaded her privacy by intrusive touchings including Zolik kissing

her, Adams and Zolik inquiring into her sexual life with her husband, sexual comments from the men, and the use of her computer to view pornography. Plaintiff asserts  that the Defendants are liable for the acts of their agents. Plaintiff has alleged facts and presented evidence that raise a genuine issue of material fact as to whether the agents of the Defendants, Jennings, Adams, and Zolik, invaded her privacy.  Accordingly, the Court finds that the Defendants' motion for summary as to Plaintiff Hovanski's invasion of privacy claim is due to be denied.

## Assault and Battery

Under Alabama law, an "assault" is defined as "an intentional, unlawful, offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a well-founded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt, if not prevented." Wood v. Cowart Enterprises, Inc., 809 So.2d 835, 837 (Ala. 2001)(quoting Western Union Tel. Co. v. Hill, 150 So. 709, 710 (Ala. 1993)).  In a civil action, to establish a claim for battery, a plaintiff must show "(1) that the defendant touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner." Wood, 809 So.2d at 837; see

also Ex parte Atmore Community Hospital, 719 So.2d 1190 (Ala. 1998). An actual injury to the body is not a necessary element of a civil assault and battery. Surrency v. Harbison, 489 So.2d 1097, 1104 (Ala. 1986).

Plaintiff's assault and battery claim is based upon the conduct of Jennings, Adams, and Zolik. Adams allegedly stroked her knee, rubbed her shoulders, and hugged her. Zolik allegedly kissed her, hugged her, and rubbed her shoulders. Jennings allegedly hugged her and grabbed her shoulders when she was sitting in a chair. Although Plaintiff was not bruised or injured as a result of this touching, Plaintiff alleges that the conduct was offensive and harmful. Plaintiff described herself as feeling hesitant, rather than scared of these men. However, on one occasion Plaintiff believed that Adams was going to hit her. The Defendants assert that the alleged conduct was not done in an angry or openly hostile manner, or accompanied by menacing threats. The Court finds that Plaintiff Hovanski has raised a genuine issue of material fact as to whether the alleged conduct by the agents of the Defendant was done in a harmful or offensive manner. Accordingly, the Defendants' motion for summary judgment as to Plaintiff Hovanski's assault and battery claim is due to be denied.

## Negligent Training, Supervision, and Retention[22]

Plaintiff alleges that the Defendants negligently retained and failed to train and supervise its employees. Plaintiff asserts that the Defendants failed to (1) inform its employees and managers of the subject of sexual harassment, (2) provide its employees with an effective method of reporting sexual harassment, and (3) adequately investigate her complaints. Plaintiff Hovanski alleges she suffered severe emotional distress as a result.

The Alabama Supreme Court has stated "'a failure on the part of [the employer] to review the company's training manuals with [its employees] or to otherwise train [its employee]' could result in liability for negligent training." Ahart v. Host Marriott Corp., 1996 WL 1057054 at 7 (M.D. Ala. 1996)(quoting Big B. Inc. v. Cottingham, 634 So.2d 999, 1003 (Ala. 1993)). In Ahart, the

---

[22] Plaintiff Hovanski did not oppose the Defendant's motion for summary judgment as to her negligent and/or wanton hiring state law claim in her brief in opposition to Defendant AIL's motion for summary judgment.

In opposing a motion for summary judgment, "a party may not rely on [her] pleadings to avoid judgment against [her]." Ryan v. Int'l Union of Operating Eng'rs, Local 675, 794 F.2d 641, 643 (11th Cir. 1986). There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Blue Cross & Blue Shield v. Weitz, 913 F.2d 1544, 1550 (11th Cir. 1990). Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint, but not relied upon in summary judgment are deemed abandoned. Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp., 10 F.3d 1563, 1568 (11th Cir. 1994) (citing Lazzara v. Howard A. Esser, Inc., 802 F.2d 260, 269 (7th Cir. 1986)), cert denied, ---U.S.---, 115 S.Ct. 189, 130 L.Ed.2d 122 (1994). Plaintiff Hovanski has abandoned her negligent and/or wanton hiring claim. Therefore, the Defendant's motion for summary judgment is due to be granted as to Plaintiff's negligent and/or wanton hiring claim.

court granted summary judgment for the employer as the employer presented evidence that the harassing employee attended a four-hour seminar on sexual harassment prior to the alleged incident of harassment. Id. at 7. Although, in the present case, the Defendants have presented evidence that they review sexual harassment information in the manuals provided to the agents on their first day of work, there is no evidence that the Defendants provide training or review the sexual harassment policy with the employees after commencement of their employment. Plaintiff Hovanski has raised a genuine issue of fact as to whether the Defendants negligently trained their employees as to the sexual harassment policies.

In order to prevail on a claim of negligent supervision, Plaintiff Hovanski must demonstrate "by affirmative proof that the alleged incompetence of the [problem] employee[s] was actually known to the employer or was discoverable by the employer if it had exercised care and proper diligence." Portera v. Winn Dixie of Montgomery, Inc., 966 F. Supp. 1418, 1438 (M.D. Ala. 1998)(citing Ledbetter v. United Am. Ins. Co., 624 So. 2d 1371 (Ala. 1993)). In addition, Plaintiff Hovanski  must prove that, at the time of the complained-of conduct, the allegedly incompetent employee was acting within the line and scope of his employment. Nash v. Segars, 682 So. 2d 1364 (Ala. Civ. App. 1996). It is an

essential element of a negligent supervision claim that the employer or principal have actual or constructive knowledge of the offending conduct or tort committed by his employee or agent. Pescia v. Auburn Ford- Lincoln Mercury, Inc., 68 F. Supp. 2d 1269, 1280 (M.D. Ala. 1999). See also Portera, 996 F. Supp. at 1439 (without evidence of prior complaints of sexual harassment, there was no evidence from which the employer could know that the supervisor created a hostile working environment).

Plaintiff Hovanski provided evidence that she complained to Allan Jennings regarding the alleged sexual harassment. The Defendants have provided evidence that when Plaintiff Hovanski complained about offensive language, Jennings held a meeting to tell the agents that offensive language would not be "tolerated." Jennings also held a meeting concerning sexual harassment with the agents at REA Agency. The court finds that Plaintiff Hovanski has raised a genuine issue of material fact as to whether the Defendants negligently supervised their employees.

In regard to Plaintiff Hovanski's claim of negligent retention, Alabama law requires an employer to "use due care to avoid the ... retention of an employee whom [the employer] knows or should know is a person unworthy, by habits, temperament, or nature, to deal with the persons invited to the

51

premises by the employer." <u>Brown v. Vanity Fair Mills, Inc.</u>, 277 So.2d 893, 894 (Ala. 1973).  For a master to be held liable for its servant's incompetency, it must be affirmatively shown that, had the master exercised due and proper diligence, the master would have learned of incompetency.  This showing may be done by showing specific acts of incompetency and showing that they were brought to the knowledge of the master, or by showing them to be of such a nature, character, and frequency that the master, in the exercise of due care, must have had notice of them.  <u>Mardis v. Robbins Tire & Rubber Co.</u>, 669 So.2d 885 (Ala. 1995).  To recover for negligent retention in Alabama, a plaintiff must show breach of that duty and that such breach proximately caused the plaintiff's injury.  <u>Patterson v. Augat Wiring Systems, Inc.</u>, 944 F. Supp. 1509, 1529 (M.D. Ala. 1996).  Isolated incidents of negligence by the employee will not suffice to create a duty to terminate the problem employee.

> Negligence such as unfits a person for service, or such as renders
> it negligent in a master to retain him in the employment, must be
> habitual, rather than occasional, or of such a character as to render
> it imprudent to retain him in service.  A single exceptional act will
> not prove a person incapable or negligent.

<u>Bank of Montgomery v. Chandler</u>, 39 So. 822, 828 (Ala. 1905).  Plaintiff Hovanski  has presented evidence that she informed Allan Jennings of the

alleged harassment.   The Court finds that Plaintiff Hovanski has raised a genuine issue of material fact as to whether the Defendants negligently retained Plaintiff's alleged harassers.

## Wanton and Malicious Training, Supervision, and Retention

Plaintiff alleges that the Defendants wantonly and maliciously retained and failed to train and supervise their employees resulting in her being subjected to abuse.   Plaintiff asserts that the Defendants failed to (1) inform their employees and managers of the subject of sexual harassment, (2) provide their employees with an effective method of reporting sexual harassment, and (3) adequately investigate her complaints.   Plaintiff Hovanski alleges she suffered severe emotional distress as a result.

> "To prove wantonness, it is not essential to prove that the defendant entertained a specific design or intent to injure the plaintiff." "Wantonness" is defined by statute as "[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others . . . (T)his court described wantonness as the conscious doing of some act or the omission of some duty, while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result."

Machen v. Childersburg Bancorporation, Inc., 761 So.2d 981, 986 (Ala. 1999)(quoting Alfa Mutual Insurance Co. v. Roush, 723 So.2d 1250,1256 (Ala.

1998). Plaintiff Hovanski has not demonstrated that the Defendants' sexual harassment training, sexual harassment policies, and investigation of her sexual harassment complaints were carried on with a reckless or conscious disregard of Plaintiff's rights or safety. Accordingly, the Defendants' motion for summary judgment as to Plaintiff Hovanski's wanton supervision, training, and retention claim is due to be granted.

## V. Conclusion

For the reasons set forth above, the Defendant's motion for summary judgment is due to be **GRANTED** in part and **DENIED** in part. This opinion shall be carried out by a separate Order.

**DONE** and **ORDERED** this 11th day of January, 2006.

**VIRGINIA EMERSON HOPKINS**
**United States District Judge**

54