FILED
2006 Jan-11 AM 08:21
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **LYDIA HOVANSKI,** | ] |
| | ] |
| **PLAINTIFF,** | ] |
| | ] |
| **v.** | ]**Civil Case No.** |
| | ]**2:03-CV-0838-VEH** |
| | ] |
| **AMERICAN INCOME LIFE** | ] |
| **INSURANCE CO.; et. al.,** | ] |
| | ] |
| **DEFENDANTS.** | ] |

## Opinion

This Court has before it the March 5, 2004, motion of Defendant American Income Life Insurance Company's ("AIL") for summary judgment as to Plaintiff Lydia Hovanski's claims. (Doc. 51.) For the reasons set forth below, the Defendant's motion is due to be granted as to Plaintiff's federal claims and granted as to her state law claims.

### I. Procedural History

Plaintiff Lydia Hovanski commenced this action on April 10, 2003, by

filing a complaint[1] in this Court alleging violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., as amended by the Civil Rights Act of 1991; 42 U.S.C. § 1981a; and the National Labor Relations Act, 29 U.S.C. § 159.[2] Plaintiff Hovanski alleges that she was subjected to disparate treatment based on gender in demotion, discharge, compensation, discipline, and the terms and conditions of employment. Plaintiff Hovanski contends that she was subjected to unwelcome acts of sexual harassment by agents[3] of the Defendant, in a manner sufficiently severe to create an objectively hostile work environment. Plaintiff Hovanski contends that when she complained about the alleged sexual harassment, she was retaliated against by the Defendant and constructively discharged. Further, Plaintiff Hovanski contends that Defendant AIL wantonly and/or negligently hired and failed to

[1] Plaintiff Hovanski amended her complaint on August 25, 2003, to include claims against Defendants REA Agency Corporation and Allan Jennings.

[2] The Plaintiff originally filed a complaint against Office and Professional Employees International Union Local 277, an entity subject to suit under the National Labor Relations Act. On September 23, 2005, Plaintiff Hovanski and Office and Professional Employees International Union Local No. 277 stipulated to the dismissal with prejudice of all claims and causes of actions filed by Plaintiff Hovanski against Office and Professional Employees International Union Local No. 277. Plaintiff's claims against the remaining Defendants (REA Agency Corporation and Allan Jennings) are the subject of a separate pending summary judgment motion.

[3] Bronson Zolik, Allan Jennings, and Marcellus Adams.

train, supervise, and/or terminate Jennings, Adams, and Zolik which resulted in the alleged harassers subjecting Plaintiff Hovanski to sexual harassment, retaliation, and eventually a constructive discharge.

On March 9, 2004, the Defendant filed a motion for summary judgment asserting: (1) that Plaintiff Hovanski cannot establish a Title VII claim because she was not an employee of AIL; (2) that even if the Court determines that Plaintiff Hovanski was an employee of AIL, Plaintiff Hovanski has failed to establish prima facie cases of gender discrimination, hostile environment sexual harassment, and retaliation; (3) Plaintiff Hovanski cannot establish her negligent and wanton hiring, retention, training, and supervisory claim because she can not establish that there was an employment relationship between herself and AIL; (4) that Plaintiff Hovanski's state law claims of invasion of privacy, assault and battery, and outrage must fail because she cannot establish respondeat superior liability; (5) Plaintiff cannot establish a breach of contract claim against a non-party to a contract; (6) Plaintiff cannot establish a breach of implied contract against AIL; (7) Plaintiff cannot establish her conversion and conspiracy claims as a matter of law; (8) Plaintiff cannot establish the elements of a defamation claim; and (9) Plaintiff's claim for punitive damages

are due to be dismissed because AIL acted in good faith to prevent violations of Title VII.

The Defendant has submitted evidence[4]  in support of its motion for summary judgment and filed a supporting brief on March 5, 2004.  On April 9, 2004, the Plaintiff filed a brief and evidence[5] in opposition to the Defendant's motion for summary judgment.  The Defendant filed a brief on August 18, 2005, in  reply to Plaintiff's response in opposition.

## II.  Standard of Review

### A.  Summary Judgment

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to

---

[4] The Defendant submitted the following evidence: excerpts of the deposition of Lydia Hovanksi, Volume I and certain exhibits; excerpts of the deposition of Lydia Hovanski, Volume II; deposition of Debbie Gamble and certain exhibits; deposition of Allan Jennings; supplemental affidavit of Debbie Gamble.  References to the deposition transcripts are denoted by the last name of the deponent, followed by the abbreviation "Dep.," followed by the page number of the deposition transcripts being referenced.

[5] The Plaintiff submitted the following evidence: deposition of Lydia Hovanski dated 1/6/04 with exhibits ; deposition of Lydia Hovanski dated 1/29/04; deposition of Allan Jennings; deposition of Debbie Gamble with certain exhibits; deposition of Lee Ann Jackson with exhibits; and supplemental declaration of Lydia Hovanski with exhibits.

judgment as a matter of law."  Celotex Corp. v. Catrett, 477 U.S. 317, 322

(1986); Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000).  The

party asking for summary judgment always bears the initial responsibility of

informing the court of the basis for its motion and identifying those portions

of the pleadings or filings which it believes demonstrate the absence of a

genuine issue of material fact.  Celotex Corp., 477 U.S. at 323.  Once the

moving party has met his burden, Rule 56(e) requires the nonmoving party to

go beyond the pleadings and by his own affidavits, or by the depositions,

answers to interrogatories, and admissions on file, designate specific facts

showing that there is a genuine issue for trial.  Id. at 324.

   The substantive law will identify which facts are material and which are

irrelevant.  Chapman, 229 F.3d at 1023; Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable

inferences are resolved in favor of the non-movant.  Chapman, 229 F.3d at

1023; Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A

dispute is genuine "if the evidence is such that a reasonable jury could return

a verdict for the nonmoving party." Anderson, 477 U.S. at 248; Chapman, 229

F.3d at 1023.  If the evidence is merely colorable, or is not significantly

probative, summary judgment may be granted. Anderson, 477 U.S. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. Fitzpatrick, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion

for directed verdict at trial. The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case. Fitzpatrick, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

## III. Relevant Facts[6]

AIL is an insurance company headquartered in Waco, Texas. AIL primarily sells life and accident insurance policies, and caters to a clientele within the niche market of union and other organization members. (Gamble Dep. 8-9, 12.) AIL contracts with insurance agents to sell its products. (Gamble Dep. 11-12, 14, 15, 17, 23.) AIL's "highest" contract is with State General Agents ("SGA"). (Gamble Dep. 11-12.) These SGAs essentially run their own businesses. (Gamble Dep. 11-15, 21-22; Jennings Dep. 31-32.) AIL does not share in any of the costs or expenses associated with the SGAs' offices. (Gamble Dep.125-126, 150.)

Public Relations Representatives ("PR Reps") assist SGAs in developing relationships with unions, credit unions, and other organizations to sell insurance. (Gamble Dep. 13-14.) The SGAs contract with PR Reps to generate leads for their agents and the agents develop those leads to sell policies. (Gamble Dep. 13-14; Jennings Dep. 123, 169.) The PR Reps contract directly with the SGAs. (Gamble Dep. 14-15, 26-27, 29.) Generally, it is the

---

[6] Facts are undisputed unless otherwise expressly noted. If the facts are in dispute, pursuant to Rule 56 of the Federal Rules of Civil Procedure, the facts are presented in the light most favorable to the Plaintiff. See Fitzpatrick, 20 F.3d at 1115.

PR Rep's responsibility to contact a union, credit union, or organization to see if it is interested in offering no cost accidental death and dismemberment ("AD&D") policies to its members. (Gamble Dep. 13-14). If so, the PR Rep completes an application for group insurance coverage for the members of the organization. (Gamble Dep. 13-14.) AIL must approve the applications for group insurance. The SGA pays the cost of the group coverage for the organization. (Gamble Dep. 14.) The organization, or the SGA on its behalf, then notifies members informing them by mail of this coverage. (Gamble Dep. 13-14.) The members are asked to return a response card ("lead card") if they are interested in having an agent contact them to discuss other insurance products. (Gamble Dep. 13-14.) If the lead card is returned, an agent will deliver a certificate of group coverage to the member and discuss other available insurance products with that person. (Gamble Dep. 13-14.) PR Reps, including Plaintiff, are paid for each lead card returned. (Gamble at 15, 24, 34-35.) PR Reps can either be paid on an "as earned" basis, meaning they are paid for each lead card which has been returned, or they can be paid an advance against anticipated lead credits. (Gamble Dep. 25, 39.) Although AIL facilitates the payments to the PR Reps (i.e., AIL prepares the payments), AIL

charges the amount paid to a PR Rep back to the appropriate SGA. (Gamble Dep. 24-25, 59, 76, 151-152; Hovanski Dep. 138-140.) SGAs may have a PR Rep who manages other PR Reps. (Gamble Dep. 29.) Some SGAs may decide to compensate PR managers for their management duties by giving them manager overrides (a percentage of the amount the originating PR Rep receives, per card) on lead cards generated by the PR Reps working under their supervision. (Gamble Dep. 78-79:24.)

AIL has a Collective Bargaining Agreement ("CBA") with Office and Professional Employees International Union ("OPEIU"), which represents certain agents and PR Reps. (Gamble Dep. 24, 35, 45.) Among other things, the CBA defines the relationship between AIL and the agents and PR Reps as an independent contractor relationship and sets minimum compensation levels for agents and PR Reps. (Gamble Supplemental Aff. at ¶¶5-8, Exhibit D thereto.) Pursuant to the CBA, AIL and the SGAs also provide a bonus to qualifying agents and PR Reps who meet certain production criteria, to reimburse them for some of the cost of their health insurance, which the agent or PR Rep must obtain for themselves. (Gamble Dep. 45-46, 149-150.) This reimbursement is a production incentive for which agents and PR Reps must

qualify. (Gamble Dep. 149-150.) AIL does not provide health insurance to anyone working in the SGA offices. (Gamble Dep. 149.) The agents and PR Reps may also qualify, based upon production, for group term life insurance coverage, the cost of which is also divided between AIL and the SGA[7]. (Gamble Dep. 45.)

In the Spring of 2001, Plaintiff Hovanski was hired to work as a PR Rep at Jennings & Associates, an agency that sold American Income Life products in Utah. (Hovanski Suppl. Decl. ¶¶2-3.) Jennings & Associates was operated by Bill Jennings, the State General Agent for American Income Life. Id. Plaintiff was hired after posting her resume on the internet. (Hovanski Dep., 41-42, 221-222.) She was initially interviewed by Marcellus Adams in the Utah SGA office. Id. However, when it became apparent that Plaintiff was interested in a PR position, she was also interviewed by Becky Cutler, the PR Director for Bill Jennings' SGA offices in Colorado and Utah, and Bill Jennings. (Hovanski Dep. 177-178, 223.) Plaintiff received her public relations contract from Becky Cutler. (Hovanski Dep. 224.) Plaintiff read her public relations contract before she signed it and understood it. (Hovanski

[7] Plaintiff received AIL life insurance.

Dep. 35-36.) After Plaintiff signed the public relations contract, Bill Jennings signed it. (Hovanski Dep. 224; Gamble Dep. 35-36, Exhibit 1 thereto; Jennings Dep. 89, 261.) The PR Contract signed by Plaintiff provides:

> The PR Rep shall not represent or imply that the PR Rep is an employee or officer of the agency or of American Income Life Insurance Company, or a person having the authority to transact business for the agency or American Income Life Insurance Company. The PR Rep will not be treated as an employee with respect to services performed under this contract for federal and state tax purposes.[8]

(Hovanski 305-306, 314-316, Exhibits 11 and 17 thereto.) The PR contract further provides that:

> The PR Rep may devote such effort and hours to the work as the PR Rep chooses and shall not be required to work in any particular manner. [...] The PR Rep may pursue other business or work for other entities.[9]

(Hovanski Dep. 305-306, Exhibit 11thereto.) In addition to signing her PR contract, Plaintiff completed certain documents which provided AIL with the

---

[8] Plaintiff alleges that, despite the contract, Bowyer instructed her to tell the union representatives that she met with that she was an employee of AIL and that every employee of AIL was a member of union OPEIU Local 277. (Hovanski Dep. 33-35; Hovanski Suppl. Decl. ¶ 9.) Therefore, Plaintiff Hovanski alleges she held herself out as an employee of AIL. Id.

[9] Plaintiff alleges that upon signing the PR contract she asked Bill Jennings whether it was true that she could work for another insurance company pursuant to the contract. (Hovanski Suppl. Decl. ¶13.) Bill Jennings allegedly responded that Plaintiff Hovanski worked for AIL and that she could not work for any other insurance company. Id.

information necessary to evaluate her background for licensing purposes, and to allow AIL to facilitate payments on behalf of the SGA. (Gamble Dep. 41-44; Jennings Dep. 111-115.) When Plaintiff first started as a PR Rep, she became a union member by joining OPEIU Local 277. (Hovanski Dep. 308-309, Exhibit 13 thereto; Gamble at 47-48.) By joining the OPEIU, Plaintiff authorized the Union to be her exclusive collective bargaining agent. (Hovanski Dep. 309, Exhibit 13 thereto.) Plaintiff received and read a copy of a CBA[10] between AIL and OPEIU which defines the relationship between AIL and the agents and PR Reps as an independent contractor relationship. (Hovanski Dep. 36, 72-73, 314, Exhibit 17 thereto.) Everyone who works for an agency that sells American Income Life insurance is an independent contractor, including the SGAs. (Gamble Dep. 16-17.)

Plaintiff began her duties as a PR Rep in approximately July 2001, after she received her insurance license.[11] (Hovanski Dep. 175-176; 225.) Plaintiff paid for her own insurance license. (Hovanski Dep. 226-227.) Plaintiff was

---

[10] Collective Bargaining Agreement

[11] PR Reps are required to get an insurance license because they solicit applications for insurance.

trained by Cutler for three days and then she was sent to Colorado to watch Cutler work for a few days. (Hovanski Dep. 177-178.) Bill Jennings was the SGA in Utah when Plaintiff commenced her duties as a PR Rep. (Gamble Dep. 36-37.) At the end of December 2001, Allan Jennings ("Jennings") took over as the Utah SGA.[12] (Hovanski 175-176; Gamble Dep. 37; Jennings Dep. 40.) In approximately January 2002, after Allan Jennings became the Utah SGA, Denise Bowyer, National Director of Public Relations for AIL, came to Utah to assist Plaintiff with some training.[13] (Hovanski Dep. 238, 301.) Ms. Bowyer also provided Plaintiff with a password which enabled her to obtain access to certain parts of AIL's website which were relevant to PR work. (Hovanski Dep. 237- 238). Access to AIL's website enabled Plaintiff to print off additional copies of certain documents she needed to arrange AD&D coverage for the groups with whom she worked. (Hovanski Dep. 238-239.)

---

[12] Allan Jennings was originally the Managing General Agent contracted under Bill Jennings in Utah. (Gamble Dep. 37; Jennings Dep. 259-260, Exhibit 40 thereto.) Plaintiff was not required to sign a new contract. (Hovanski Dep. 315-317; Hovanski Supp. Decl. ¶8.)

[13] Since Allan Jennings informed Plaintiff Hovanski that he did not control or know anything about PR, Plaintiff Hovanski would call or email Denise Bowyer whenever she had a question related to public relations. (Hovanski Dep. 315-317; Hovanski Suppl. Decl. ¶8.) In addition, AIL provides policies and procedures for public relations representatives to follow. (Gamble Dep. 45-46.)

When Plaintiff first started work as a PR Rep, she was paid a "draw" (or advance) against anticipated lead card compensation. (Hovanski Dep. 118.) In Utah, after lead cards started coming in, Plaintiff transitioned to an "as earned" compensation scheme and, at the same time, worked toward paying off her debit balance which had accrued as a result of her draw. (Hovanski Dep. 118-119.)

In the late Spring or Summer of 2002, Allan Jennings became the SGA in Alabama while simultaneously serving as the SGA in Utah. (Hovanski Dep. 16; Jennings Dep. 41-42.) Around this time, Allan Jennings decided to promote Plaintiff to PR Manager.[14] (Jennings Dep. 130-132; 185.) Plaintiff Hovanski supervised the work of three other PR Reps who worked in the Birmingham agency.[15] (Hovanski Dep. 47-48; Hovanski Suppl. Decl. ¶12.) In addition to being paid on a per card basis for groups she signed, Allan

---

[14] Plaintiff Hovanski had not applied for a promotion or even asked if she was interested prior to receiving the position. (Hovanski Suppl. Decl. ¶10.) Plaintiff Hovanski was not required to sign a new contract when she received the promotion. (Hovanski Suppl. Decl. ¶11.)

[15] AIL approved the hiring of these three PR Reps. (Hovanski Suppl. Decl. ¶12.) Plaintiff Hovanski did not have the authority to hire any of the PR Reps she supervised without the approval of AIL. (Hovansi Dep. 103-104; Hovanski Suppl. Decl. ¶12.) When Plaintiff Hovanski experienced performance problems with one of the PR Reps, she discussed these issues with Bowyer at her direction. (Hovansi Dep. 103-104; Hovanski Suppl. Decl. ¶14.) Eventually, Bowyer instructed Plaintiff Hovanski to terminate the particular PR Rep and instructed Plaintiff on what to write in the termination letter. Id.

Jennings agreed to pay Plaintiff a manager override on groups signed by PR Reps under her supervision. (Jennings at 132- 133, 134-136.)

Jennings created the REA Agency as a Subchapter S Corporation in Utah and moved it to Alabama from Utah. (Jennings Dep. 49-51.) The officers of REA Agency are Allan Jennings and his wife, Emily Jennings. In addition to PR Reps and agents, the REA Agency employs an office manager and four "phone room" people who are paid by Jennings. (Jennings Dep. 52-53, 54.) As a PR Rep and Manager, Plaintiff was responsible for generating leads for the insurance agents in her office to sell insurance. (Hovanski Dep. 336.) To do this, she met with unions, credit unions, and other organizations and offered them a no cost AD&D policy for the group's members.[16] (Hovanski Dep. 338.) In addition, Plaintiff was to obtain the group's membership list so that information regarding AIL and a lead card could be mailed to the members. (Gamble Dep. 13-14.) Plaintiff was paid on a per-card basis for the number of lead cards returned from these mailings. (Hovanski Dep. 333-334.) To

[16] Before Hovanski could obtain the actual leads, AIL had to approve the applications for group insurance with the particular union or association. (Hovanski Dep. 251-254; Hovanski Suppl. Decl. ¶6.) If AIL did not approve of the particular union or association, then Hovanski could not send the necessary documentation to obtain the leads. (Hovanski Suppl. Decl. ¶6.)

provide a group with the no cost AD&D coverage, Plaintiff was required to have them sign an insurance application. (Gamble Dep. 13-14.).  As the PR Rep, Plaintiff and the union president or manager were required to sign the applications for group insurance (TG-13s, IG, and AGs).  (Hovanski Dep. 31-33.)  After groups were signed, Plaintiff drafted lead letters to the members of the group. (Hovanski Dep. 262-264.)  AIL approved these lead letters for legal compliance because they are considered advertisements and hence are regulated by law.  (Gamble Dep. 61-63.)  Once the lead letters were approved by AIL, the SGA office was responsible for the mailings and the costs associated with the mailings.  (Hovanski Dep. 230-231.)  When Jennings did not want to pay a mailing service to send out the mailings, Plaintiff and others in the office were required to get the mailings out themselves.  (Hovanski Dep. 231.)  Plaintiff was authorized by Jennings to sign releases at the mailing houses when she went to pick up mailings or to obtain quotes.  (Hovanski Dep. 33.)  In addition to her regular PR duties, Plaintiff was instructed by Becky Cutler and Jennings that she would also handle customer issues.  (Hovanski Dep. 77.)

Jennings held weekly mandatory office meetings.  (Hovanski Dep. 185,

188-190.)  As PR Manager, Plaintiff also held required weekly meetings of the PR Reps under her supervision to discuss what needed to be done in PR that week. (Hovanski Dep. 185, 188- 190; Jennings Dep. 65-66.)  As PR Manager, Plaintiff also took on the administrative duties of dealing with AIL's home office on paperwork for the PR Reps working under her supervision. (Hovanski Dep. 77-79.)

At either the end of September or the beginning of October 2002, Plaintiff had a conversation with Allan Jennings, after he returned from an SGA Conference in Texas, which she tape-recorded.  (Hovanski Dep. 13-14.) In this conversation, Jennings told Plaintiff that he was taking away some of her managerial responsibilities and giving them to Emily Jennings.  (Hovanski Dep. 20-21; 301.)  Once Emily Jennings took over as PR Manager, she began having the PR meetings in her office. (Hovanski Dep. II at 98.)  Plaintiff's pay did not change after her demotion. (Hovanski Dep.301.)  While working as a PR Rep, Plaintiff received no formal performance evaluations.  (Hovanski Dep.277.)  However, she received informal feedback on her production. (Hovanski Dep. 277-278.)   The only reprimand she received came from Jennings and related to her production. (Hovanski Dep. 278.).  Jennings was

her supervisor in the office. (Hovanski Dep. 85-86.) Plaintiff believes that she was successful throughout her time as a PR Rep. (Hovanski Dep. 366-367; Hovanski Dep. II 142-143.)

The tools and equipment Plaintiff used to complete her job were provided by SGA, AIL, or Plaintiff. Plaintiff received group insurance application forms from AIL. (Hovanski Dep. 267-268, 333, Exhibit 27 thereto; Jennings Dep. 67-68.) Plaintiff received form lead letters from AIL and received AIL's approval on the final versions of her letters. (Hovanski Dep. 267-268, 330, Exhibit 26 thereto; Jennings Dep. 67-68.) Plaintiff was provided with business cards and letterhead for faxes from the home office of AIL that reflect that Plaintiff was the Director of Public Relations for AIL.[17] (Hovanski Decl. Suppl. ¶¶9, 15; Ex. B; Ex. G.) AIL also pointed Plaintiff to resources to find organizations to contact about obtaining group insurance, and provided all PR Reps copies of "blue papers" which contain information of interest to credit unions. (Hovanski Dep. 268-269, 270-274, 322, Exhibit 22 thereto.) These "blue papers" may also be mailed to different organizations at the SGA's

[17] AIL disputes that the business cards and letterhead were provided by its company. AIL contends that the business cards and letterhead were provided by or generated by Allan Jennings without AIL's approval. (Jennings Dep. 268-270.)

expense.  (Gamble Dep. 94.)  Plaintiff obtained leads via internet research. (Hovanski Dep. 276.).  She also consulted a monthly recap list, which was generated by AIL and sent to the SGAs regarding groups which had previously had AIL insurance, for assistance in generating leads. (Hovanski Dep. 275-276; Jennings Dep. 67-68; Gamble Dep. 33.)  In Utah, Plaintiff used the computer, telephone and fax machine in the SGA office, which were paid for by the SGA. (Hovanski Dep. 269-270; Jennings Dep. 68-69, 271.)    When PR mailings went out, the SGA paid for the copying service  and postage on those mailings. (Jennings Dep. 271.)  Jennings also paid the rent on the SGA office and provided the furniture contained in the office.  (Jennings Dep. 271-272.)   In Alabama, Plaintiff provided her own computer.  (Hovanski Dep. 299; Jennings Dep. 271.)  Plaintiff was responsible for providing her own transportation and she was not reimbursed for her mileage.  (Hovanski Dep. 270.)  However, she was told by Jennings that she would be reimbursed for some of her trips between Alabama and Utah because they were business trips.  (Hovanski Dep. 368.)

Plaintiff was treated as a non-employee for benefits and tax purposes. Plaintiff received an IRS Form 1099 from AIL reporting her income for 2001

and 2002.  (Hovanski Dep. 301-303, Exhibits 8 and 9 thereto.)  Plaintiff never disputed the fact that she was classified as a non-employee for tax purposes. (Hovanski Dep. 302-303.)    On her own tax returns, Plaintiff listed the compensation she received via AIL as non-employee compensation and further testified that everything on the tax return was true and correct.  (Hovanski Dep. 303-305, Exhibit 10 thereto.)   Plaintiff is not aware of anyone making unemployment compensation insurance payments for her while she was working as a PR Rep.  (Hovanski Dep. 299.)  Jennings did not pay worker's compensation insurance for either PR Reps or agents.  (Jennings Dep. 273)  An agent or PR Rep whose production met certain guidelines may qualify to be reimbursed for a portion of the cost of their health insurance.  (Jennings Dep. 273.)  However, the agent or PR Rep must obtain their own insurance, and half of the cost of the reimbursement amount is charged to the SGA.  (Jennings Dep. 273.)  As SGA, Jennings did not keep track of vacation and individuals in his agency did not need approval to take vacation.  (Jennings Dep. 273-274.) After her termination, Plaintiff applied for unemployment benefits, which she did not receive because of her 1099 status.  (Hovanski Dep. 298.)

**Claims of Sexual Harassment**

Plaintiff claims that she was subjected to "constant touching" while working in the Alabama and Utah SGA offices. (Hovanski Dep. 41.) By "constant," Plaintiff means many times a week. (Hovanski Dep. 44, 74.) Plaintiff accuses Allan Jennings, Marcellus Adams, Bronson Zolik, and Gary Clark of unlawful or harassing conduct. (Hovanski Dep. 43-50, 64, 67-69.) The alleged sexual harassment began in Plaintiff's initial interview when Adams stroked her knee and told her that she would "fit in great." (Hovanski Dep. 41-42.) Thereafter, Plaintiff claims that there was a constant demeaning of women. (Hovanski Dep. 43-44, Hovanski Dep. II 33-37.) Plaintiff claims that women were referred to as "sluts, hoes, [and] bitches." (Hovanski Dep. 42, 75, Hovanski Dep. II 26-28.) She alleges that "awful jokes" were told. (Hovanski Dep. 44.) While she worked in Utah, the male insurance agents made comments that Mormon women need to be in the house making breakfast and having babies. (Hovanski Dep. 42- 43.) Plaintiff contends that people rubbed her shoulders and hugged her. (Hovanski Dep. 42.) However, Plaintiff admits Allan Jennings hugged both men and women. (Hovanski Dep. 18, 20-21.) The alleged harassment involving Zolik and Jennings began in Utah and

continued when Plaintiff moved to Alabama to continue working with them. (Hovanski Dep. 50, 59.)

Plaintiff testified that she was sure that she had rubbed people's shoulders at work, but the only person whose shoulders she could recall rubbing was Nathan Hammond.  (Hovanski Dep. 195-196.)  Plaintiff asked Zolik to rub her feet on one occasion.  (Hovanski Dep. II at 57-58.)  She also discussed a part of a woman's sexual anatomy at work.  (Hovanski Dep. 56-57. Plaintiff contends that when she was in Alabama, there were comments made about her husband being back in Utah, implying that she needed to "get someone" while in Alabama.  When she returned to Alabama from trips home to Utah, suggestive comments were made about her coming back in a good mood.  (Hovanski Dep. 62-63.)  On one occassion, Zolik expressed that he was tired of his comments to Plaintiff Hovanski being seen as sexual harassment. (Hovanski Suppl. Decl. ¶23.)  He then grabbed Plaintiff Hovanski and kissed her on the lips.  (Id.)  Thereafter, he stated, "this is sexual harassment!"  As Plaintiff Hovanski began to flush, Zolik snickered and said to the the other men, "see, she even liked it."  (Id.)

In Alabama, at a time when Plaintiff provided her own computer in the

office, she claims that Jennings and Zolik used it to view pornographic web sites. (Hovanski Dep. 86-87.) Plaintiff did not actually see them viewing the web sites, but they are the ones she saw using her computer. (Hovanski Dep. 89.) In response to discovering that her computer had been used to view pornography, Plaintiff locked her keyboard in a cupboard when she left the office. (Hovanski Dep. 164.) Upon finding the keyboard locked up, Plaintiff testified that Emily Jennings called her repeatedly and instructed her to come to the office immediately or she would be fired. (Hovanski Dep. 164.) Plaintiff alleges that she complained to Jennings, Denise Bowyer and, on one occasion, Lee Ann Jackson, about this alleged harassment. (Hovanski Dep. 63.) As to her complaints to Jennings, Plaintiff reported being kissed by Zolik, the offensive language used with regard to women, and the hugging and shoulder rubbing. (Hovanski Dep. 65-67.) Plaintiff claims she complained to Bowyer numerous times about Jennings and the offensiveness in the office. (Hovanski Dep. 70-71.) Plaintiff also claims that she told Bowyer that she had told Jennings about these issues and he had done nothing about them. (Hovanski Dep. 70-71.) On the one occasion Plaintiff claims she complained to Lee Ann Jackson, she says she told Jackson about the "problems," the

language, and about being kissed by Zolik.  (Hovanski Dep. 71-72.)  Plaintiff did not complain to Becky Turner of OPEIU until after her termination. (Hovanski Dep. 72.)  Although the alleged harassment made it more difficult for Plaintiff to go into the office, she did not generate fewer leads and considered herself successful through her tenure as a PR Rep.  (Hovanski Dep. II 139-144.)

**Other Discrimination Claims**

In addition to a harassment claim, Plaintiff has also made a claim of gender discrimination.  (Hovanski Dep. 36-40.)  She bases this claim on the fact that, when she was PR Manager in Utah, before coming to Alabama, she was told to hire new PR Reps and was told that the maximum draw was $600 per month.  (Hovanski Dep. 37.)  Plaintiff later discovered that a male PR Rep she hired received a $750 per month draw.   (Hovanski Dep. 37-38, Hovanski Dep. II at 117-118.)  However, when Plaintiff moved to Alabama, she, too, received a $750 draw.  (Hovanski Dep. 37-38, Hovanski Dep. II 117-118.) Schouten is the only PR Rep who Plaintiff claims received a larger draw than she did.  (Hovanski Dep. 38- 39.)   Plaintiff also claims it was gender discrimination that, when she moved to Alabama, she was not compensated for

her move. (Hovanski Dep. 38.) She claims that this was discriminatory because Zolik and Hammond were compensated for their moves. (Hovanski Dep. 38.) However, Hammond and Zolik were both agents and had contracts directly with AIL. (Hovanski Dep. 39-40; Gamble Dep. 14-15.) Moreover, both received advances against future commissions and were required to pay the advances back. Gamble Supplemental Aff. at ¶9.

**Retaliation**

_____Plaintiff's retaliation claim is based upon her termination, which she claims occurred shortly after she informed Jennings that she had filed a "formal complaint" based upon the conduct in the office. (Hovanski Dep. 79-81.) She also claims that she was retaliated against by being given bad job references after her termination. (Hovanski Dep. 81-83, 85.) Potential employers Blue Cross Blue Shield, MedQuest, and the Country Loft told Plaintiff that she had been given bad references, but not by whom. (Hovanski Dep. 83-84;Hovanski Dep. 91– 92.) No one ever told Plaintiff that the bad reference came from AIL, REA Agency, or the Jenningses. (Hovanski Dep. 91-92.)

**Plaintiff's Contract Claims**

Plaintiff testified that she is suing AIL because of an alleged breach of

contract.  (Hovanski Dep. 24.)  The only written contract of which Plaintiff is aware is her Public Relations Contract.  (Hovanski Dep. 25.)  Plaintiff identified her only written contract as the one page PR Contract signed by her and by Bill Jennings.  (Hovanski Dep. 224, 305-306, Exhibit 11 thereto.) Plaintiff also claims that she had an implied contract that she would be paid as a manager.  (Hovanski Dep. 25-27.)  Plaintiff admits that she was being paid as a manager while she was working, but stated the problems occurred after her termination.  (Hovanski Dep. 27-28).

**Plaintiff's Other State Law Claims**

_____Plaintiff's invasion of privacy claim is based upon the conduct of Jennings, Zolik, and Adams.  (Hovanski Dep. 91-92.)  In addition to the conduct which also comprises her harassment claim, Plaintiff also claims that Adams invaded her privacy by obtaining unauthorized access to her financial information.  (Hovanski Dep. 91-92.)  Plaintiff's assault and battery claim is based upon the conduct of Jennings, Adams, and Zolik.  (Hovanski Dep. 92-93.)  Adams allegedly stroked her knee, rubbed her shoulders, and hugged her. (Hovanski Dep. 93.)  Zolik allegedly kissed her, hugged her, and rubbed her shoulders.  (Hovanski Dep. 93, 94.)  Jennings allegedly hugged her and

grabbed her shoulders when she was sitting in a chair.  (Hovanski Dep. 93-94.)

Plaintiff was not bruised or injured as a result of this touching.  (Hovanski Dep.

II 21.)  Plaintiff described herself as feeling hesitant, rather than scared of

these men.  (Hovanski Dep. 94.).  However, on one occasion Plaintiff believed

that Adams was going to hit her.  (Hovanski Dep. 94-95.)

Plaintiff's conversion claim is based upon her allegation that she was

entitled to certain manager overrides on groups signed by PR Reps who

worked under her supervision and that she was no longer receiving these

overrides after her termination.  (Hovanski Dep. 107-108, 114-115, 120-123.)

She also claims that credit was given to other PR Reps for lead cards returned

on groups that she signed.  (Hovanski Dep. 123-126.)  The conversion claim

against AIL is based upon money she claims is owed to her.  (Hovanski Dep.

122, 130.)    However, Plaintiff is unable to identify with particularity the

money which is due her.  (Hovanski Dep. 130, Hovanski Dep. II 61- 62.)

These payment problems occurred after Plaintiff's termination.  (Hovanski

Dep. 132, 348-349.)  Additionally, Plaintiff bases her conversion claim on a

check made out to her that was deposited by Adams into his account, for which

she received a replacement check, and another check she believes was sent to

Jennings, in Alabama, which she claims she has not received. (Hovanski Dep. 137-138, 140-141.) Plaintiff's conspiracy to convert money claim is based upon these same events. (Hovanski Dep. 142.) Finally, Plaintiff's defamation claim is based upon the alleged bad job reference she received from Alabama. (Hovanski Dep. 142-143.) Plaintiff cannot specifically articulate the nature of the "bad references," nor can she even attribute them to any of the Defendants. (Hovanski Dep. 91-92.)

**Sexual Harassment Policy**

AIL has a policy prohibiting sexual harassment which it distributes to its employees. (Gamble Dep. 95.) The policy is posted on AIL's website and on its bulletin board. Id. Pursuant to AIL's policy, AIL employees may contact AIL's Director of Human Resources to make a complaint of sexual harassment. (Gamble Dep. 105.) Further, AIL provides training to its employees on the policy, which includes requiring them to watch videos regarding harassment and sign acknowledgements periodically regarding their training on the policy. (Gamble Dep. 95.) Since the people working in SGA offices are not considered employees of AIL, AIL does not provide this same sexual harassment policy or training to those offices. (Gamble Dep. 95-97.)

Therefore, AIL neither provides a sexual harassment policy nor sexual harassment training to its approximately 2300 alleged independent contractors who work in agencies across the country that only sell American Income Life products. (Gamble Dep. 95.) In addition, AIL does not provide any sexual harassment training to the SGAs that operate these agencies, including Jennings. (Gamble Dep. 9; Jennings Dep. 49; 82.)

**Plaintiff's Termination**

On October 29, 2002, Plaintiff was getting ready for a trip back to Utah to visit her husband. (Hovanski Dep. 166-167, 168.) Allan Jennings came into her office and began discussing the possibility of her staying in Utah and told her that he would arrange for her to work with Marcellus Adams. (Hovanski Dep. 168.) Jennings further told her that her production had been falling, her attitude had been bad, and she could stay in Utah. (Hovanski Dep. 168.) Plaintiff and Jennings continued to talk and Plaintiff raised the issue that she had complained to him about a number of things about which he had done nothing. (Hovanski Dep. 169.) Plaintiff then told Jennings that she had filed a formal complaint, and they were interrupted. Id. The "formal complaint" filed by Plaintiff was her EEOC charge filed on October 31, 2002. (Hovanski

Dep. 318-319, Exhibit 19 thereto.)   After her conversation with Jennings, Plaintiff went to speak with Emily Jennings. (Hovanski Dep. 169-170.) Emily Jennings asked Plaintiff if she had been tape recording conversations. (Hovanski Dep. 170.)  Plaintiff did not respond directly, nor did she deny having done so.  (Hovanski Dep. 170.)  In response, Plaintiff claims Emily Jennings fired her and told her she would see no money from the company. (Hovanski Dep. 170-171, 320, Hovanski Dep.  II 88-89.)  On November 1, 2002, Allan Jennings sent Plaintiff a letter giving her thirty days notice of the termination of her PR Contract.  (Jennings Dep. 94; 175-176.)  AIL did not receive a copy of the letter terminating Plaintiff's contract until after it was sent.  (Gamble Dep. 53, Exhibit 9 thereto.)  Jennings also determined that, as of Plaintiff's termination, she would no longer receive manager overrides on groups signed after her termination.   (Jennings Dep. 146-147, 161-167.) Plaintiff made a written complaint alleging sexual harassment, but not until approximately November 25, 2002.  (Hovanski Dep. 10-11, 241-243, Exhibit 3 thereto.)  This complaint was sent to Becky Turner of OPEIU.  (Hovanski Dep. 10-11, 241-243.)  Plaintiff also filed an amended charge of discrimination with the EEOC after her termination.  (Hovanski Dep. 319-320, Exhibit 20

thereto.) Both charges were dismissed by the EEOC, on January 13, 2003, for lack of jurisdiction, "failure to establish employee/employer relationship under Title VII." (Hovanski Dep. 321-322, Exhibit 21 thereto.) Plaintiff filed her original complaint with this Court on April 10, 2003. See Complaint.

## IV. Applicable Substantive Law and Analysis

Plaintiff Hovanski alleges Title VII and state law claims against Defendant AIL. Defendant AIL asserts that Plaintiff Hovanski's Title VII claims are meritless because she was an independent contractor and not an employee of AIL. The protection against discrimination that is afforded by Title VII is extended only to the employment relationship and is not afforded to independent contractors. Cobb v. Sun Papers, Inc., 673 F.2d 337-340 (11th Cir. 1982). See also Lockett v. Allstate Insurance Co., 364 F.Supp.2d 1368 (M.D. Ga. 2005) (citing Spirides v. Reinhardt, 613 F.2d 826, 829 (D.C.Cir. 1979) (independent contractors are not covered by Title VII). Before the Court can address Plaintiff Hovanski's Title VII claims, the Court must determine whether Plaintiff Hovanski was an employee or an independent contractor of Defendant AIL.

Title VII defines "employee" as "an individual employed by an employer." 42 U.S.C. §2000e(f). An "employer" is defined as a "person ...

who has fifteen or more employees" during a specified period of time. 42 U.S.C. §2000e(b). This circular definition leaves the term "employee" essentially undefined insofar as an employee is to be distinguished from an independent contractor. However, to decide whether Plaintiff was an employee or independent contractor, the Eleventh Circuit has adopted a hybrid economic realities test. Cobb, 673 F.2d 337-340-1 (11th Cir. 1982); see also Lockett v. Allstate Insurance Co., 364 F.Supp.2d 1368 (M.D. Ga 2005) (stating the Eleventh Circuit has adopted a hybrid economic realities test); Cuddleback v. Fla. Bd. of Educ., 381 F.3d 230, 1234 (11th Cir. 2004) (stating "this circuit has adopted the 'economic realities' test to determine whether a Title VII plaintiff is an employee"). This test looks "at the economic realities of the situation," but "the focus of the inquiry is the employer's right to control the 'means and manner' of the worker's performance." Oestman v. Nat'l Farmers Union Ins. Co., 958 F.2d 303, 305 (10th Cir. 1992) (quoting Spirides, 613 F.2d at 831). In addition, the hybrid test considers common-law agency principles: (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the employer or the individual in question furnishes the equipment used and the place of work; (4)

the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated, i.e., by one or both parties; with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the employer; (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays Social Security taxes; and (11) the intention of the parties. Cobb, 673 F.2d at 340. The Court will first consider the common law principles, then Defendant's control over Plaintiff, and finally view the economic realities of the situation in light of the first two inquiries.

1. *Common Law Principles*

Upon applying the common law principles to the case at hand, the Court finds that Plaintiff is likely an independent contractor. Plaintiff contracted directly with the SGA as a PR Rep in order to generate leads for the SGA's agents to sell insurance policies. Although Plaintiff provides public relations services, Plaintiff is licensed to sell insurance. It is disputed whether Plaintiff was supervised by Denise Bowyer. However, at the summary judgment stage all facts and inferences must be viewed in the light most favorable to the Plaintiff. Based on the first factor and all inferences in favor of Plaintiff

Hovanski, Plaintiff is an employee.   As a public relations professional, Plaintiff's position did not require any great industry-specific skill.  Plaintiff did not have any experience as a PR Rep before working with the SGA and Defendant AIL.  Therefore, the second factor points towards Plaintiff's status as an employee and not an independent contractor.  See Stewart v. Midani, 525 F.Supp. 843, 849 (N.D. Ga 1981) ("The  more skilled the employee, the more likely he is an independent contractor.")  As for the third factor,  the tools and equipment used by Plaintiff primarily came from her SGA, Bill or Allan Jennings, and not Defendant AIL.  Plaintiff worked in an office paid for by the SGA and not the Defendant.  The furniture in the office, including the fax, copier, and telephone, was also provided by the SGA.  When public relations mailings went out, the SGA paid for the copying service and postage on those mailings.  Even though Defendant AIL provided group insurance application forms, form lead letters, and other literature related to its products, the SGA and/or Plaintiff were responsible for providing the office space, equipment, and products to maintain the agency.  Therefore, the third factor indicates that Plaintiff was not an employee of Defendant AIL.

The duration of the work relationship with Plaintiff and AIL was short-term.  Plaintiff signed her PR contract with Bill Jennings in May 2001 and was

given notice of her termination by Allan Jennings on November 1, 2002. However, unlike typical independent contractor relationships, the public relations contract signed by Plaintiff Hovanski does not set forth a length of time for Plaintiff Hovanski to complete her job.  This factor is not valuable in the analysis of Plaintiff's employment status because she was terminated and the contract does not provide much insight as to the duration of her position. As to the fifth factor, Plaintiff was paid by commission.  Plaintiff Hovanski was paid for each lead card which was returned by the groups she signed.  As a manager, Plaintiff also received a manger override on groups signed by PR Reps under her supervision.  Overall, Plaintiff's compensation was determined by her productivity, which indicates, by the fifth factor, that she is likely an independent contractor.  See Sica v. Equitable Life Assurance Soc'y of the U.S., 756 F.Supp. 539, 542 (S.D. Fla. 1990) ("Sica's method of compensation was by commission, as opposed to on a salary basis–a further indication of his status as an independent contractor."); John Cooper Produce, Inc. v. Paxton Nat'l Ins. Co., 774 F.2d 433 (11th Cir. 1985) (per curiam) (inferring independent contractor status from payment by commission).  Further, Plaintiff Hovanski was treated as a non-employee for tax purposes.  The payments made to Plaintiff were reported to the IRS on a Form 1099 rather than on a W-2 for

2001 and 2002.  As for termination, the sixth factor, there is no evidence of a public relations contract  between Plaintiff and Defendant AIL.  However, the public relations contract between Plaintiff and the SGA gives either Plaintiff or the SGA authority to terminate the agreement.  Therefore, the agreement gives the SGA, an independent contractor of AIL,  no greater authority to fire Plaintiff than Plaintiff has ability to resign.  Although there is no agreement between Defendant AIL and Plaintiff Hovanski as to termination rights, Plaintiff Hovanski asserts that the SGA consulted with Defendant AIL regarding Plaintiff's termination.  Since all facts and inferences at the summary judgment stage must be viewed in the light most favorable to the Plaintiff, the sixth factor will be viewed as indicating that Plaintiff was an employee.  Factor seven indicates an independent contractor relationship because Plaintiff does not receive paid sick leave, paid vacation time, or any sort of annual leave from her relationship with Defendant AIL.  In fact, Jennings, the SGA, did not keep track of vacation and Plaintiff Hovanski did not need approval to take vacation.  Similarly, factor nine evidences an independent contractor relationship as Defendant AIL did not provide retirement benefits and health insurance to Plaintiff.  Factor ten also indicates an independent contractor relationship.  Plaintiff was treated as a non-employee for benefits and tax purposes.  She

received an IRS Form 1099 from AIL reporting her income for 2001 and 2002. There is also no evidence of Defendant AIL paying social security taxes or unemployment insurance for Plaintiff.[18]  Compare McKenzie v. Davenport-Harris Funeral Home, 834 F.2d 930, 934 (11th Cir. 1987) (stating that deduction of social security, federal and state taxes from McKenzie's commission checks indicated that "she was regarded as a saleswoman, and not merely as an independent contractor").  The eighth factor is instructive as to the employment relationship between the parties.  Plaintiff Hovanski's duties as a PR Rep to contact unions, credit unions, or similar organizations in order to generate insurance leads for the insurance agents is central to Defendant's business. Therefore, the eighth factor weighs in favor of Plaintiff being an employee. See Weary, 377 F.3d at 528 (noting that individual is likely employee when work is regular part of hiring party's business).

The eleventh factor requires the Court to consider the intention of the parties.  There is no evidence of a public relations  agreement directly between Defendant AIL and Plaintiff Hovanski.  However, the public relations contract

---

[18] Although PR Reps were required to obtain their own health insurance, an agent or PR Rep who met certain production criteria was reimbursed for a portion of the cost of his or her health insurance.  The agents and PR Reps may also qualify, based upon production, for group term life insurance coverage.  Plaintiff received AIL life insurance.

entered into by and between the SGA and Plaintiff Hovanski indicates that the PR Rep should not represent or imply that she is an employee or officer of the agency or of AIL. The contract further states that the PR Rep will not be treated as an employee with respect to services performed under the contract for federal and tax purposes. Further, the collective bargaining agreement[19] between Defendant AIL and OPEIU defines the relationship between Defendant AIL and the agents and PR Reps as an independent contractor relationship. Plaintiff contends that she had a basis for believing that she entered into an employer-employee relationship with Defendant AIL because (1) Bowyer told her to tell the organizations she met with that she was an employee of AIL; (2) Bowyer trained Plaintiff Hovanski and she had daily contact with employees of AIL in Waco, Texas; (3) AIL had to approve all of the documentation that she sent to obtain leads; (4) AIL provided Plaintiff with business cards and letterhead stating that she was the Director of Public Relations for AIL; (5) Plaintiff did not have to execute a new public relations contract when she transferred from Utah to Alabama and (6) she was honored for her first year anniversary as a PR Rep for AIL and congratulated for her

[19] Plaintiff joined OPEIU and authorized the union to be her exclusive collective bargaining agent.

decision to begin a career with AIL.  Even though Plaintiff has presented facts and evidence that AIL represented to her that she was an employee of AIL, it is clear from the public relations contract and the collective bargaining agreement that at the time the agreements were entered into Plaintiff was designated as an independent contractor.  As the terms of the agreement establish the parties' intentions, it is apparent that the Defendant AIL intended for Plaintiff to operate as an independent contractor.  Lockett v. Allstate Insurance Co., 364 F.Supp.2d 1368 (M.D. Ga 2005); see also Bates v. Variable Annuity Life Ins. Co., 200 F.Supp.2d 1375, 1379 (N.D. Ga. 2002) (looking to terms of contract to find insurance agent independent contractor for purposes of ADEA); Gordon v. Birmingham News, No. CV89-PT-0436-S, 1989 WL 222730 (N.D. Ala. June 27, 1989) (looking at applicable paragraph of contract for clear intention of parties).

In sum, the totality of the common law agency principles indicate that Plaintiff is an independent contractor.

2.    *Right to Control*

An alleged employer's control over an individual is a vital factor in determining whether a person is an employer or an independent contractor. When "an employer has the right to control and direct the work of an

individual, not only as to the result to be achieved, but also as to the details by which that result is achieved, an employer/employee relationship is likely to exist." Cobb, 673 F.2d at 340. As noted above, there is no evidence of a public relations contract between Defendant AIL and Plaintiff Hovanski. However, the public relations contract entered between Plaintiff Hovanski and the SGA indicates that Plaintiff Hovanski was allowed to devote such effort and hours to the work as she chose and was not required to work in any particular manner. Therefore, Plaintiff Hovanski was free to set her own work hours and schedule. The only restriction on when Plaintiff was required to work involved weekly meetings called by the SGA and not Defendant AIL. The Defendant AIL provided Plaintiff Hovanski with group insurance application forms, form lead letters, and other literature related to its products. Defendant AIL also provided Plaintiff Hovanski with resources to find organizations to contact in order to obtain group insurance. The SGA was responsible for providing the office space, equipment, and products to maintain the agency. Even though Plaintiff was required to use the product forms and promotional materials provided by Defendant AIL, this requirement does not intrude onto Plaintiff's ability to control her business day. See Lockett, 364 F.Supp.2d at 1377. Further, the fact that Defendant AIL had to approve all group insurance applications derived

by Plaintiff Hovanski before policies were issued does not indicate control by Defendant AIL sufficient to deem Plaintiff Hovanski an employee of AIL. See Alberty-Velez v. Corporacion de Puerto Rico Para La Difusion Publica, 361 F.3d 1, 8 n. 8 (1st Cir. 2004) (A company may require that it provide prior approval before an independent contractor takes action or associates with an entity that could reflect poorly on the company.) This requirement does not intrude on Plaintiff's ability to conduct daily business. It is apparent from the record that Defendant AIL does not have the right to control the time, manner, and method of executing the work of Plaintiff Hovanski. Therefore, the Court finds that Defendant AIL does not have sufficient control over Plaintiff to find her Defendant's employee.

3. *Economic Realities*

The Eleventh Circuit has adopted a hybrid approach, which adheres to the common-law test with a consideration of the economic realities of the hired party's relationship with the hiring party. Daughtrey v. Honeywell, Inc., 3 F.3d 1488, 1488 (11th Cir. 1993). Financial interdependence is a factor that is considered when determining whether an individual is an employee or independent contractor. See N.L.R.B. v. O'Hare-Midway Limousine Serv., 924 F.2d 692, 695 (7th Cir. 1991). Under the traditional economic realities test, "an

individual is an employee if economically dependent on the business to which he or she renders service." Daughtrey, 3 F.3d at 1495. Under the hybrid test, the Court looks at the economic reality of the situation, but "the focus of the inquiry is the employer's right to control the 'means and manner' of the worker's performance." Oestman, 958 F.2d at 305 (quoting Spirides, 613 F.2d at 831).

Since the Court has determined that Defendant AIL does not control the means and manner by which Plaintiff Hovanski conducts her business, the Court reviews the economic realities of the situation. Plaintiff was paid by commission for her public relations services. Plaintiff Hovanski was paid for each lead card which was returned by the groups she signed. As a manager, Plaintiff also received a manager override on groups signed by PR Reps under her supervision. Overall, Plaintiff's compensation was determined by her productivity, which indicates, that she is likely an independent contractor. See Sica, 756 F.Supp. at 542 (S.D. Fla. 1990); see also John Cooper Produce, Inc. V. Paxton Nat'l Ins. Co., 774 F.2d 433 (11th Cir. 1985) (per curiam) (inferring independent contractor status from payment by commission). Further, Plaintiff Hovanski was treated as a non-employee for tax purposes. The payments made to Plaintiff were reported to the IRS on a Form 1099 rather than on a W-2 for

2001 and 2002. Additionally, there is no evidence of Defendant AIL paying social security taxes or unemployment insurance for Plaintiff. While Plaintiff Hovanski does rely on Defendant to pay her commission, Plaintiff is not economically dependent on Defendant AIL as she must rely on her own abilities in obtaining leads to generate her income and is responsible for her own financial well-being.

Upon review of the hybrid test set forth by the Eleventh Circuit which adheres to the common-law test with a consideration of the economic realities of the hired party's relationship with the hiring party, the Court finds that Plaintiff Hovanski is an independent contractor.

**A. Discrimination Claims**

Since Plaintiff is an independent contractor, she is not protected by Title VII and her federal discrimination claims fail as a matter of law. Title VII only applies to employees and does not apply to independent contractors. Cobb, 673 F.2d at 337-340. Accordingly, the Defendant's motion for summary judgment as to Plaintiff Hovanski's federal discrimination claims is due to be granted.

**B. State Law Claims**

In addition to the federal discrimination claims, Plaintiff has alleged several state law claims in her complaint. Plaintiff's state law claims are

invasion of privacy (Count IV), assault and battery (Count V), outrage (Count VI), negligent and/or wanton hiring, retention, training, and supervision (Count VII), breach of duty of fair representation[20] (Count VIII), breach of contract (Count IX), breach of implied contract (Count X), conversion (Count XI), civil conspiracy (Count XII), and defamation (Count XIII).  Defendant moved for summary judgment on all of Plaintiff's state law claims against it.  Plaintiff Hovanski did not oppose  the Defendant's motion for summary judgment on any of  her state law claims in her brief in opposition to Defendant AIL's motion for summary judgment.

In opposing a motion for summary judgment, "a party may not rely on [her] pleadings to avoid judgment against [her]."  Ryan v. Int'l Union of Operating Eng'rs, Local 675, 794 F.2d 641, 643 (11th Cir. 1986).  There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.  Blue Cross & Blue Shield v. Weitz, 913 F.2d 1544, 1550 (11th Cir. 1990).  Rather, the onus

---

[20] Plaintiff's claim of breach of duty of fair representation was against Office and Professional Employees International Union Local 277.  Therefore, Plaintiff's claim of breach of duty of fair representation was dismissed on September 23, 2005 when Plaintiff and Office and Professional Employees International Union Local 277 stipulated to the dismissal with prejudice of all claims and causes of actions filed by Plaintiff Hovanski against Office and Professional Employees International Union Local 277.

is upon the parties to formulate arguments; grounds alleged in the complaint, but not relied upon in summary judgment are deemed abandoned. Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp., 10 F.3d 1563, 1568 (11th Cir. 1994) (citing Lazzara v. Howard A. Esser, Inc., 802 F.2d 260, 269 (7th Cir. 1986)), cert denied, ---U.S.---, 115 S.Ct. 189, 130 L.Ed.2d 122 (1994). Accordingly, the Court finds that the Plaintiff has abandoned her state law claims against Defendant AIL. Therefore, Defendant's motion for summary judgment as to Plaintiff Hovanski's state law claims is due to be granted.

## V. Conclusion

For the reasons set forth above, the Defendant's motion for summary judgment is due to be **GRANTED** as to all of Plaintiff's claims. This opinion shall be carried out by a separate Order.

**DONE** and **ORDERED** this 11th day of January, 2006.

**VIRGINIA EMERSON HOPKINS**
**United States District Judge**